1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3    Case No. 11-cr-00302-CMA

4   _____

5   UNITED STATES OF AMERICA,

6       Plaintiff,

7   vs.

8   SAM JAHANI,

9       Defendant.

10  _____

11       Proceedings before MICHAEL J. WATANABE, United

12  States Magistrate Judge, United States District Court for

13  the District of Colorado, commencing at 10:30 a.m., November

14  8, 2011, in the United States Courthouse, Denver, Colorado.

15  _____

16       WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18  _____

19               APPEARANCES

20       JAIME PENA and MICHELLE HELDMYER, Assistant United

21  States Attorneys, appearing for the government.

22       STEPHEN PETERS and TODD MAIR, Attorneys at Law,

23  appearing for the defendant.

24  _____

25            BOND REVOCATION HEARING

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5              THE CLERK: All rise.  Court is in session.

 6              THE COURT: You may be seated.

 7              The Court calls 2011-cr-00302-CMA, United States

 8    of America versus Sam Jahani.  Counsel on behalf of the

 9    government if you'd enter your appearance, please.

10              MS. HELDMYER: Yes, Your Honor, Michelle Heldmyer

11    on behalf of the government.

12              THE COURT: Thank you.

13              MR. PENA: Jaime Pena also on behalf of the

14    government.

15              THE COURT: Thank you.

16              Counsel on behalf of defendant.

17              MR. PETERS: Good morning, Your Honor, Steve Peters

18    with defendant Jahani who's present in court.

19              THE COURT: Thank you.

20              MR. MAIR: Todd Mair also for (inaudible - not at

21    microphone).

22              THE COURT: Thank you.

23              The matter is before the Court for hearing on the

24    United States' Motion for Hearing to Review or Revoke

25    Conditions of Release Set by -- Set for Defendant Jahani,
```

1    which is Docket No. 41.  I don't believe the defendant has

2    filed a response to this, is that correct, Mr. Peters?

3              MR. PETERS: Actually, I believe it's Docket 49.

4    If I might just have a moment.

5              THE COURT: Well, just a moment.

6              MR. PETERS: Pardon me, Document 44.  In the motion

7    to continue the originally set hearing we note at paragraphs

8    2 and 3 our position opposing the motion.

9              THE COURT: All right.  That was not handed to me

10   since I had not previously handled the case, but...

11             MR. PETERS: Let me grab you a hard copy.  If I may

12   approach?

13             THE COURT: Yes, that would be fine.

14             Thank you.

15             MR. PETERS: Your Honor, I was (inaudible - not at

16   microphone).

17             THE COURT: All right.

18             MR. PETERS: It was actually filed while I was out

19   of town.

20             THE COURT: All right.

21             MR. PETERS: Is the reason it was --

22             THE COURT: Give me just a moment.

23             MR. PETERS: Of course.

24             THE COURT: All right.  I reviewed the pertinent

25   paragraphs as cited by Mr. Peters on Docket No. 44 which

1    relates to the motion to continue the hearing that had

2    previously been granted by Judge Rice, I believe, that's

3    what -- where we were in the case, so I'll consider that.

4            Is the government ready to proceed on the motion?

5            MS. HELDMYER: We are, Your Honor.

6            THE COURT: Mr. Peters, ready to proceed?

7            MR. PETERS: We are.

8            THE COURT: All right.  Is either side requesting

9    an order for sequestration of witnesses?  Ms. Heldmyer?

10           MS. HELDMYER: No, Your Honor.

11           THE COURT: Mr. Peters?

12           MR. PETERS: We do.

13           THE COURT: All right.  The Court will enter an

14   order for sequestration pursuant to Federal Rule of Evidence

15   615.  May I ask -- I don't believe Mr. Lozow will be a

16   witness for anyone, is that correct?

17           MR.  LOZOW:  I  hope  not  (inaudible  -  not  at

18   microphone).

19           THE COURT: Okay.

20           MR. PETERS: He wouldn't be my first choice.

21           THE COURT: All right.  So it looks like all the

22   witnesses now that may be called to this hearing have been

23   sequestered by the Court pursuant to Federal Rule of

24   Evidence 615.

25           The  government  may  call  their  first  witness,

 1    please.

 2              MS. HELDMYER: Your Honor, I know that Court has

 3    familiarized itself with the government's motion.

 4              THE COURT: Yes.

 5              MS. HELDMYER: As you can probably tell, some of

 6    that information actually -- and actually the entire matter

 7    was initiated by the United States Attorneys, specifically

 8    myself.  I would like to offer information by way of proffer

 9    if the Court would accept a proffer from me with regard to

10    what I personally know about this event.

11              THE COURT: Well, no, call your witness.

12              MS. HELDMYER: Yes, Your Honor.

13              THE COURT: Who's your witness?

14              MS. HELDMYER: Okay.  May I then begin first,

15    however, by asking the Court to take judicial notice of bond

16    conditions that have been filed in this case that should be

17    part of the record, Pretrial Services reports, and the

18    indictment in this case.

19              THE COURT: I'll take judicial notice of the court

20    file under Federal Rule of Evidence 201, as well as the bond

21    and the current conditions that are on the bond, yes.

22              MS. HELDMYER: Thank you, Your Honor.

23              THE COURT: Mr. Pena?

24              MR. PENA: Your Honor, if I may proceed.  Ms.

25    Heldmyer obviously is a potential witness in this case and

1   now that the rule has been invoked, the government would

2   call Ms. Michelle Heldmyer as its first witness.

3          THE COURT: Come forward, Ms. Heldmyer.  Kindly

4   raise your right hand, please.

5        MICHELLE HELDMYER, GOVERNMENT WITNESS, SWORN

6          THE COURT: Please be seated in the witness chair.

7   Kindly keep your voice up so the Court, counsel, and parties

8   can hear you.

9          THE WITNESS: Yes, Your Honor.

10          THE COURT: And if you would state your full name,

11   please, and spell your last name for the record.

12          THE WITNESS: Michelle McCain Heldmyer, spelled

13   H-E-L-D-M-Y-E-R.

14          THE COURT: You may proceed, Mr. Pena.

15          MR. PENA: Your Honor, prior to proceeding may I

16   approach the witness and the Court with its proposed

17   exhibits?

18          THE COURT: Yes.

19          MR. PENA: Thank you.

20          THE COURT: Have you provided a copy to Mr. Peters?

21          MR. PENA: Yes, Your Honor.

22          THE COURT: All right.  Thank you.

23          MR. PENA: Your Honor, has the Court taken judicial

24   notice of the documents in its file, including the Pretrial

25   Services reports and prior bond conditions?

```
 1                    THE COURT: Yes, sir.

 2                    MR. PENA: Thank you, Your Honor.

 3                    May I proceed now?

 4                    THE COURT: Yes, sir.

 5                         DIRECT EXAMINATION

 6      BY MR. PENA:

 7      Q    Ms. Heldmyer, what is it you do for a living?

 8      A    I'm an Assistant United States Attorney for the

 9      District of Colorado.

10      Q    How long have you been an Assistant United States

11      Attorney?

12      A    For approximately 24 years.

13      Q    Okay.  During the time you were an AUSA, or Assistant

14      United States Attorney, did there come a time when you were

15      involved in an investigation and a prosecution involving a

16      Dr. Sam Jahani?

17      A    Yes.

18      Q    Is that individual in the courtroom at this time?

19      A    He is.

20      Q    Could you please point to him.

21      A    He's the middle gentleman sitting with the gray suit

22      sitting next to counsel, in between counsel at counsel

23      table.

24      Q    Okay.  And that would be defense counsel table, is that

25      correct?
```

1    A    Defense counsel table, yes, sir.

2    Q    All right.  And during the course of that investigation

3    did there come a time where Mr. Jahani was taken into

4    custody pursuant to an indictment being issued?

5    A    That's correct.

6    Q    Do you know where that custody -- initial custody took

7    place?

8    A    At his office in Texas, it was a -- if I'm not

9    mistaken, it was suburb of or around Beaumont, Texas, and he

10   had his initial appearance in Beaumont.

11   Q    Was he subsequently placed under conditions of

12   supervision pending trial?

13   A    He was.

14   Q    Where did that initial order take place, or where did

15   that get issued from?

16   A    In Beaumont, Texas.

17   Q    And what were some of the conditions with regards to

18   the issues that we're before this Court on?

19   A    There were standards conditions, and in addition to the

20   standards conditions we had requested and obtained some

21   special conditions, one of which was condition -- my copy is

22   hard to read, I'm sorry.  It's J, it's in -- I think 8(j) is

23   the number of the condition which indicates that he is to

24   avoid all contact directly or indirectly with any person who

25   is or may become a victim or potential witness in the

1   investigation or prosecution, including but not limited to

2   former employees of Urgent Care, Inc., or former patients of

3   Urgent Care, Inc.

4   Q    Okay.  And did there come a time when you came to know

5   that it was a possibility that Dr. Jahani had violated that

6   condition?

7   A    Yes.

8   Q    When did that happen and how did that occur?

9   A    On September 16th of this year I received a phone call

10  from Donna Summers, who is our victim witness coordinator

11  here in the Denver office, my office is located in Grand

12  Junction, Colorado, and Ms. Summers indicated to me that she

13  had just gotten off the phone with a Carolyn Gale.  Carolyn

14  Gale was a physician's assistant who worked with Dr. Jahani

15  during the crucial time as indicated in the indictment, and

16  she worked in the Delta and I believe some in the Montrose

17  offices of Urgent Care.

18        Ms. Summers told me that I needed to call and talk

19  with Carolyn Gale because Carolyn Gale had told her that Dr.

20  Jahani was trying to get a hold of her and she didn't know

21  how to handle the situation.

22  Q    Did you reach out to Carolyn Gale to find out what was

23  going on?

24  A    I did.

25  Q    What did she indicate to you?

1   A    She told me that she had received a message via

2   Facebook, which is a social internet media, and she

3   apparently has a Facebook page, that she had received a

4   message from someone named Ann Miranda.  She used to work

5   with Ann Miranda at a place called Youth With A Big Mission

6   that's located in Cimarron, Colorado.  She indicated that

7   Ann had told her that Dr. Jahani was trying to get a hold of

8   her and that Ann had indicated that she would forward Dr.

9   Jahani's request on to Carolyn Gale.

10           Carolyn said that she did in fact receive that

11  information via Facebook from Ann Miranda, and that she

12  received the name of Dr. Jahani and a telephone number where

13  she was supposed to return Dr. Jahani's call.

14  Q    Okay.  Ms. Heldmyer, in front of you you have what's

15  been marked as Government's Exhibit No. 1.  What is that?

16  A    This is a copy of an e-mail that Ms. Carolyn Gale had

17  actually sent to Steve Peters' office, but it includes the

18  information to which she had referred, specifically

19  information that she has received from Ann Miranda at Youth

20  With A Big Mission, where she used to work, indicating that

21  Dr. Jahani was trying to get a hold of her.

22  Q    All right.  Now, it's a very short communication

23  starting with:  Hey, Carol.  Could you please read it into

24  the record.

25  A    Yes.  It says:  Ann Miranda.  Hey, Carol, Dr. Sam

1    Jahani called the base yesterday and asked for you.  He said

2    he needed to talk to you about a patient you saw and I told

3    him I would you send you a message and give you his number.

4    It's is 970-209-3787.  I hope you and Tim and the kids are

5    doing well.  Take care, Ann.

6    Q    Now, within the communication there's a contact phone

7    number.   Were you able to follow up on that to make a

8    determination as to who that phone number belonged to?

9    A    I was.

10   Q    Okay.  And what did you find out?

11   A    During the course of our investigation we had issued an

12   administrative subpoena for phone records to a phone company

13   called  Cellco  Partnership,  doing  business  as  Verizon

14   Wireless, we did that through DEA administrative subpoena,

15   and that indicated that the number that I had just read off

16   of this e-mail was in fact a cell phone number assigned to

17   Dr. Sam Jahani.

18   Q    Could you please take a look at what's been marked as

19   Government's Exhibit No. 2 in front of you.

20   A    Yes, sir.

21   Q    What is that?

22   A    That is a copy of the administrative subpoena and --

23   for that telephone number, the telephone number appears in

24   the middle of the second page of this exhibit at the very

25   bottom of the middle paragraph, and then it also includes

1      the first page of the response that was obtained via the

2      subpoena that indicates that the number 970-209-3787 is

3      assigned -- at the time of the subpoena was assigned to Dr.

4      Sam Jahani as of 3-16-07.

5              MR. PENA: Your Honor, the government would move to

6      admit Government Exhibits Nos. 1 and 2 into evidence.

7              THE COURT: Any objection, Mr. Peters?

8              MR. PETERS: Sorry, Your Honor, didn't mean to talk

9      over you.

10              No objection as to 1 or 2.

11              THE COURT: All right.  Government Exhibits 1 and

12      2 will be admitted into evidence for purposes of this

13      hearing.

14              You may continue, Mr. Pena.

15              MR. PENA: Thank you, Your Honor.

16      Q    (By Mr. Pena) Ms. Heldmyer, in furtherance of your

17      inquiry into this issue, did you contact Pretrial Services

18      officers in either Beaumont or Houston?

19      A    I did.

20      Q    Okay.  Who did you make contact with?

21      A    I made contact with an Andrew Flores, who indicated --

22      the office indicated was assigned to Dr. Sam Jahani as a

23      Pretrial Services officer out of the Houston area.

24      Q    Okay.  And what did you discuss with him?

25      A    I contacted him immediately after I had gotten the

1    telephone call with Ms. Gale and I discussed with him what

2    Ms. Gale had told me, that Dr. Jahani was trying to make

3    contact with her.  My purpose was to determine a couple of

4    things.   Number one, whether or not Mr. Flores had gone

5    through the conditions of bond with Dr. Jahani prior to this

6    event happening, and also, of course, to report to the

7    Pretrial Services officer what I knew since I felt that it

8    was important that he know that this contact had taken

9    place.

10   Q    Did Mr. Flores indicate whether he indeed had gone over

11   the conditions of bond with Dr. Jahani?

12   A    He did, and he indicated that he did, and he indicated

13   that he had done so on a particular date of August 15th of

14   2011.   He had -- he told me that he was referring to his

15   notes at the time and verified that he did that during an

16   office visit on that date.

17   Q    And when you communicated to him your concerns

18   regarding the contact with witnesses violation, what did

19   Mr. Flores indicate to you in response?

20   A    Yes, Mr. Flores indicated to me when I mentioned the

21   name Carol Gale that he had heard that name before.  He told

22   me that it was one of the names during one of the -- as a

23   matter of fact, the first house visit that he had made with

24   Dr. Jahani that that was a name that Dr. Jahani and his

25   wife, Christine, who was also present during this

1    conversation, indicated to him was one of the people that
2    had tried to ruin his life, and he was paraphrasing, so I do
3    not know the exact quote.
4    Q    Did you, in terms of furthering the inquiry, contact a
5    Jason Sawyer?
6    A    I did.
7    Q    Who was Jason Sawyer?
8    A    Jason Sawyer is a detective with the Grand Junction
9    Police Department, he's also part of the Western Colorado
10   Drug Task Force.  He is a TFO there in Grand Junction.
11   Q    Why did you contact him?
12   A    He's one of the investigators and one of the few local
13   investigators that I have working on this matter with me.
14   Q    Okay.  Did you give him any specific instructions?
15   A    I did.
16   Q    What were they?
17   A    I asked him if he would try to make contact with Ann
18   Miranda at Youth With A Big Mission to see if he could
19   verify  this  information  to  see  whether  or  not  the
20   information I was receiving from Ms. Gale was true.
21   Q    Do you know whether he indeed made contact with Ms.
22   Miranda?
23   A    He did make contact with Ms. Miranda.
24   Q    If you could just tell me the approximate date, if you
25   recall.

```
1    A    I'm afraid I don't have that date.  It's on a -- it's
2    on a report that's sitting on my desk, but I don't have it
3    memorized, I'm sorry.
4              MR. PENA: That's fine.
5              Your Honor, at this time I'll pass the witness.
6              THE COURT: Cross-examination, Mr. Peters?
7              MR. PETERS: Thank you, Your Honor.
8                        CROSS-EXAMINATION
9    BY MR. PETERS:
10   Q    Is it correct, Ms. Heldmyer, that the information that
11   you're pursuing today is information that you learned in the
12   inception on about September 16th, 2011?
13   A    The information that I received from Carolyn Gale, I
14   initially received that information on or about September
15   16th, that's correct.  I believe that is the exact date.
16   Q    And you filed a motion to revoke my client's bond on
17   about September 28, is that right?
18   A    Yes, sir.
19   Q    And during the 12 days that intervened, did you feel
20   like you had gathered all the facts that would be necessary
21   to make a good faith allegation that there had been a bond
22   violation as you've alleged?
23   A    I attempted to contact or make -- or have contact made
24   to everyone that I felt had relevant information before I
25   filed the motion.
```

1     Q    And who did that include?

2     A    That included Carolyn Gale and Ann Miranda and Andrew

3    Flores.

4     Q    Did you ever ask for any information from the defense

5    as to --

6     A    I --

7     Q    Pardon me.  As to our position on what had occurred?

8     A    I did not.

9     Q    All right.  Now, before we get started then, let me

10   just clarify.  In the 50 or so days that have intervened

11   since September 28th, 2011, are you aware of any other bond

12   violations that you contend my client has committed?

13    A    I am not aware of any.

14    Q    Do you feel like you've had that entire period so that

15   you would be aware of such?  You've been working on the

16   case?

17    A    Well, I've been working on the case.  I wouldn't say

18   I would necessarily know if there'd been a bond violation,

19   that would be up to the probation office.

20    Q    Well, I'll withdraw that, I don't mean to be

21   argumentative.

22          You're not here to tell us about any other

23   alleged bond violation than this one episode involving what

24   you contend is an improper outreach to Carol Gale, is

25   that right?

1    A    That is correct.

2    Q    All right.  And so we're not here about anything else?

3    A    No.

4    Q    Now, you mentioned that you learned initially  --

5    strike that.

6         The initial information you learned was from

7    someone named Donna Summers.

8    A    Correct.

9    Q    And you're telling the Court that Carol Gale made a

10   call to your victim witness coordinator for the purpose of

11   reporting this contact from Mr. Jahani, is that what you're

12   saying?

13   A    No.

14   Q    In fact, she called Donna Summers to plan her

15   appearance before the federal grand jury as requested by the

16   Justice Department, isn't that why she called?

17   A    I'm not free to talk about any matters involving the

18   grand jury.

19   Q    Well, what can you tell the Court?  You're aware, for

20   example, that Carol Gale told me that she came down here and

21   testified before the grand jury.

22   A    That may be, but I'm not at liberty to talk about the

23   grand jury.

24   Q    All right.  Who -- let's try it this way.  Who

25   coordinates the grand jury testimony in the District of

1    Colorado?  When you subpoena a witness, how -- in this case

2    one from Alaska, right?

3    A    Correct, Ms. Gale lives in Alaska.

4    Q    I'm sorry?

5    A    I said correct --

6         THE COURT: Mr. Peters, I'm going to need you to be

7    a little bit closer to the microphone --

8         MR. PETERS: My apologies.

9         THE COURT: -- only because --

10        MR. PETERS: My apologies.

11        THE COURT: -- this Court is using electronic means

12   to record the hearing, I do not have a court reporter, so

13   I'll ask you to try to stay close to the microphone if you

14   would, please.

15        MR. PETERS: I will, and I apologize again to the

16   Court.

17   Q    (By Mr. Peters) Who plans grand jury appearances for

18   witnesses traveling from outside of Colorado to appear

19   before the federal grand jury in Denver?

20   A    If you're talking about travel only we're talking about

21   our victim witness coordinators of which we have two.

22   Q    And is one of those Donna Summers?

23   A    Correct.

24   Q    Are you contending that the only purpose of Carol Gale

25   calling Donna Summers is to report this alleged contact from

1    Dr. Jahani?

2    A    No.

3    Q    So without getting into any details, do you concede

4    that the primary purpose was a different purpose, she was

5    calling for some other reason on the 16th of September?

6    A    There was another reason, another topic of

7    conversation.  Her purpose for calling I couldn't testify

8    to, but there was another topic of conversation between the

9    two of them.

10   Q    And this came up, this allegation about Dr. Jahani came

11   up at the end of the call about that?

12   A    I don't know.

13   Q    You don't know one way or another?

14   A    No.

15   Q    Now, so you immediately then contacted Carol Gale?

16   A    I did.

17   Q    And, of course, she lives in Alaska.

18   A    She does.

19   Q    Now, and so we're clear, on September 18th, 2011, can

20   you point to any discovery that you had provided in the

21   defense in this case that would have disclosed Carol Gale as

22   a government witness?

23   A    On September 18th?

24   Q    2011.

25   A    All right.  Well, my call was on September 16th, but

1    this was very early in the process and discovery had not

2    been -- well, some discovery had been provided at that

3    point.

4    Q    Right.  In fact, some discovery had been provided, as

5    I understand it, initially by your office to ours on the 9th

6    of September, correct?

7    A    I don't know that I can verify the date with the

8    documents I have in front of me right now.

9    Q    Would it be about that date?

10   A    I don't know that I can argue with you one way or

11   another unless I have the documents in front of me.

12   Q    Well, I'm not looking to argue with you, I'm just

13   trying to gain some common ground.  Do you dispute, AUSA

14   Heldmyer, as the lead prosecutor in this case and the one

15   responsible for producing the discovery, that your initial

16   discovery was produced to us on approximately the 9th day of

17   September, give or take a few days?

18           If you don't remember, then I guess --

19   A    I honestly do not remember what dates without having my

20   documents in front of me.

21   Q    Then let me ask my question again.  Can you point to

22   any discovery that you would have provided to the defendants

23   prior to this September 16th date?

24   A    Yes.

25   Q    That would have identified Carol Gale as a government

 1    witness?   Any statement, any transcript, any interview,

 2    anything whatsoever?

 3    A    Well, "anything whatsoever" is very broad.  I had

 4    provided to you the names of the patients who had died and

 5    were charged in the indictment as death patients.  At least

 6    one of those patients had been treated by Carol Gale at one

 7    point in time or another.  I also had provided I think

 8    probably two disks by then with Medicare and Medicaid

 9    records on them which probably would have contained Carolyn

10    Gale's information as a provider for whom Dr. Jahani's

11    office billed Medicaid and Medicare.

12    Q    Coming back to my question again.  Any interview with

13    Carol Gale that you can point to --

14    A    No.

15    Q    -- (inaudible) not.  Any summary of what her testimony

16    might (inaudible - not at microphone)?

17    A    No.

18    Q    Any transcript?

19    A    No.

20    Q    All right.  And no witness list has been provided.

21    That is to say at this stage of the case as of September 16

22    that you had not provided a list to the defense of any

23    witnesses that you would intend to call at the trial of this

24    matter, correct?

25    A    Correct.

1    Q    So what you're referring to is that you had provided

2    some patient records which identified Carol Gale as having

3    treated one of the individuals noted in the (inaudible - not

4    at microphone).

5    A    Well, at least one of them, probably more given that

6    we had provided Medicare and Medicaid records by then.

7    Q    And she had treated one of the individuals who

8    apparently had died?

9    A    Correct.

10   Q    It's your theory of prosecution that our client was

11   responsible for that, correct?

12   A    For what?

13   Q    For his death.

14   A    Yes.

15   Q    All right.  And would you agree with me that the

16   patient  records  that  (inaudible - not  at  microphone)

17   disclosed  that  Carol  Gale  was  last  person  to  treat  this

18   individual?

19   A    For this death patient?

20   Q    Yes.

21          MR. PETERS: Sorry, Your Honor.

22          THE COURT: Thank you.

23   A    Carol Gale was the last -- the last prescriber of

24   medication to this patient before he died.

25   Q    (By Mr. Peters) All right.  And would you agree with me

1    that on your theory of prosecution it would make it logical

2    for the defense attorneys in this case to want to interview

3    Carol Gale, particularly since we had no statement at that

4    time?

5    A    I would --

6    Q    As to what -- pardon me -- as to what she might say?

7    A    I wouldn't presume to know what the defense would want

8    to do and not want to do.

9    Q    So from your perspective, just to ask again and without

10   asking for any presumption, because that wasn't my question,

11   would it be reasonable in your view, without indulging your

12   personal presumption, for a defense attorney defending Count

13   24 in this case, which alleges a fatality, would it be

14   reasonable for a defense attorney to want to interview this

15   Carol Gale about that particular allegation?

16   A    Yes.

17   Q    All right.  And in your view would it be reasonable

18   for the defense attorney attempting to locate the witness?

19   Would it be reasonable for that attorney to attempt to have

20   his client provide any contact information that might be

21   available?

22   A    I'm not qualified to answer that question, I don't know

23   what the defense attorney would think would be a reasonable

24   role for his client who's under restrictions and bond to

25   reach out and try to contact witnesses, that's just -- I

1   wouldn't think that would be reasonable, but that wouldn't

2   be up to me.

3   Q    Well, can you point the Court to any discovery that you

4   had provided as of September 16, 2011, that would have

5   disclosed Carol Gale's contact information or address?

6   A    Probably not.

7   Q    So an attorney wanting to interview Carol Gale would

8   have to locate the information outside the body of discovery

9   that you had provided at that time, is that correct?

10  A    At that time probably, that's correct.

11  Q    Now, do you -- just to lay a few things away.  Having

12  thoroughly investigated this matter, you're not contending

13  that my client ever spoke to Carol Gale, are you?

14  A    That is correct, she did not return his phone call.

15  Q    Pardon me, I'm just asking you whether he ever spoke

16  to you, is that a yes or a no?

17  A    Whether Dr. Jahani ever spoke to me?

18  Q    Do you have any evidence in prosecuting this bond

19  violation that my client ever spoke to Carol Gale?

20  A    No.

21  Q    Do you have any evidence based on your very thorough

22  investigation that my client ever telephoned Carol Gale?

23  A    Directly?

24  Q    I'll ask the question again.

25  A    Please do.

1   Q    Do you have any evidence that my client telephoned,

2   placed a telephone call to Carol Gale?

3   A    Yes.

4   Q    Placed a telephone call, what is that evidence?

5   A    That is when he called Youth With A Big Mission,

6   because that's were he thought she was working --

7   Q    Pardon me --

8   A    -- and placed a phone call --

9        MR. PETERS: Your Honor, I'm sorry, I'm sorry,

10  maybe -- I'll withdraw the question and reask it one more

11  time.

12       THE COURT: You may.  Go ahead.

13  Q    (By Mr. Peters) Do you have any evidence that my client

14  placed a telephone call to Carol Gale in Alaska?

15  A    In Alaska, no.

16  Q    Do you have any evidence that he placed any telephone

17  call to her residence?

18  A    In Alaska?

19  Q    Isn't that where she lives?

20  A    It is where she lives.

21  Q    Then yes.

22  A    No.

23  Q    Do you have any evidence that he ever telephoned her at

24  work?

25  A    Yes.

1    Q    That he telephoned her at work?

2    A    Where he thought she was working, yes.

3    Q    To speak to her?

4    A    Yes.

5    Q    And what is that evidence?

6    A    That he called Cimarron, Colorado, Youth With A Big

7    Mission because he thought that's where she was working, and

8    he asked to talk to her.

9    Q    Well, isn't it true that she had left his employ

10   several years ago?

11   A    She had.

12   Q    And --

13   A    Well, let me take that back.  I don't know when she

14   left the employment.  I know she did, but the "several years

15   ago" I can't address.

16   Q    Well, did you interview her before you brought the

17   indictment in this case?

18        Did you ever -- you've been working on the case

19   for over two years, right?  You executed search warrants in

20   October of 2009?

21   A    Yes.

22   Q    All right, did you ever interview Carol Gale in

23   connection with your activity in 2009?

24   A    No.

25   Q    She was already gone and had moved to Alaska, correct?

1    A    I didn't know that.

2    Q    All right.  And so on what evidence do you suggest that

3    Mr. Jahani thought she would be working in Cimarron,

4    Colorado, in September of 2011 if she had already moved to

5    Alaska?

6    A    Because that's where she went and she started working

7    for Youth With A Big Mission after Dr. Jahani -- she left

8    Dr. Jahani's employ, that's where she went to work.

9    Q    Well, let me see if I can ask the question a different

10   way.  Has Investigator Sawyer, who's outside, or any of the

11   other investigators inquired of Dr. Jahani as to where he

12   thinks or thought Carol Gale was living at any time?

13   A    We're not permitted to talk to Dr. Jahani, he's

14   represented by counsel.

15   Q    Well, is the answer no?

16   A    The answer would be no.

17   Q    All right.  So you have no evidence whatsoever that my

18   client believed he was calling Carol Gale's residence when

19   he called Cimarron, Colorado, do you?

20   A    That's not correct.

21   Q    Well, you would agree with me, wouldn't you, that it

22   would be an appropriate defense function for me to try to

23   interview Carol Gale, wouldn't you?

24          MR. PENA:  Objection, Your Honor, it calls for

25   speculation.

1          THE COURT: Sustained.  Next question, Mr. Peters.

2     Q    (By Mr. Peters) Well, do you object to our interviewing

3     these witnesses?

4     A    For you personally to interview witnesses?  No, I have

5     no objection to that.

6     Q    Well, then why did you tell Carol Gale to call the

7     government if I tried to reach her?

8     A    I didn't.

9     Q    Did one of your agents do so?

10    A    No.

11    Q    Do you dispute that she believes you made that request?

12    A    I made a request, I did not tell her to do anything.

13    Q    So you requested that she should contact the

14    government, namely yourselves or the agents assisting you,

15    if I reached out to her?

16    A    I asked her if she wouldn't mind if she got a contact

17    from you that she let me know that she spoke with you.

18    Q    Why did you do that?

19    A    Why did I do that?

20    Q    Yes.

21    A    Because I wanted to know whether or not she was

22    interviewed by you so that I would know whether you were

23    creating impeachment information about her.

24    Q    In other words, you wanted to know what questions I

25    asked her and what answers she gave?

1    A    No.

2    Q    Well, you certainly wanted to be aware of what I was

3    doing.

4    A    No, not necessarily.

5    Q    Developing impeachment information, for example?

6    A    I wanted to know if you were contacting her and whether

7    you were able to get a hold of her so that you would know

8    what was going on here and whether -- and so that I would

9    know what she told you, so that I could be prepared -- if

10   she was going to be a witness -- so that I could be prepared

11   because I didn't think that I was going to be getting a

12   report on you from what she was going to tell you.

13   Q    So you -- let me cut through that, I just want to

14   establish -- you agree that it's not a violation of my

15   client's bond for me to contact witnesses in this case?

16   A    That's correct.

17   Q    Now, you did interview Carol about my conversation with

18   her, didn't you?

19   A    About what conversation with her?

20   Q    The conversation I had with her last week on Monday

21   night.

22            MR. PENA: Your Honor, if I may object.  This is

23   going far outside the scope of this hearing.

24            THE COURT: How is this relevant, Mr. Peters?

25            MR. PETERS: It's relevant to whether there's been

1   a violation of the bond or any intimidation or contact or

2   coercion of this witness.

3          THE COURT: Your contact?  You're not on bond.

4   Sustained.

5          MR. PETERS: Yes, but it's -- the witness is -- the

6   witness is, I guess, the alleged victim of this crime, I

7   think I should be allowed to develop some testimony about

8   what's really occurred here.

9          THE COURT: Well, let me make sure I'm clear with

10  your argument.  Are you speaking of this witness that's on

11  the witness stand, or are you speaking of Carol Gale?

12         MR. PETERS: Carol Gale, who is implicated --

13         THE COURT: Give me your offer of proof in this

14  line of inquiry, because this seems to be a little bit

15  outside the scope of the hearing --

16         MR. PETERS: I'd be happy to.

17         THE COURT: -- that's before the Court.

18         MR. PETERS: I'd be happy to.

19         THE COURT: Go ahead.

20         MR. PETERS: If I could have one moment.

21         THE COURT: Yes, sir.

22         MR. PETERS: My offer of proof would be that if

23  allowed to proceed, since Ms. Gale's not being called and I

24  can't bring her to Colorado on the subpoena, at least not

25  without being appointed under the Criminal Justice Act to do

1    so, my offer of proof would be that counsel has learned that
2    Carol Gale lives in Alaska and that she did not contact the
3    United States Attorney's Office on September 16, 2011, to
4    tell them Dr. Jahani was attempting to contact me.

5         Further, my offer of proof would be that I was
6    called -- she was calling, as directed by the government, to
7    speak to victim witness coordinator Donna Summers regarding
8    a grand jury subpoena she had received and to discuss travel
9    arrangements for her appearance for the grand jury in
10   Colorado.

11        Further, my offer of proof would be that Ms.
12   Heldmyer learned that during these conversations with Ms.
13   Summers I was asked if it was okay for me to speak to Dr.
14   Jahani and mentioned a Facebook message that I had received
15   from a former co-worker, Ann Miranda, in which she stated
16   that Dr. Jahani had called and asked her about me.

17        Further, my offer of proof would be that after
18   that conversation with Ms. Summers, Ms. Gale received a call
19   from Assistant U.S. Attorney Michelle Heldmyer, who stated
20   that Dr. Jahani had violated the terms of his bond by
21   attempting to contact me.

22        Further, my offer of proof would be that Ms.
23   Heldmyer's learned about an e-mail provided by Dr. Jahani's
24   son, Joshua, on approximately September 18 of 2011, and that
25   that e-mail was in response to an e-mail from Ms. Gale,

1       which is Exhibit A to my proffer, and that Ms. Heldmyer
2       explored this e-mail with Carol Gale on the phone.  Carol
3       Gale being the author.  Josh:  I wonder how you are doing.
4       I have recently been pulled into your father's nightmare.
5       I am praying for him and only have good feelings towards him
6       and your family.  I know he cannot contact me, but I want
7       all of you to know that I am not your enemy and I am praying
8       for God's wisdom on (inaudible - not at microphone).  God
9       woke me up with a dream the day of the raids and had me
10      praying for your dad and his marriage and your family before
11      I ever knew anything was happening.  I am sorry that you are
12      all going through this.  I wish I could call and talk to
13      your dad.  I'd be happy to talk to you or his lawyer, if
14      that is legal, without getting him or me into anymore
15      trouble.

16             Further, my proffer would be that this e-mail was
17      provided to the prosecutor, that she's aware of the content
18      of it, and that she's aware that there was a four-hour
19      interview here in Denver on October 3rd at the government's
20      expense.  You know, I'm requesting discovery of that
21      interview, I don't have it.

22             Further, my proffer would be that Ms. Gale would
23      confirm that she was never contacted by Dr. Jahani and had
24      not communicated with Dr. Jahani in any way since becoming
25      aware of these legal proceedings.

1        Finally, it would be my proffer, with regard to

2   what Ms. Heldmyer has learned, that at no time during these

3   events did Ms. Gale feel in any way coerced, intimated, or

4   influenced by the knowledge that Dr. Jahani inquired about

5   me, which (inaudible - not at microphone).  I would expect

6   that if Ms. Heldmyer has debriefed Ms. Gale on the entire

7   conversation I had with her one week ago Monday evening,

8   that we discussed Ms. Heldmyer's suggestion to the witness

9   that Dr. Jahani had made a statement about trying to -- or

10  that his life was being (inaudible - not at microphone).

11  Specifically, rhetorically, Ms. Heldmyer would ask, it would

12  be my proffer, why would Dr. Jahani suggest that you ruined

13  his life, and that Gale couldn't think of any answer to

14  that.

15       It would further be my proffer that I discussed

16  that with the witness on -- eight days ago, last Monday

17  night, whether that had even occurred, and that I explained

18  to Ms. Gale that this statement was made in relation to a

19  completely different individual named Tonya Creel, and that

20  Ms. Heldmyer's aware of all that, and the Court will here

21  more about that as the testimony proceeds today.

22       But --

23       THE COURT: The objection by the government is

24  overruled based upon the proffer.

25       MR. PENA: Your Honor, as to the rest of the

1    proffer, the many facets of it, the government continues

2    with its objection.  Just -- just hear me out, Your Honor.

3            The alleged violation took place on or about the

4    14th of September.  All of the things that Mr. Peters is

5    talking about subsequent to October is really totally

6    irrelevant to  whether he attempted to make contact with a

7    witness back in September.  All of these conversations and

8    things that he proffered are frankly --

9            THE COURT: Just a moment.

10           Mr. Peters, the time frame you're speaking of

11   these other events, are they subsequent to roughly September

12   14th through September 16 time frame, 2011?

13           MR. PETERS: They're conversations about events

14   that occurred during that time.

15           THE COURT: Okay.

16           MR. PETERS: And also thereafter in the prosecution

17   of the defense of this motion.

18           THE COURT: All right.  The objection is overruled;

19   however, Mr. Pena, it's without prejudice.  If it gets out

20   of scope here, it needs to be within that time frame, Mr.

21   Peters.

22           MR. PENA: Thank you, Your Honor.

23           THE COURT: All right.  You may continue with your

24   questioning.  If you want to remain there, because I need

25   the microphone in front of you, that's fine.

1    Q    (By Mr. Peters) Did Ms. Gale provide you a declaration

2    that I asked her to review?

3    A    No.

4    Q    Did you ask her to do so?

5    A    No.

6    Q    Did you discuss the conversation we had last Wednesday

7    morning in which she explained to me that she was afraid?

8    A    No.

9    Q    Do you deny that she's afraid as a result of this

10   situation?

11   A    I have no idea whether she's afraid or not.

12   Q    Did you say anything to suggest to her her own

13   wrongdoing?

14   A    Excuse me?

15   Q    Did you say anything to Ms. Gale to suggest that she

16   has wrongdoing in this matter?

17   A    At what time frame?

18   Q    At any time frame.

19   A    No.

20   Q    And certainly within the prosecution of this motion,

21   have you suggested that she's done something wrong?

22   A    No.

23   Q    And I'm asking specifically since September 28, 2011,

24   when you brought this motion to revoke my client's bond,

25   have -- for example, you were with her for about a half day

1    on October 3rd.

2    A    I can't discuss that, Mr. Peters.

3    Q    Well, outside the presence of the grand jury, did you

4    interview Carol Gale for approximately four hours concerning

5    her employment for Dr. Jahani?

6    A    I believe that I cannot answer that question without

7    being in violation of the court rules.

8         THE COURT: You can answer the question yes or no.

9    A    Repeat the question.

10    Q    (By Mr. Peters) Did you interview -- with one or more

11    other federal agents assigned to this case -- Carol Gale in

12    Denver, Colorado, outside the presence of the grand jury on

13    approximately Monday, October 3rd, 2011?

14    A    Yes.

15    Q    And where did that occur?

16         THE WITNESS: Your Honor, I'm very concerned about

17    my obligations as a federal prosecutor.

18         THE COURT: You can answer the question as to

19    location.  Was it here?

20    A    At the U.S. Attorney's Office.

21    Q    (By Mr. Peters) All right.

22         THE COURT: Mr. Peters, we're getting a little

23    close to some problems here, so keep it to the scope of this

24    hearing as relates to this time frame in September between

25    the 14th and 16th primarily is when the alleged violation is

1    suggested in the motion.

2              MR. PETERS: Well, may I just -- may I just fill up

3    my proffer again?  I understand what the Court is --

4              THE COURT: Go ahead.

5              MR. PETERS: -- instructing me to do and to fill up

6    my record.

7              THE COURT: That's fine.

8              MR. PETERS: Until Thursday night, Carol Gale, who

9    told me that she was working today, and I don't have any way

10   to subpoena her here today like the government does, was

11   willing to provide a declaration bearing out the facts set

12   forth in this proffer, and then last Thursday, it would be

13   my proffer that last Thursday after speaking with the

14   prosecutor and/or several of the government agents she

15   didn't want me to call her anymore, didn't want to sign the

16   declaration, and said she was sorry she couldn't help.

17             And so I think all of that is relevant to the

18   motive in bringing this motion, I think it is to interfere

19   with the defense function.  I think it's (inaudible) away,

20   way out of bounds, and I appreciate the Court allowing me to

21   finish the proffer.  I spoke with her three times last week,

22   and I think you have the proffer.  We would like to have her

23   on the stand instead of having the prosecutor tell us what

24   she says and what her concerns are.  There may be a reason

25   for that, but I'll move on, and I appreciate the Court

1    allowing me to finish the proffer.

2            THE COURT: All right, you may continue then with

3    your questioning, please.

4    Q    (By Mr. Peters) Now, then you also interviewed this Ann

5    Miranda.

6    A    I did not personally, no.

7    Q    Okay.  Do you have any knowledge that when Dr. Jahani

8    made the call that you're talking about that he had ever met

9    Ann Miranda before?

10   A    I have no knowledge one way or another.

11   Q    How long was the conversation that you're relying on

12   in bringing this motion?  This telephone conversation to

13   Youth With A Big Mission?

14   A    I don't know.

15   Q    Okay.  Would you dispute that it was no more than two

16   minutes?

17   A    I don't know how long it was.

18   Q    I don't mean to make you angry, I'm simply asking if

19   you would dispute that it was a short call.

20   A    I'm not angry, and I don't know how long the call was.

21   Q    And do you think you know everything about the call?

22   Do you know everything that was asked and everything that

23   was answered?

24   A    What I know about the call appears in the report that

25   we provided to you in discovery.

1    Q    What you know about Ann's version of the call, right?
2    The report is a report of an interview with Ann Miranda,
3    right?
4    A    That's correct.
5    Q    Did Ann tell you she had been reading about this case
6    in the newspaper?
7    A    Ann told me nothing.
8    Q    Did she tell any of the agents working with you that
9    she'd been reading about this case in the newspaper?
10   A    I have no knowledge of that.
11   Q    Did Ann provide any information as to whether she knew
12   Dr. Jahani before this call was placed?
13   A    I have no information about that.
14   Q    Let me ask you, are you aware that Dr. Jahani called
15   the  Alaska  Medical  Board  to  try  to  locate  contact
16   information for Carol Gale?
17   A    No.
18   Q    Do you contend that that would be a violation of his
19   bond?
20        MR.  PENA:  Objection,  Your  Honor,  we're  going
21   outside the scope of what's been charged.
22        THE COURT: Sustained.  Next question.
23   Q    (By Mr. Peters) Are you aware of whether there is
24   publicly available information concerning Carol Gale at the
25   Alaska Medical Board?

```
 1      A    I have no idea.

 2                MR. PETERS: May I have a moment, Your Honor?

 3                THE COURT: Yes, sir.

 4                (Pause in the proceedings.)

 5                MR. PETERS: Nothing further.  Thank you, Your

 6      Honor.

 7                THE COURT: Redirect, Mr. Pena, please.

 8                MR. PENA: No, Your Honor.  May this witness be

 9      excused?

10                THE COURT: Yes.  Ms. Heldmyer, you may step down.

11      I have issued a sequestration order not to discuss your

12      testimony with any other witness.

13                THE WITNESS: Yes, Your Honor.

14                THE COURT: Mr. Pena, you may call your next

15      witness, please.

16                MR. PENA: The United States calls Jason Sawyer.

17                THE COURT: I'll call Mr. Sawyer, please.

18                MS. HELDMYER: May I have one moment with Mr. Pena,

19      Your Honor?

20                THE COURT: Yes.

21                (Pause in the proceedings.)

22                THE COURT: Mr. Sawyer, if you'd come up to the

23      witness chair, please.  Just go into the witness box if you

24      would, please.

25                And please raise your right hand, sir.
```

```
 1                JASON SAWYER, GOVERNMENT WITNESS, SWORN
```
```
 2                THE COURT: Kindly be seated in the witness chair,
```
```
 3      sir.  Please keep your voice up so the Court, counsel, and
```
```
 4      parties can here you, and kindly state your full name,
```
```
 5      spelling your first and last name for the record, please.
```
```
 6                THE WITNESS: My name is Jason Sawyer, J-A-S-O-N,
```
```
 7      S-A-W-Y-E-R.
```
```
 8                THE COURT: You may proceed, Mr. Pena.
```
```
 9                MR. PENA: Thank you, Your Honor.
```
```
10                         DIRECT EXAMINATION
```
```
11      BY MR. PENA:
```
```
12      Q    Mr. Sawyer, how are you employed?
```
```
13      A    I'm currently employed by the City of Grand Junction as
```
```
14      a police officer assigned to the DEA Drug Task Force.
```
```
15      Q    Okay.  Are you what's commonly known as a TFO Officer?
```
```
16      A    Yes.  Yes, sir.
```
```
17      Q    And during the time that you've been a TFO, were you
```
```
18      called upon by Ms. Heldmyer or somebody at the U.S.
```
```
19      Attorney's Office to conduct an interview of a Ms. Miranda?
```
```
20      A    Yes, I was.
```
```
21      Q    Okay.  Can you tell me about the circumstances under
```
```
22      which you were called upon to do that.
```
```
23      A    I was advised that she had been contacted by Mr. Jahani
```
```
24      and asked to -- or -- and through the conversation found out
```
```
25      that he had gotten a hold of her to contact Carolyn Gale.
```

```
 1    Q    All right.  And with that information, did you attempt
 2    to make contact with Ms. Miranda to essentially get her side
 3    of the story?
 4    A    Yes, I did.
 5    Q    And when did that contact take place?
 6    A    I contacted her on September 16th.
 7    Q    Okay.  Of this year?
 8    A    Yes.
 9    Q    Okay.  And can you tell us a little bit about the
10    conversation, what you asked her, what she responded to you
11    was.
12    A    I had asked her if Mr. Jahani had reached out to her
13    and contacted her, she said that he had.  That he had asked
14    her to try and get a hold of Carolyn Gale.  He understood
15    that she couldn't give out Carolyn's personal information,
16    so if she could kind of play mediator for him.  Ms. Miranda
17    she that she would, but then she would -- so what she did
18    was she e-mailed or texted or Facebook'd, I believe.
19    Q    Okay.  And when did this conversation take place
20    relative to when the alleged contact took place between Dr.
21    Jahani and Ms. Miranda?
22    A    Ms. Miranda stated that she had been contacted either
23    on the 12th or 13th, she couldn't remember which.
24    Q    Okay.  And during that conversation, did she indicate
25    whether she had been requested to or directed to make
```

1    contact with anybody?

2    A    She had been asked to get a hold of Carolyn Gale, a

3    former employee of Mr. Jahani.

4    Q    Okay.  And was that a former employee of Mr. Jahani

5    while at Urgent Care?

6    A    Yes, it was.

7    Q    Are you familiar with the investigation in this case?

8    A    Yes, I am.

9    Q    Was Ms. Gale a potential witness for the government in

10   this case?

11   A    Yes, she was.

12   Q    Was she a potential material witness that the

13   government intended to use or may use in the prosecution of

14   this case?

15   A    Yes, she was.

16            MR. PENA: Pass the witness, Your Honor.

17            THE COURT: Cross-examination, Mr. Peters, please.

18                    CROSS-EXAMINATION

19   BY MR. PETERS:

20   Q    How long have you worked on the investigation?

21   A    I've been working on it since the beginning, February

22   2009, I believe.

23   Q    And when was the first time you spoke with Ms. Gale?

24   A    This year.  A few months ago, I can't tell you the

25   exact date.

1    Q    Was it on the date that you called and spoke to her
2    that you've just testified about?
3    A    I haven't -- I've never -- I didn't speak to Ms. Gale
4    in this case.
5    Q    I'm sorry, I'm -- okay, you've never spoken to Ms.
6    Gale.
7    A    I have spoken to Ms. Gale, but I just hadn't spoken to
8    her regarding this.
9    Q    When was the first time you spoke to her?
10   A    I don't know the exact date.  It's been in the last
11   couple of months.
12   Q    Since the indictment was returned?
13   A    Yes.
14   Q    So at no time before the indictment was returned did
15   you interview Carol Gale?
16   A    Not that I can remember, no.
17   Q    Are you aware of anyone else who did?
18   A    I know that one other investigator had reached out to
19   try and interview her, and I don't know if it ever happened
20   or not.
21   Q    Have you seen a report of any such interview?
22   A    No, I have not, sir.
23   Q    Who was that individual?
24   A    That reached out to her?
25   Q    Yes.

1      A      I believe it was Jane Myers (phonetic).

2      Q      And this was all post-indictment?

3      A      I believe so.  Well, I think Jane actually reached out

4      prior to indictment.

5      Q      Unsuccessfully?

6      A      Like I said, I'm not sure.

7      Q      All right.

8      A      I haven't seen any reports.

9      Q      All right.  Well, we haven't either, so...

10             As for the is Facebook message that you testified

11     about.

12     A      Yes, sir.

13     Q      I want to be clear.  You have no information that Sam

14     Jahani even has a Facebook account, do you?

15     A      No, the only -- the only information that I had was

16     that Ann -- or Ms. Miranda had reached out to Carolyn Gale

17     and gave Carolyn Gale through Facebook, or one of those, the

18     information for Mr. Jahani so that she could contact him.

19     Q      And you're not contending that Dr. Jahani was using

20     Facebook at any time during these events?

21     A      Not that I'm aware of, no.

22     Q      Or any of his family or friends?

23     A      Not that I'm aware of regarding this, no.

24     Q      Your investigation did not disclose any prior

25     relationship of any kind between Ann Miranda and Dr. Jahani,

1    did it?

2    A    No.  I have nothing to show that they even knew each

3    other.

4    Q    Right.

5            MR. PETERS: May I have a moment, Your Honor?

6            THE COURT: Yes.

7    Q    (By Mr. Peters) Do you remember (inaudible - not at

8    microphone) the phone call --

9            THE COURT: Mr. Peters, I'm going to need you --

10   I'm sorry, but I need you to get closer to the microphone.

11   I do not have a court reporter in this particular hearing

12   and we need you to be closer to the electronic microphone,

13   please.

14           MR. PETERS: Your Honor, I'm genuinely sorry.  I

15   mean -- and I appreciate you dogging me about it.

16           THE COURT: All right.

17           MR. PETERS: Please keep it up.

18           THE COURT: All right.

19   Q    (By Mr. Peters) There's no recording of this call

20   between Ann Miranda and Sam Jahani?

21   A    No, I've never been provided one.

22   Q    Did you ask?

23   A    I don't recall that I did.  I figured if there was one

24   she would have told me.

25   Q    Right, right.

1          And so there's no rendering of exactly what was

2     said except for what Ann Miranda told you?

3     A    Yes.

4     Q    And what was the date of that call?

5     A    The call that I spoke to Ms. Miranda, or the call

6     between Mr. Jahani and Ms. Miranda?

7     Q    Well, let's -- I was actually -- thank you, I want to

8     talk about both of them.

9          Is it correct that the Facebook message was sent

10    on September 14th?

11    A    That's the date on the copy of it that I have, yes.

12    Q    Consistent with your investigation that the date this

13    Facebook message was sent was September 14th from Ann to

14    Carol?

15    A    What Ann told me, Ms. Miranda told me, was that she was

16    contacted either on the 12th or the 13th by Mr. Jahani.  She

17    then  sent  a  message  to  Ms.  Gale  with  Mr.  Jahani's

18    information, and then I contacted Ms. Miranda on the 16th.

19    Q    All right.  Well, let's sequence that just a little bit

20    Do you have Government Exhibit 1 in front of you?

21    A    I do not know what Government Exhibit 1 is.

22          MR. PETERS: May I approach, Your Honor?

23          THE  COURT: Just  a  moment,  it  should  be  on  the

24    witness --

25          MR.  PENA: Your  Honor,  may  I  approach?   Ms.

1    Heldmyer brought it back.

2         THE COURT: Yes, stick that -- stick those exhibits

3    on the witness stand there.

4    A    Yes, I do have a copy of it.

5    Q    (By Mr. Peters) Okay.  And we talked about September

6    14th as the date this private Facebook message was sent,

7    correct?

8    A    That's what it looks like is September 14th that Ms.

9    Miranda sent a message to Carolyn Gale.

10   Q    The reason for following up, Investigator Sawyer, is do

11   you see that there's a reference to Sam having called

12   yesterday?

13   A    Correct.

14   Q    So it is reasonable based upon what you know that the

15   call that's in question here would have been made on

16   September 13th?

17   A    That's the understanding -- based on all of this stuff,

18   yes.

19   Q    Okay.  And then you interviewed her about it on the

20   16th?

21   A    Yes, sir.

22   Q    Was that at Ms. Heldmyer's instruction then?

23   A    Ms. Heldmyer called me and asked me to call her, yes,

24   and interview her.

25   Q    And she was contending that Dr. Jahani had violated his

1    bond?

2    A    That is correct.

3         MR. PETERS: That's all I have.  Thank you.

4         THE COURT: Redirect, Mr. Pena?

5         MR. PENA: Yes, Your Honor, I have limited

6    redirect.

7                    REDIRECT EXAMINATION

8    BY MR. PENA:

9    Q    With regard to the incident, you, of course, made a

10   report, is that correct?

11   A    That is correct, yes.

12   Q    And do you have that in front of you?

13   A    I do.

14   Q    And with regards to the date of contact that you have

15   recorded in your report, would it be fair to say that in

16   your report you said that the contact between Ms. Miranda

17   and Dr. Jahani, according to Ms. Miranda, occurred on

18   Monday, September 12th, 2001, or Tuesday, September 13th,

19   2001?

20   A    That is correct, yes.

21   Q    And is also consistent with what's been marked as

22   Government's Exhibit No. 1 in front of you where Ann Miranda

23   contacting Carol Gale talks about Dr. Jahani having called

24   her the day before?

25   A    Yes, it does.

1          MR. PENA: Nothing further, Your Honor.

2          THE COURT: Recross on that limited area, Mr.

3     Peters?

4          MR. PETERS: No, Your Honor.

5          THE COURT: All right.  May this witness be

6     excused?  Any objection by the government?

7          MR. PENA: No, Your Honor.

8          THE COURT: Or defendant, Mr. Peters?

9          MR. PETERS: No, Your Honor.

10         THE COURT: All right.  Mr. Sawyer, you're excused

11    with the thanks of the Court.

12         THE WITNESS: Thank you.

13         THE COURT: Please leave those exhibits there, and

14    you're not to discuss your testimony with any other witness

15    since the Court has imposed a sequestration order in this

16    case.

17         THE WITNESS: Yes, sir.

18         THE COURT: You're excused, sir.  Thank you.

19         Mr. Pena, your next witness.

20         MR. PENA: The government rests.

21         THE COURT: The government's rested.

22         Mr. Peters, do you have any witnesses to call?

23         MR. PETERS: Yes, I do.  At this time we call Sam

24    Jahani.

25         THE COURT: Okay.  Mr. Jahani, if you'd come

1      forward, sir.  Just come into the witness stand, sir, and

2      then I'll administer the oath to you at that point.

3                  THE WITNESS: Yes, Your Honor.

4                  THE COURT: Please raise you right hand, sir.

5                  SAM JAHANI, DEFENSE WITNESS, SWORN

6                  THE COURT: Kindly be seated in the witness chair,

7      sir.  Please keep your voice up so the Court, counsel, and

8      parties can hear you.

9                  THE WITNESS: Yes, Your Honor.

10                 THE COURT: And I'll ask you to state your full

11     name, and would you spell your first and last name for the

12     record, please.

13                 THE WITNESS: May name is Sam, S-A-M, last name

14     Jahani, J-A-H-A-N-I.

15                 THE COURT: Thank you.

16                 Mr. Peters, you may proceed, please.

17                         DIRECT EXAMINATION

18     BY MR. PETERS:

19     Q    Dr. Jahani, have you ever testified in federal court

20     before?

21     A    No, sir.

22     Q    Where do you live?

23     A    I live in Conroe, Texas, address **REDACTED **,

24     Conroe, Texas.

25     Q    What do you do for a living?

1    A    I practice medicine.

2    Q    And how are you employed?

3    A    I work -- I have two jobs.  I work at Dr. Padilla's

4    medical clinic in Houston.  Also, I'm medical director of a

5    skin care clinic in Houston, Texas.

6    Q    And, Dr. Jahani, do you recall attending a meeting in

7    Denver on approximately September 12, 2011, in my office?

8    A    Yes, sir, I do.

9    Q    As an outgrowth of that meeting, did I ask you whether

10   you had any contact information for an individual named

11   Carol Gale?

12   A    Yes, sir, you did.

13   Q    And what did you indicate?

14   A    I said I did not have any contact information.

15   Q    Was there any discussion about whether you could obtain

16   it?

17   A    Yeah, I thought that I could easily obtain the contact

18   information for you.

19   Q    And just so we do have a linear record here, September

20   12 was the first day you appeared before Judge Arguello in

21   this case.

22   A    That's correct.

23   Q    And directing to your attention next to September 13th,

24   2011 --

25   A    Yes, sir.

1    Q    -- the following day, did you take any steps that day

2    to try to obtain contact information for Carol Gale?

3    A    Yes, sir, I did.

4    Q    And before you go to that, what did you know about

5    where Carol was living when we were discussing this in my

6    office?

7    A    I knew that Carol when she was working for me was

8    living in Cimarron, Colorado, and after she quit working for

9    me in my office had moved to Alaska.  I had received a call

10   from a physician who was going to employ her, pre-

11   indictment, this was in 2009, and they asked me if -- what

12   kind of work she did, and I told them that she did a great

13   job in my office, and I knew that she had moved away to

14   Alaska.

15   Q    So coming back to September of 2011, where did you

16   expect she was living when you reached out to try to locate

17   this contact information?

18   A    In Alaska.

19   Q    And did you contact anybody in her family for that

20   information?

21   A    No, sir.

22   Q    Now, why did you choose to make the call to this Youth

23   With A Big Mission?

24   A    Because I knew that her and her husband lived there

25   while she was working for me, and I knew that they probably

1    had some forwarding phone number or forwarding address for

2    her.

3    Q    Now, did you recognize the voice of the person who

4    answered the phone?

5    A    No, sir.

6    Q    And to your knowledge, had you ever spoken with that

7    person before?

8    A    No, sir.

9    Q    By the way, is English a first or second language for

10   you?

11   A    Second language.

12   Q    And tell the judge exactly what you recall saying to

13   her when you made the call.

14   A    When the phone rang -- I got the number off the

15   Internet, and when the phone range somebody answered the

16   phone who identified herself as the receptionist, and I

17   asked her -- I told her that I was Dr. Jahani, that Carol

18   Gale had worked for me, and I was wondering if she had any

19   forwarding information or contact phone number for her since

20   she had moved away.

21   Q    What did she say?

22   A    She said she did not have any information but she was

23   going to get the phone number and call me.

24   Q    Did she ask you why you were calling?

25   A    She did, and I told her it was about a patient matter.

1   Q    Was there any other discussion about why you were

2   calling?

3   A    No, sir.

4   Q    Was there any discussion in that telephone call about

5   anybody destroying anybody's life?

6   A    No, sir.

7   Q    Was there any discussion in that telephone call about

8   you wanting to actually speak with Carol yourself?

9   A    No, sir, not at all.

10   Q    And to be clear and fair and balanced here, as they say

11   on Fox, was there any discussion on this call about whether

12   you wanted to have your attorneys?

13   A    No, sir.

14   Q    One way or the other?

15   A    No, sir, I just asked for her phone number.

16   Q    And did you tell her, give her any idea as to what you

17   intended to do with the contact information if she could

18   locate it?

19   A    No, sir, I did not.

20   Q    If I've asked this, I apologize, but what did she

21   indicate she would do?

22   A    She told me that she would get the information and

23   call me.  And I asked her please don't forget, it's

24   important, so she said she would get the information and

25   call me.

1    Q    Did you ever ask her, the caller, this Ann Miranda, to

2    contact Carol Gale?

3    A    No, sir, I did not.

4    Q    You're clear about that?

5    A    I'm positive about that, yes, sir.

6    Q    Is there anything else that you can recall about the

7    conversation that I'm not asking?  This isn't a memory test,

8    Sam, but is there -- let me ask it this way, I withdraw the

9    question.

10         About how long did that call last?

11   A    About two or three minutes.

12   Q    Did you intend for Ann Miranda to contact Carol Gale

13   when you made the call?

14   A    No, sir, I did not.

15   Q    What was your understanding, just to punctuate this.

16   When you terminated the call and hung up, what did you

17   understand Ann was going to do?

18   A    I felt like she was the receptionist, she was going to

19   turn around, either look on her computer system or look in

20   her file record and find the place where she's working in

21   Alaska and call me with the phone number of Carol Gale.

22   Q    Now, do you have Exhibit 1 in front of you still?

23   A    Yes, sir, I do.

24   Q    This Facebook message?

25   A    Yes, sir, I'm looking at it.

1   Q   All right.  And just so we have a record, when was the

2   first time you saw this Facebook message?

3   A   This particular Facebook message, I think I saw it in

4   your office yesterday.

5   Q   Before then?

6   A   No, sir, I have not seen this Facebook message.

7   Q   Did you ever have any conversation with Ann Miranda

8   about what content to use in a Facebook message?

9   A   No, sir, I did not.

10  Q   Did you have any conversation with Ann Miranda about

11  using this Facebook as a vehicle to contact Carol Gale?

12  A   No, sir, I did not.

13  Q   Did you have any idea that she would do so?

14  A   No, sir, I did not.

15  Q   Why did Ann Miranda have your telephone number?

16  A   Because Ann Miranda was going to call me back, as I

17  asked her to please find Carol's number and call me back

18  with that number, and I gave her my number to do so.

19  Q   And what did you intend to do with the contact

20  information if you could locate it?

21  A   Give it to you as we had spoken about.

22  Q   There's been testimony today about your Pretrial

23  Services officer.  What is his name?

24  A   Andrew Flores.

25  Q   It's alleged by the prosecutor in the motion that you

1    made a statement that Carol Gale was destroying your life.

2    You've reviewed that?

3    A    Yes, sir, I saw that.

4    Q    And it's alleged that you made that statement to Mr.

5    Flores.

6    A    It's alleged, yes, sir.  I did not make that statement.

7    Q    Well, let's talk about that.   You've heard the

8    prosecutor talk about a home visit that apparently occurred

9    on about August 15th when she was under oath.   Does that

10    sound about the same day when Mr. Flores came to your home

11    after you were indicted?

12    A    It was in September that he came to my home.

13    Q    All right.  And did you and he have any conversation

14    concerning Tonya Creel?

15    A    Yes, sir, we did.

16    Q    And who is Tonya Creel?

17    A    She was an ex-employee of mine that used to work for

18    me.

19    Q    In fact, is she the same person who bought a

20    whistleblower action against you in this court that was

21    assigned to Magistrate Judge Tafoya for discovery?

22    A    Yes, sir, that's correct.

23    Q    And why was Tonya coming up in this conversation during

24    the home visit?

25    A    He was asking me about my case and what was going on,

1   and I told him that I had an employee that used to work for

2   me that the day she left she told my wife and I that she was

3   going to destroy our lives.

4   Q    "She" being Ms. Creel?

5   A    That's correct.

6   Q    Was that before she brought the whistleblower action?

7   A    No, this was -- yes, that was before the action.  This

8   was when she was fired.

9   Q    So when you were having that conversation, you were

10   referring to a statement she made before you were even

11   indicted?

12   A    Yes, sir.

13   Q    During your conversation with Mr. Flores in the home

14   visit, did you have any conversation concerning Carol Gale?

15   A    None whatsoever, sir.

16   Q    And just so we have this in the record, did you ever at

17   any time tell Mr. Flores that Carol Gale had destroyed your

18   life or was destroying your life?

19   A    No, sir, I did not.

20   Q    Okay.  Now, I'm jumping around a little bit, for which

21   I apologize, but I want to go back to September 13th.

22   A    Yes, sir.

23   Q    And I want to go back to hanging up the phone with this

24   Ann.

25   A    Yes, sir.

```
 1    Q    In fact, did you ever even know her name before --

 2    A    No, sir, I did not.

 3    Q    -- this motion was filed and --

 4    A    No, sir, I didn't.

 5    Q    Okay.  What did you do when you got off the phone on

 6    September 13th after speaking with Ann Miranda?

 7    A    I thought to myself that there may be a better way to

 8    get her -- to get Carol's contact information for you, as we

 9    had spoken about the day before, and after thinking about

10    that I called the Alaska State Medical Board.

11    Q    And you spoke with whoever answered, I take it?

12    A    That's correct.

13    Q    Was your call routed?

14    A    That's correct.

15    Q    And tell us about that conversation --

16    A    I asked --

17    Q    -- with the Alaska Medical Board on September 13.

18    A    I asked them if they had a number for Carol Gale,

19    and she asked me the name and the spelling and she looked it

20    up and she said, yeah, we have a work number for her, and

21    she provided it for me.

22    Q    She provided a work number.

23    A    That's correct.

24    Q    Not a home number.

25    A    That's correct.
```

1    Q    A work number.

2    A    That's right.

3    Q    And what did you do with that information, Dr. Jahani?

4    A    I gave it to you.

5    Q    And how did you do so?

6    A    I called you as soon as I hung up and gave you the

7    phone number.

8    Q    Was this a call on September 13th, 2011?

9    A    Yes, sir.

10   Q    Did you provide a number for Carol Gale, to wit,

11   907-263-3119?

12   A    That's correct.

13   Q    Now, did you ever use that number to contact Ms. Gale?

14   A    I did use the number to make sure that was the clinic

15   that was still open and Carol Gale was working there, but I

16   did not ask to talk to Carol Gale, and as soon as I knew

17   that was the medical clinic that was still operating I hung

18   up the phone and gave you the number, so I did not contact

19   Carol Gale with that number, no, sir.

20   Q    Did all of these events, the call with Ann and then the

21   call with the Alaska Medical Board, did all of that occur on

22   September 13th?

23   A    Yes, sir, it did.

24   Q    Did you speak with Ann again after that time?

25   A    Yes, sir, Ann called me the next day.

1    Q    The next day.

2    A    Yes, sir.

3    Q    So would that be September 14th?

4    A    That's correct.

5    Q    And tell me what was said.

6    A    She said that since you called me yesterday and I

7    promised you I was going to call you back, I wanted to let

8    you know that I'm trying to get Carol's information for you,

9    and I said, look, look, it's okay, you don't have to worry

10   about it, I got it taken care of, thank you so much for your

11   help, because I know she had gone out of her way to find the

12   number, and I hung up.

13   Q    Now, returning your attention to Exhibit 1.

14   A    Yes, sir.

15   Q    Is it your testimony that the second call with Ann

16   where you told her not to do anything else happened on

17   September 14th?

18   A    That's correct.

19   Q    Did she tell you whether or not she had sent a Facebook

20   message to Carol Gale?

21   A    No, sir, she did not.

22   Q    Did she mention a Facebook message in any way, shape,

23   or form?

24   A    No.   She mentioned she was in the process of getting

25   that information for me.   And that's when I stopped her,  I

1    said I got the number, thank you very much.

2    Q    Other than these -- well, how long would you say that

3    call lasted?

4    A    Ten seconds.

5    Q    A short call is what you mean?

6    A    A very short call, yes, sir.

7    Q    Ten seconds make me breath hard just hearing.

8    A    I was laying down when she called, and I wanted to go

9    back to sleep.

10    Q    Okay.  All right.  So both calls were short calls.

11    A    Yes, sir.

12    Q    And did you ever hear from her again?

13    A    No, sir.

14    Q    When was the first time, just to transition a little

15    bit, when was -- how did you learn that AUSA Heldmyer was

16    contending that you violated your bond condition?

17    A    She had called Mr. Mair, Todd Mair at your office and

18    told him that.

19    Q    And was that on approximately September 19th?

20    A    That's right, sir.

21    Q    And as an outgrowth of that, did you call your Pretrial

22    Services officer?

23    A    I asked Todd what's the best course of action, and he

24    said -- I asked should I call Mr. Flores, Andrew Flores, the

25    Pretrial Services officer in Texas, and he said yes.

1    Q    And did you do so?

2    A    Yes, sir, I did.

3    Q    And tell us about that conversation.

4    A    I called Mr. Flores and I said I know you've been

5    contacted by the prosecutor in my case, and I wanted to

6    explain to you what had happened regarding this Carol Gale,

7    and explained to him that by no way or form I was trying to

8    talk to her or get in contact with her, I was trying to find

9    her number.

10    Q    What did he say?

11    A    He said yes, he had been contacted by the -- by

12    Michelle Heldmyer, by Ms. Heldmyer, USA Attorney, and he

13    knew about it but he wasn't going to do anything about it.

14    Q    Why not?

15    A    Because in his opinion no violation had taken place.

16    Q    Did he say anything else about Ms. Heldmyer at that

17    time?

18    A    Well, he said, Dr. Jahani, you have to be careful, you

19    have to be careful because other people are watching you,

20    and the prosecutor is out to get you.

21    Q    Dr. Jahani, do you understand that one of your

22    conditions of release in this case prohibits you from

23    contacting, directly or indirectly.

24    A    Yes, sir, I do, very well.

25    Q    In fact, it uses the language "avoid contact."

1    A    That's correct.

2    Q    With former or current employees of Urgent Care.

3    A    That's correct.

4    Q    Did you take any action in -- withdrawn.

5         Did you do anything in trying to locate Ms. Gale's

6    contact information which you felt was going around or

7    violating the condition of release?

8    A    No, sir, I did not, by any means.

9    Q    Did you do anything that you did to show disrespect

10   to the court in Texas?

11   A    No, sir, not at all.

12   Q    What about to the court in Colorado?

13   A    No, sir, not at all.  I take those things very

14   seriously.

15            MR. PETERS: May I have a moment, Your Honor?

16            THE COURT: Yes, sir.

17            (Pause in the proceedings.)

18            MR. PETERS: That's all I have, Your Honor.

19            THE COURT: Cross-examination, Mr. Pena, please.

20            MR. PENA: Yes, Your Honor.

21                      CROSS-EXAMINATION

22   BY MR. PENA:

23   Q    Dr. Jahani, you referred to one of your lawyers as

24   Todd, is that Mr. Mair sitting here to my right?

25   A    That's correct, sir.

1   Q    And you, of course, know Mr. Peters here, and who else
2   is part of your investigative and defense team?

3              MR. PETERS: Objection, relevance.

4              THE COURT: How's that relevant?

5              MR. PENA: Your Honor, he talked about contacts
6   with his attorney about what should happen with regards to
7   witnesses and making contact with witnesses prior to making
8   contact with Ms. Gale, and he --

9              MR. PETERS: May I reply?

10             THE COURT: You may.

11             MR. PETERS: This invades the defense function, in
12  addition to not being relevant to what we're here about.
13  The prosecutor is not entitled to know everyone on the
14  defense team.

15             THE COURT: Sustained.

16             Next question, Mr. Pena.

17             MR. PENA: All right.  Thank you, Your Honor.

18  Q    (By Mr. Pena) Was there an investigator assigned as
19  part of your team?

20             MR. PETERS: Same objection.

21             THE COURT: He can answer yes or no to the
22  question.

23  A    I don't believe so.

24  Q    (By Mr. Peters) Okay.  So the folks that you dealt
25  with were Mr. Peters and Mr. Mair primarily?

1    A    Yes, sir.

2    Q    All right.  And you said that you guys had a

3    conference, your attorney brought this up, that you had a

4    conference on or about September 12th, correct?

5    A    That's correct.

6    Q    And what directions were you given in order to make

7    contact with these potential witnesses?

8                MR. PETERS: Objection to the question which

9    misstates the evidence that there's any directions given,

10   and the substance of the conversation with counsel is

11   privileged, I object on that basis.

12               THE COURT: As to the form of the question, the

13   objection is sustained.  Rephrase your question, Mr. Pena.

14               MR. PENA: Thank you, Your Honor.

15   Q    (By Mr. Pena) What was your understanding as to your

16   ability to make contact with potential witnesses?

17   A    I was not to make contact with any potential witnesses.

18   Q    You were what?

19   A    I was not to make contact with any employees of Urgent

20   Care, Inc., employees or patients.

21   Q    And was Ms. Gale a former employee of Urgent Care?

22   A    She was an employee at my office, Sam Jahani, DO.

23   Q    And was that associated with Urgent Care, Incorporated?

24   A    It was my office and then there was Urgent Care,

25   they're two different offices, but, yeah, I was working in

1    both locations, that's correct.

2    Q    Okay.  And what was your purpose for making contact

3    with her?

4    A    I wasn't making contact with Ms. Gale, sir.

5    Q    Your attempt to make contact with her.

6    A    No, sir, I was not attempting to make contact with Ms.

7    Gale.

8    Q    Could you take a look at what's marked as Government's

9    Exhibit No. 1 in front of you.

10   A    Yes, sir.

11   Q    All right.  Let's read through that if we could, it's

12   very short.  Hey Carol, and then read the next sentence,

13   please.

14   A    Dr. Sam Jahani called the base yesterday and asked for

15   you.  He said --

16   Q    Hold on, hold on, let's take it one step at a time,

17   that's the first sentence.  "And he asked for you," and that

18   actually happened, right, because we're talking about a

19   communication that takes place on September 14th, and you

20   had reached out to Ann Miranda around the 13th, right?

21   A    I asked for her number, yes, sir.

22   Q    Okay.  So Ms. Miranda is wrong when she says that?

23   A    Yes, sir.

24   Q    All right.  Let's go to the next sentence.  Please

25   read the next sentence.

1      A      He said he needed to talk to you about a patient you

2      saw --

3      Q      Stop just a second.  "He needed to talk to you about a

4      patient you saw."  Is that true or is that false?

5      A      That's false.  I did not need to talk to her, I was

6      not going to talk to her, sir.

7      Q      So she made that up?

8      A      I don't know if she made it up, sir, but I wasn't going

9      to talk to Carol about a patient.

10     Q      All right.  Let's finish the rest of that sentence.

11     And -- go ahead.

12     A      And I told him I would send you a message and give you

13     his number.

14     Q      Okay.  And did you -- is that true or not?

15     A      No, sir, I asked her to find the number for me, I

16     didn't know how she was going to get it, I thought she was

17     going to get it from their archives or their computer

18     systems.

19     Q      All right.  So the reason that you needed her number

20     was for what?

21     A      To give it to my attorney, Steve Peters.

22     Q      Why couldn't Mr. Peters or Mr. Mair have made that

23     direct contact themselves?

24             MR. PETERS: Objection, argumentative.

25             THE  COURT:  Overruled.   You  may  answer  the

1    question.

2    A    I'm sure they could have, sir.

3    Q    (By Mr. Pena) Yes, as a matter of fact, these orders,

4    the ones having to do with your bond release, you went over

5    with your probation officer or bond officer and with the

6    court in the Eastern District of Texas, right?

7    A    Yes, sir.

8    Q    There is no question in your mind that this order

9    pertained to you and not to your attorneys, right?

10   A    That's correct.

11   Q    All right.  And so when you made contact, either

12   directly or indirectly with Ms. Gale, you knew that she was

13   a potential witness in this case, isn't that also right?

14   A    I did not make contact with Ms. Gale, sir.

15   Q    When you attempted to make contact, if that will make

16   it easier.

17   A    No, sir, I wasn't attempting to make contact, I was

18   trying to get her phone number.

19   Q    Why were you trying to get a hold of her?

20          MR. PETERS: Objection, asked and answered, we're

21   arguing.

22          THE COURT: Sustained.  That's been asked already,

23   Mr. Pena.  Next question.

24   Q    (By Mr. Pena) And certainly when you contacted Ms.

25   Miranda it was in hopes of contacting an individual or

1    making contact with an individual or getting contact
2    information for an individual relative --
3                MR. PETERS: Objection.
4                MR. PENA: May I please finish?
5                THE COURT: Please.
6    Q    (By Mr. Pena) Relative to the case that you were under
7    indictment for?
8                MR. PETERS: Objection to the compound form of the
9    question, which is also vague.
10               THE COURT: Sustained on compound grounds.
11               Rephrase your question.
12               MR. PENA: All right.
13   Q    (By Mr. Pena) When you made contact with her, Ms.
14   Miranda, was that in order to further your defense in this
15   case subsequent to the indictment?
16   A    It was to provide a phone number for my attorneys.  It
17   was to get a phone number from the receptionist at Youth
18   With A Big Mission.
19   Q    For your attorneys relative to this case?
20   A    Yes.
21   Q    And so you didn't tell Ms. Miranda that you needed to
22   get a hold of people to help him with your case and that she
23   could help you to do that?
24   A    No, sir, I did not.
25   Q    Okay, that would have been false, right?

1      A     I did not say that.

2      Q     Okay.  You never told that to Ms. Miranda?

3      A     No, sir, I did not.

4             MR. PENA: Pass the witness, Your Honor.

5             THE COURT: Redirect, please.

6             MR. PETERS: No redirect.

7             THE COURT: All right.  Dr. Jahani, you may step

8      down.   I have issued a sequestration order, you may not

9      discuss your testimony with any other witness.   You may

10     remain in the courtroom, however, sir.

11            THE WITNESS: I may remain in the courtroom, Your

12     Honor?

13            THE COURT: You may remain in the courtroom, sir,

14     yes, sir.   You're a party to the lawsuit so you are

15     permitted to remain.

16            Mr. Peters, do you have any other witnesses?

17            MR. PETERS: No other witnesses.  Let me just see

18     how the Court wishes to proceed if I may.

19            THE COURT: You may.

20            MR. PETERS: I would like to mark two exhibits, the

21     first is a report of interview that was provided to us on

22     October 18th, 2011, of the interview of Carol Gale that

23     you've heard about through Investigator Sawyer.  If there's

24     no objection, I'd just like (inaudible) receive that.

25            MR. PENA: May I see that?

1              MR. PETERS: Of course.

2              And then when Mr. Pena is done, I want to discuss

3     one other exhibit --

4              THE COURT: All right.

5              MR. PETERS: -- and how you wish to proceed.

6              THE COURT: We're going to need to mark that first

7     exhibit as Defendant's Exhibit A.

8              MR. PETERS: I have a tag.

9              THE COURT: We'll get -- we'll have my -- you

10    already have it marked, Mr. Peters, or --

11             MR. PETERS: I'm marking it now.

12             THE COURT: All right.

13             MR. PETERS: I have the sticker.

14             THE COURT: All right.

15             MR. PENA: I have no objection, Your Honor.

16             THE COURT: All right.  Just a moment.

17             Mr. Pena, do you have any objection to Exhibit A

18    being received into evidence?

19             MR. PENA: I do not, Your Honor.

20             THE COURT: Exhibit A on behalf of the defendant

21    will be received into evidence for the purposes of this

22    hearing.

23             And then as to your second exhibit, Mr. Peters.

24             MR. PETERS: I wish to proffer --

25             THE COURT: All right.

1          MR. PETERS: -- an Exhibit B and then determine how
2     you wish to receive it and whether there's an agreement in
3     how to receive it.  Without describing the content, Exhibit
4     B is an attorney note I made on an attorney form kept at our
5     law firm in the ordinary course of business.  It is marked
6     attorney work product and privileged.  Without going into
7     the content of it, it's a one-tenth hour entry, and it
8     relates to the call that Mr. Jahani has testified about.

9          I'm prepared to show this to the prosecutor unless
10    it's setting up some broad form of subject matter waiver
11    that I would obviously object to, because I think it
12    corroborates what my client has testified to under oath.
13    But if the prosecutor wants Mr. Mair to ask me about it and
14    authenticate, I understand we can do it that way.

15          THE COURT: Mr. Pena?

16          MR. PENA: Your Honor, here's the problem.  I asked
17    him about communications his attorneys, they raised the
18    attorney-client privilege and defense counsel/defense camp
19    sort of defense.  If he starts getting into that, I'm going
20    to call Mr. Jahani again and go into it.

21          THE COURT: Well, the objection is sustained at
22    this point.

23          MR. PENA: Thank you, Your Honor.

24          THE COURT: And secondly, Mr. Peters, it appears to
25    me that that would be cumulative as well, since we already

1    have testimony from Dr. Jahani as to the date and time and

2    subject of the conversation that you're describing.

3              MR. PETERS: I appreciate the Court clarifying its

4    position, and if you will indulge me, that's why I would

5    like to reply.  I think what's corroborative about proposed

6    Exhibit B is that I'm provided with a business telephone

7    number and not a home telephone number.  It think it

8    corroborates exactly what he's saying he did and when he did

9    it and is not cumulative because of that particular content.

10             THE COURT: Objection sustained.

11             Do you have any other evidence you wish to offer,

12   Mr. Peters?

13             MR. PETERS: Not in addition to Exhibit A, Your

14   Honor.

15             THE COURT: All right.

16             Does the government have any further evidence in

17   rebuttal?

18             MR. PENA: Your Honor, one more item.

19             THE COURT: You may.

20             And, Mr. Peters, if you could hand, please,

21   Exhibit A to my clerk so I can review that, since that's in

22   evidence at this point.

23             MR. PETER: I'm sorry.  This is -- Your Honor, I'm

24   tendering as requested Exhibit A.

25             THE COURT: All right.

1        Mr. Pena, give me a moment first to review Exhibit

2   A since it was just admitted --

3        MR. PENA: Yes, Your Honor.

4        THE COURT: -- and I haven't had a chance to review

5   it.

6        (Pause in the proceedings.)

7        THE COURT: All right.  The Court's now had an

8   opportunity to review Defendant's Exhibit A, which is, in

9   essence, a three-page incident report from the Grand

10  Junction Police Department by Officer Sawyer who had

11  previously testified before the Court.

12       And, Mr. Peters, you know, you've rested.

13       The government has some witnesses in rebuttal or

14  other offers of evidence in rebuttal, Mr. Pena?

15       MR. PENA: Yes, Your Honor, and I can do it one of

16  two ways.  Now that defense counsel has offered the

17  extensive statement of Ms. Gale to another officer -- well,

18  actually to Officer Sawyer, the government would tender to

19  the Court and has tendered to defense Government Exhibit No.

20  3, which is the officer's report regarding the interview of

21  Ms. Miranda on September 16th, 2011, in rebuttal to the

22  information provided.

23       THE COURT: In rebuttal to the report?

24       MR. PENA: Yes, sir.

25       THE COURT: All right.

1          MR. PENA: The information in the report.

2          THE COURT: All right.  Mr. Peters?

3          MR. PETERS: I object.  I think it's improper

4     rebuttal.  I don't know how it ties to this other report and

5     why that makes it proper rebuttal.  If it was to be

6     introduced, it should have been introduced during the

7     testimony of Investigator Sawyer who's the author of the

8     report.

9          THE COURT: Let me see the report.

10          MR. PENA: Yes, Your Honor.

11          THE COURT: I'm not going to be able to determine

12     if it's true rebuttal or not without reviewing it.

13          MR. PENA: And may I respond?

14          THE COURT: Yes, go ahead with your response.

15          MR. PENA: Your Honor, the report that was tendered

16     is Defense Exhibit No. A, it talks about a specific meeting

17     or communication that took place between Ms. Miranda and Ms.

18     Gale in great detail.  This is actually rebuttal because it

19     actually memorializes what Ms. Mirada's recollection was of

20     that communication, and so it is rebuttal.

21          THE COURT: All right.  Give me just a moment.

22          MR. PENA: Thank you.

23          (Pause in the proceedings.)

24          THE COURT: All right.  The objection by the

25     defendant as relates to Government Exhibit 3 that it's not

1  relevant and should have been brought forth during the

2  testimony of Officer Sawyer, since the Court does know

3  Officer Sawyer is the author of Government's Exhibit 3, is

4  overruled.  I do find it does fall within rebuttal evidence

5  in the case, so Exhibit 3 is admitted into evidence, and the

6  Court will consider that as part of the evidence in the

7  case.

8          Is the government now resting?

9          MR. PENA: Your Honor, the government rests and

10  closes.

11          THE COURT: All right.  I'll hear closing argument

12  by the government on the motion at this point.

13          MR. PENA: Your Honor, considering that fact that

14  this has been a hour and a half long hearing involving

15  testimony, I think everything is before the Court.  I don't

16  think that there's any doubt that Dr. Jahani knew that he

17  was not to make contact with any potential witnesses related

18  to the investigation and prosecution, and specifically

19  former employees of Urgent Care, Inc.

20          There's no question that Ms. Gale falls within

21  that category.  There's also no question that the

22  government's not taking the position that defendant's

23  attorney can't make that contact or the defendant's

24  investigator can't make that contact.  Who is limited,

25  specifically, is Dr. Jahani.  And quite frankly, I find it

1    very disturbing that he is actually out there making contact

2    with these folks, and there's no question about why he was

3    doing it, he was trying to make specific contact with that

4    individual.   Otherwise, he could have just passed on his

5    attorney's phone number, the investigator's phone number.

6    No, he was trying to make contact with that particular

7    individual, and he knew that that wasn't proper under the

8    circumstances, and it wasn't until after he got caught that

9    he came in and said oh, no, no, I was never trying to make

10   contact with them, I was just trying to pass on a phone

11   number.

12         Well, whose phone number does he pass on?   It's

13   his own.   What does that tell the Court?   He's trying to

14   talk to Carol Gale.   And the reason he's trying to talk to

15   Carol Gale is because she has an awful lot to say about the

16   underlying charges in this case, she is a critical witness,

17   a material witness to the prosecution, and he knows it, and

18   he's trying to make contact with her because he wants to

19   influence her testimony.   But even aside from that, he knew

20   that he was prohibited from doing so, and he did so anyway.

21         Certainly,   he   could   have   passed   on   that

22   information to folks that can make contact with her, her

23   defense attorney, investigators.   He chose not to do so, and

24   actually followed-up and continued to follow-up with that

25   afterwards.   Your Honor, I don't think that there's any

1    question that he violated the terms of his release.  The big

2    question really for the government is what is appropriate

3    under the circumstances.

4            Frankly, Your Honor, I'm not looking to ask that

5    Mr. Jahani be put behind bars for this.  You know, we've

6    certainly seen much worse violations take place, but I do

7    think that Mr. Jahani needs to understand that he can't just

8    unilaterally decide the rules don't apply to him, and I

9    think that's what you have here.  I think that you have a

10   situation, maybe he had the best of intentions, maybe he

11   wanted to help out his defense team, but certainly he knew

12   that he could not make that contact and he attempted to do

13   so, and certainly the Facebook communication between Ms.

14   Miranda and Ms. Gale indicates that there was much more

15   information passed on by Dr. Jahani to Ms. Miranda and then

16   on to Ms. Gale.

17           There's no question that he tried to make contact

18   with her, the big question is what are we going to do about

19   it, and, Your Honor, the only thing that I could ask the

20   Court to do, I don't even think electronic monitoring really

21   addresses this issue, I do believe that with regards to him

22   making contact with potential witnesses that, number one, he

23   be admonished in the most sincere way by the Court, and

24   that, number two, if he does make contact that he

25   immediately report that to Pretrial Services.  It's not so

1    that the government can invade defense camp or take
2    advantage of that, it's just so that he continues to comply
3    by the orders of the court.

4         You know, I'm not asking him to report it to us.
5    Frankly, I don't think I want to know who he's making
6    contact with, but I will tell you, Your Honor, Dr. Jahani
7    decided to contact witnesses, maybe in his mind thinking
8    it's appropriate, but, you know, subsequent to the Court
9    entering the order, in an unappropriate fashion, and I would
10   ask that the Court consider if there's going to be an
11   amendment to the order of the court, it's considering making
12   a finding that a condition of release was violated, that the
13   Court enter the further order that if there is contact with
14   any potential witnesses in the investigation or prosecution
15   of the case by Dr. Jahani, not by his lawyers, directly or
16   indirectly, that that be made known to Pretrial Services,
17   and so that we can take this issue up again.

18        THE COURT: All right.  Thank you.

19        MR. PENA: Thank you.

20        THE COURT: Mr. Peters, sir, your argument on
21   behalf of Dr. Jahani, please.

22        MR. PETERS: Yes, thank you, Your Honor, may it
23   please the Court.

24        I think I'd like to speak first to the procedure
25   and the matrix I think that applies here, secondly to try to

1   summarize the evidence very briefly, and, third, to advocate

2   what I think it means.

3          It would appear that we're here today under 18

4   U.S.C., Section 3145, to review a release or detention

5   order.  And if I'm following the playbook correctly, the

6   government has the burden in this hearing to show by clear

7   and convincing evidence that the person on release has

8   violated a condition of release, and I'm referring

9   specifically to 18 U.S.C., Section 3148(b)(1)(B), which

10  appears at 1099 of the current desk book.

11         I know the Court works with these statutes --

12         THE COURT: Actually, it's that section, plus (b),

13  plus (2)(A), plus capital (B), plus 3142(g), I'm well

14  familiar with this section since I handle it daily.

15         MR. PETERS: Yes.  Well, and I'm trying to

16  acknowledge that, but I just want to make sure I'm kind of

17  staying within the framework of what I think has to be

18  shown.

19         THE COURT: Correct.

20         MR. PETERS: And has to be shown not by a

21  preponderance, not by probable cause, but by clear and

22  convincing evidence, and with that in mind this is how I

23  would summarize the evidence.

24         Through the prosecutor I think we've adduced that

25  the first discovery in this case was produced on the 8th or

1    9th of September.  That there was a meeting the following

2    Monday, September 12th, that Dr. Jahani attended at my

3    office.  That as an outgrowth of the meeting he attempted to

4    obtain the contact information for a Carol Gale.  In terms

5    of the insidiousness of that activity, I would simply note

6    that in the exhibit that we have tendered as Exhibit A

7    you'll note that she had been interviewed by the government

8    on September 8.  So four days earlier -- I mean, it's like

9    both sides were starting to look at Carol Gale as pretty

10   important here, not just the defense but both sides, and, in

11   fact, the evidence is that they dropped a grand jury

12   subpoena on her, and brought her to Denver and had a long

13   interview with her and then she's testified in front of a

14   tribunal.

15        So is it insidious that we would want contact

16   information for her?  The evidence is that Exhibit A, which

17   you have before you, was produced on October 18th, 2011.  So

18   on that date, on the date of the alleged violation, we had

19   no other contact information.  This incident report shows a

20   telephone number and an address in Soldotna, Alaska, whereas

21   Dr. Jahani testified he believed she had relocated two years

22   earlier in 2009.  So, you know, armed with that

23   understanding he called a place where according to the

24   evidence she used to live and used to work, some form of a

25   non-profit mission for children, so that he could attempt to

1    ascertain some current contact information for her.  That's
2    the only testimony before you on that subject.   There's
3    hearsay, there's competing hearsay through Ann Miranda,
4    which you've received in rebuttal, but no one's brought Ann
5    Miranda to court, and what we instead have are competing
6    versions of what occurred in that call.

7         Under 18 United States Code, Section -- is it
8    3142(j), Dr. Jahani is presumed innocent in these
9    proceedings.  He doesn't come to the court just because he's
10   been indicted with any less credibility than any other
11   witness who's testified today, via those who've testified
12   live or those that the government has put on through, in
13   some cases, multiple layers of hearsay.   He's under
14   indictment, he knows full well he can be charged for further
15   crimes.  He knows full well that the government could style
16   this as a further crime, but he got up and exercised his
17   right to testify, waived his right to remain silent, and
18   testified under oath in a manner that I would suggest was
19   unimpeached.

20        To be sure, there is contradictory evidence, but
21   no contradictory evidence signed by Sam Jahani.  The
22   centerpiece of the case, the reason we're really here is
23   this Government Exhibit 1.  It's a private -- denoted as a
24   private Facebook message, I can't quite articulate what
25   private status means, and I don't use Facebook, but I know

1    that it gets you into some inner circle with other

2    individuals, but the evidence is that Dr. Jahani doesn't

3    have a Facebook account, his testimony was he didn't know

4    that Ann Miranda would use Facebook in the manner that's

5    before the Court in the record.  His testimony is all he

6    wanted to do was have her check her database and see if

7    there's any forwarding information for Carol Gale, which he

8    intended to give to me.

9         It's undisputed, his testimony today is undisputed

10   that he never spoke with Carol Gale, never intended to speak

11   with Carol Gale.  There is no evidence that he did speak

12   with Carol Gale or that he directed Ann Miranda to conduct

13   some form of substantive interview.  All he said, according

14   to his testimony today in response to Ann Miranda's inquiry

15   about what this is about, is that it involved a patient

16   matter, that's all he said.  You bring up his case, that's

17   his testimony under oath.

18        Now, I don't have the burden in this proceeding,

19   I don't have the burden to bring Ann Miranda in here.  I

20   believe it's undisputed that these are two very short calls,

21   and in the second one I believe it's undisputed, even by the

22   government, that when Ann Miranda called him back on the

23   14th he said I don't need this information from you any

24   more, thank you so much for trying to help.  And there was

25   a reason for that, because what intervened when he put down

1    the phone on the 13th was this idea that he could simply

2    track the information down by calling the Alaska Medical

3    Board, a publicly available source of information that

4    anyone, whether they're under indictment or else, can use,

5    and that's why it's not alleged in closing argument as a

6    further bond violation because there's nothing wrong with

7    it.  Probably the first call he should have made instead of

8    the second.  He's never been under indictment before, it's

9    a new experience.

10           But I respectfully submit that that evidence of

11   those two calls are, in the first instance, don't meet the

12   burden to show this violation by clear and convincing

13   evidence, and the second call is virtually uncontradicted

14   exculpatory evidence that he didn't need what she was

15   bringing back to him, and didn't ask her to do anything

16   else, and didn't instruct her to reach out to Carol Gale.

17           Now, the devil is sometimes in the details.  If I

18   could redirect the Court's attention to Exhibit A, the

19   defense exhibit that the Court did receive, you'll see that

20   it lists a home phone number for Carol Gale of 970 -- or

21   907-252-1960.  And again, although not dispositive of the

22   issue, it is corroborative of my client's testimony today

23   that he had provided me with an office telephone number for

24   Ms. Gale, and although the Court did not receive Exhibit B,

25   and I respect the Court's ruling, I don't wish to re-argue

1    it, the testimony is that he gave me a different telephone
2    number of 907-263-3119.  And without regard to whether that
3    corroborates my one-tenth hour entry for provision of the
4    services during that telephone call, it is uncontradicted
5    evidence that the information provided back to me was as
6    indicated by my client, obtained from a public source and
7    obtained the day before, I think dates are quite important
8    here.

9         The uncontradicted evidence is he phoned me that
10   evidence on September 13.  The Facebook message that is the
11   centerpiece  of  the  government's  case  here  is  marked
12   September 14th.  Again, corroborative of the fact that when
13   Ann  had  her  second  call  with  Dr.  Jahani,  he  said  don't
14   bother,  don't  bother,  because  he  had  already  gotten  this
15   some way (inaudible).

16        Now, I mean, you could -- you could draw a number
17   of  inferences  from  the  evidence  today,  but  I  don't  think
18   that  you  can  draw  a  proper  inference  that  this  evidence
19   establishes  by  clear  and  convincing  evidence  that  the
20   defendant violated his conditions of release.  I mean, there
21   isn't  any  evidence  that  he  spoke  with  Carol  Gale.   There  is
22   evidence  in  the  record  that  I  tried  to  and  there  is  evidence
23   in  the  record  that  I'm  not  able  to  develop  that,  but  maybe
24   that's  for  some  other  day  and  some  other  proceeding,  but  I
25   think  it  shows  you  how  very  seriously  the  government's

1    taking this, and I credit the hearsay testimony of the
2    Pretrial Services Officer Andrew Flores that the prosecutor,
3    namely AUSA Heldmyer, is out to get my client.

4         She contends in her motion that -- tacitly, kind
5    of sideways, that she gave him a break by not trying to have
6    him detained in the first place.  Judge, if you look in the
7    record in this case, if you look at the criminal information
8    sheets that come out with the indictment in this case you'll
9    see that she represented that she intended to seek
10   detention.  It's my personal belief that Dr. Jahani snuck
11   through the system in Beaumont before she could make that
12   harder for him, but in Beaumont where, you know, they have
13   detainees on an hourly basis, this wasn't an appropriate
14   case for detention then, and I'll happy to hear the
15   prosecutor acknowledge in closing argument that it's not a
16   proper case for detention now.

17        And so I only want to spend time on what a
18   sanction should be if the Court is inclined to find a
19   violation, and to that I would say this idea that is in the
20   written motion, I don't know quite how it reconciles with
21   what Mr. Pena is suggesting in argument, this whole idea
22   that Pretrial Services would review my client's phone
23   records to determine who he's calling, and that's in the
24   prayer for relief in this motion, so does that mean they get
25   to trace or track when he's calling me?  I mean, taken

1       literally, I suppose it does.  So do we get to redact those.

2       I mean, this gets to be a ridiculous exercise on what starts

3       out as a tempest in a teapot.

4              I mean, with all due respect, there just isn't any

5       credible evidence that my client violated this section 8,

6       and there is plenty of evidence that the prosecutor just

7       rushed to the judgment that he had and then set out to kind

8       of prove around it.  And by clear and convincing evidence

9       her proof fails.  So I don't mean to drone one, and I would

10      be happy to take the Court's questions, but the fact of the

11      matter is Dr. Jahani does have very limited resources.  He

12      doesn't have the luxury of having multiple investigators to

13      subpoena Carol Gale to Denver and have a nice meeting at the

14      U.S. Attorney's Office, and all the evidence has shown in

15      this case is that both sides were starting to identify her

16      as some form of what the prosecutor is calling a critical

17      witness post-indictment, a curious fact, probably not

18      salient today.  Post-indictment.

19             All the evidencing is establishing is that both

20      sides have a legitimate reason to be pursuing this witness

21      and using the resources available to him, Dr. Jahani tried

22      to find contact information for this witness.

23             Thank you, Your Honor.

24             THE COURT: Thank you.

25             Any final rebuttal argument, Mr. Pena?

1          MR. PENA: No, Your Honor.

2          THE COURT: All right.

3          This matter is now before the Court for
4    consideration on the government's motion for hearing to
5    review and revoke conditions of release for the defendant,
6    Dr. Jahani, which is Docket No. 41.  The Court's reviewed
7    the motion and the response, which is part of Docket No. 44
8    by the defendant Mr. - or excuse me, Dr. Jahani.

9          The Court further has considered the testimony and
10   credibility of the following witnesses.  First, Assistant
11   United States Attorney Michelle Heldmyer; secondly, Grand
12   Junction Police Officer and DEA Task Force Officer Jason
13   Sawyer; and lastly, the defendant, Dr. Jahani, who testified
14   on his behalf during this hearing.  IN addition to that, I
15   have considered and reviewed the exhibits that have been
16   received into evidence during this hearing, those are
17   Government's Exhibits 1, 2, and 3, as well as Defendant's
18   Exhibit A.

19         Now, the Court further has taken judicial notice
20   of the court file, including those documents that were
21   placed in our court file from the United States District
22   Court for the Eastern District of Texas, which was the court
23   of arrest, and in particular the bond that was allowed to be
24   posted and conditions of release, which is the subject
25   matter of this particular motion.  The Court further has

1    considered  the  Federal  Rules  of  Criminal  Procedure.    In

2    particular,  I've  also  reviewed  18  United  States  Code,

3    Section 3148(b)(1)(A) and (B), (2)(A) and (B), and 18 United

4    States Code, Section 3142(g).

5         The Court further has considered the Federal Rules

6    of Evidence, in particular Federal Rule of Evidence 1101(d),

7    which indicates when the Rules of Evidence are inapplicable,

8    as indicated there, and it does indicate under Federal Rule

9    of  Evidence  1101(b)  that  the  rules,  meaning  the  Federal

10   Rules  of  Evidence,  are  inapplicable,  in  particular  as  it

11   relates in this case to miscellaneous proceedings which can

12   include  proceedings  with  respect  to  release  on  bail  or

13   otherwise, which is before the Court since arguments were

14   made concerning hearsay in this particular hearing.

15        And lastly, the Court has considered the arguments

16   presented  both  by  the  government  and  defendant  through

17   counsel, and the Court now being fully informed will make

18   the  following  findings,  conclusions,  and  order  on  the

19   motion:  On this particular motion I do find that I do have

20   jurisdiction over the subject matter and over the parties to

21   the lawsuit.  I find that venue is proper here in the state

22   and District of Colorado, and further find that each party

23   has now been given a fair and adequate opportunity to be

24   heard on the subject motion.

25        The Court finds in this case that Dr. Jahani was

1    arrested in the state of Texas where he resides.  He was

2    then brought before the United States District Court for the

3    Eastern District of Texas.  The case number there in Texas

4    was 11-mj-186.  He then was brought before the magistrate

5    court there, and Magistrate Judge Keith F. Giblin,

6    G-I-B-L-I-N, handled the detention hearing there, which was

7    the court of arrest.  At that time he released Dr. Jahani on

8    bond.  Now, there were numerous bond conditions that were

9    entered by Magistrate Judge Giblin, which is part of the

10   Court's file, it is in our case here Docket No. 41-1, which

11   is the actual conditions of release.

12          In particular, Magistrate Judge Giblin ordered as

13   a condition of bond in this case under paragraph 8J of his

14   order that the defendant must follow the following, and I

15   will read that into the record:  Avoid all contact, directly

16   or indirectly, with any person who is or may become a victim

17   or potential witness in the investigation or prosecution,

18   including but not limited to former employees of Urgent

19   Care, Inc. or former patients of Urgent Care, Inc.

20          The evidence further shows that after bond was

21   allowed to be posted by Magistrate Judge Giblin the

22   defendant, Dr. Jahani, posted bond.  He then met with a

23   Pretrial Services officer there in Texas, a person by the

24   name of Andrew Flores.  The undisputed evidence is Andrew

25   Flores works in the Pretrial Services office there in Texas,

1    was   assigned   to   Dr.   Jahani   as   a   Pretrial   Services'

2    individual, noting that the order by Magistrate Judge Giblin

3    indicated he would be under pretrial release supervision.

4    At  that  point  the  undisputed  evidence  is  Mr.  Flores  went

5    over  the  terms  and  conditions  with  Dr.  Jahani  on  his  bond,

6    that's undisputed at that point.

7               Thereafter,   comes   to   the   motion   in   which   the

8    government   is   alleging   that   Dr.   Jahani   violated   that

9    condition of release, meaning 8J that I just read into the

10   record.  Now, the evidence shows that on September 12, 2011,

11   this  is  based  upon  judicial  notice  of  the  court  file,  the

12   Court   notes   that   Dr.   Jahani   was   before   District   Judge

13   Christine Arguello, who's assigned to this particular case.

14   In  reviewing  the  docket  I  do  note  that  he  was  present  at

15   that   point   in   time   before   the   court,   and   the   evidence

16   further  shows  it's  undisputed  that  thereafter  he  met  with

17   Mr.  Peters  in  his  office  regarding  this  case.   Now,  there

18   was discussions between Mr. Peters and Dr. Jahani concerning

19   his case and part of that discussion resulted in a name of

20   Carol Gale being surfaced.  Dr. Jahani testified before the

21   Court his morning that in fact he thought he could obtain a

22   phone number for her based upon their conversation, meaning

23   between Mr. Peters and himself.

24               Now, it appears to the Court that it's clear that

25   Dr. Jahani was aware of his bond conditions; however, he was

1    in an effort to assist his counsel to try to obtain a phone

2    number for Carolyn Gale, who may have material information

3    concerning this case.  And it's been admitted by Dr. Jahani

4    that Ms. Gale had previously worked for him in his office

5    when he was working here in Colorado.  So the evidence

6    further shows at that point that Dr. Jahani left Mr. Peters'

7    office.  He then on the next day, which would have been the

8    13h of September, 2011, called a location called the Youth

9    With A Big Mission in Cimarron, Colorado, because that was

10   the last location that he recalled that Ms. Gale may have

11   been working.

12          The evidence shows at that point that Dr. Jahani

13   contacted an individual by the name of Ann Miranda at that

14   time, although Dr. Jahani did not know who he was speaking

15   to by telephone when contacted Youth With A Big Mission in

16   Cimarron, Colorado.  It turned out later that that was Ann

17   Miranda.  Now, there was a conversation between Dr. Jahani

18   and Ann Miranda.  Ms. Miranda did not testify in this

19   particular proceeding, Dr. Jahani did.  In essence, Dr.

20   Jahani was seeking to locate Carolyn Gale and to determine

21   if there was a telephone number where she could be reached.

22   The evidence further shows that Dr. Jahani has not  actually

23   directly contacted Carolyn Gale in any way, shape or form

24   since he's been placed on bond.

25          The Court shows = or the evidence further shows at

1 that point that Ms. Miranda indicated to Dr. Jahani that she

2 did not currently have the telephone number or Carolyn Gale

3 but would try to locate that and get back to him.   Dr.

4 Jahani provided Ms. Miranda with his telephone number, which

5 is undisputed.   Thereafter, Ms. Miranda sent a Facebook

6 message to Carolyn Gale, who at the time was living in

7 Alaska, not here in Colorado, and the Facebook message reads

8 as follows, which is Government's Exhibit 1: Hey, Carol, Dr.

9 Sam Jahani called the base yesterday and asked for you.   He

10 said he needed to talk to you about a patient you saw and I

11 told him I would send you a message and give you his number.

12 It is 970-209-3787.   I hope you and Tim and the kids are

13 doing well.   Take care, Ann.   Meaning Ann Miranda.

14  Now, Dr. Jahani's testimony is somewhat different

15 as for as the context of Government's Exhibit 1 as to what

16 he asked Ms. Miranda for.   His testimony was he was just

17 asking for her phone number, not actually to speak to her,

18 nor asking to talk to her about a patient.   So there is some

19 dispute there as far as the testimony is concerned.

20  Thereafter, on the same day, which would be

21 September 13th, 2011, Dr. Jahani, which testimony is

22 undisputed, came up with an idea that he could contact the

23 Board of Medical Examiners in Alaska to try to locate Ms.

24 Gale.   And in fact the testimony shows that he did that.

25 Upon contacting the Medical Board there in Alaska, he asked

1      the Medical Board for Carolyn Gale's name, told her who she

2      was, spelling, et cetera, and they were able to provide a

3      business phone number for Ms. Gale.

4              Dr. Janani received that from the Medical Board.

5      He then placed a call to that particular facility at which

6      Ms. Gale was working in Alaska, which is a medical/clinical

7      type facility.  The evidence shows that he contacted that

8      facility and received notification that in fact was a

9      medical clinic, did not seek any further information from

10     the medical clinic, did not seek to ask and speak with Ms.

11     Gale but simply hung up the phone.

12             The testimony from Dr. Jahani was he wanted to

13     just verify that in fact that was a medical clinic in order

14     to provide that telephone number to Mr. Peters, who's

15     defending him against the indictment that's been charged

16     against him in this particular case.  Now, the evidence

17     further shows thereafter that that telephone number was

18     delivered to Mr. Peters and provided to him in order for Mr.

19     Peters to perhaps follow up and try to contact Ms. Gale.

20             The Court finds that at this point, based upon

21     those findings by the Court, that Dr. Jahani was in fact

22     aware of his conditions.  He was aware of those conditions

23     by clear and convincing evidence before the Court.  He was

24     aware of the fact he should not be contacting or making any

25     efforts to contact either directly or indirectly Carolyn

1    Gale.  Now, the evidence also shows that Dr. Jahani's first

2    language is not English, it is another language, which is

3    undisputed at this point.  The Court also notes that during

4    the conversation between Mr. Peters and Dr. Jahani, there

5    may have been some level of miscommunication, to the extent

6    that Mr. Peters was well aware of the bond conditions well,

7    being counsel, and Dr. Jahani was aware of it, but Dr.

8    Jahani's interpretation of that he did not believe in

9    essence that that would be a violation of his bond by simply

10   trying to obtain a telephone number for Ms. Gale.

11          Based upon those findings, I do not find that the

12   government has met their burden by clear and convincing

13   evidence as required under 18 United States Code, Section

14   3148(b)(1)(A), (B), (2)(A) and (B), and accordingly, the

15   motion is denied at this point to revoke bond.

16          Now, I do want to caution, however, Dr. Jahani,

17   because there may have been somewhat of a misunderstanding

18   that you had with Mr. Peters, who's a very fine lawyer, just

19   like Mr. Pena is, but I want to make it clear to you that

20   your bond is still reinstated, it's in place, all the

21   conditions of your bond you still must follow, including

22   you're under pretrial release supervision, and I do want to

23   make sure you understand that any further potential contacts

24   with any of these potential witnesses may result in another

25   motion being filed to revoke your bond, so you probably

1    don't to want to try to in any way, shape or form in the

2    future try to contact any of these potential individuals who

3    could be witnesses that are involved in this case, or any of

4    the potential victims in this case, and that includes any

5    former employees of Urgent Care, Inc., and former patients

6    of Urgent Care, Inc., in particular Ms. Gale, because that

7    brought you before the Court.

8            So I am going to caution you in that regard, and

9    do you have any questions about that, sir?

10           THE DEFENDANT: No, Your Honor, I don't.

11           THE COURT: Okay.

12           All right, that's the order of the Court on the

13   motion.  The bond continues in this case with Dr. Jahani

14   until his next court appearance for Judge Arguello in this

15   matter.

16           Anything further, Mr. Pena, on behalf of the

17   government?

18           MR. PENA: No, Your Honor.

19           THE COURT: Mr. Peters, anything further on behalf

20   of the defendant?

21           MR. PETERS: No, Your Honor.  We thank you for

22   making time for us this morning.

23           THE COURT: You're welcome.

24           All right, we'll stand in recess.

25           THE CLERK: All rise.  Court is in recess.


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

1          (Whereupon, the within hearing was then in
2     conclusion at 12:40 p.m. on November 8, 2011.)

3

4          I certify that the foregoing is a correct
5     transcript, to the best of my knowledge and belief, from the
6     record of proceedings in the above-entitled matter.

7

8          /s/ Bonnie Nikolas                November 22, 2011
9          Signature of Transcriber               Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ** WITNESS INDEX **

 2    GOVERNMENT WITNESS                        PAGE

 3    MICHELLE HELDMYER

 4    Direct Examination by Mr. Pena              7

 5    Cross-Examination by Mr. Peters           15

 6    JASON SAWYER

 7    Direct Examination by Mr. Pena            41

 8    Cross-Examination by Mr. Peters           43

 9    Redirect Examination by Mr. Pena          49

10

11    DEFENSE WITNESS

12    Sam Jahani

13    Direct Examination by Mr. Peters          51

14    Cross-Examination by Mr. Pena             65

15

16                    ** EXHIBIT INDEX **

17                              OFFERED      ADMITTED

18    Government's Exhibit No. 1      12          12

19    Government's Exhibit No. 2      12          12

20    Government's Exhibit No. 3      76          78

21    Defendant's Exhibit A          72          73

22    Defendant's Exhibit B          74          –

23

24

25
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305