**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 11-cr-00302-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**1.  SAM JAHANI, and**
**2.  ERIC PEPER,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT**
**(Motions Hearing)**
_____

         Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 12:55 p.m. on the 2nd
day of July, 2013, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

                **A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
JAIME PENA, Assistant U.S. Attorney, 1225 17th St., Suite
700, Denver, CO 80202


**FOR DEFENDANT JAHANI:**
STEPHEN C. PETERS, Peters Law Firm, LLC, 3773 Cherry Creek
Dr. N., Suite 1005E, Denver, CO 80209
TODD ELLIOTT MAIR, Peters Mair Wilcox, 1755 Blake Street,
#240, Denver, CO 80202
**FOR DEFENDANT PEPER:**
GARY LOZOW, Foster Graham Milstein & Calisher, LLP, 360
South Garfield Street, 6th Floor, Denver, CO 80209
ANTHONY L. LEFFERT, Robinson, Waters & O'Dorisio, P.C.
1099 18th Street, Granite Tower, #2600, Denver, CO 80202

1          **JULY 2, 2013**

2          (Proceedings commence at 12:54 p.m.)

3          THE COURT:  You may be seated.

4          Court calls Criminal Case No. 11-cr-00302-CMA,

5   encaptioned United States of America v. Sam Jahani and

6   Eric A. Peper.

7          Counsel, would you please enter your appearances.

8          MR. PENA:  Good afternoon, Your Honor, Jaime Pena

9   on behalf of United States.  I am assisted by a third-year

10  law student, J.P. Samsung, who is working for our office.

11  The Government is present and ready to proceed.

12         THE COURT:  Good afternoon.

13         MR. PETERS:  Good afternoon, Your Honor, Steve

14  Peters and Todd Mair with Dr. Jahani, who is present on

15  bond.

16         THE COURT:  Good afternoon.

17         DEFENDANT JAHANI:  Good afternoon.

18         MR. LOZOW:  Your Honor, Gary Lozow and Anthony

19  Leffert appearing on behalf of Dr. Peper, who sits between

20  us.  Good afternoon.

21         DEFENDANT PEPER:  Good afternoon.

22         THE COURT:  Good afternoon.

23         We are here today on a special hearing where I wish

24  to hear more argument.  I have read the briefing, and this

25  is actually taking the jury instructions at a preliminary

1    time so that we can try to get the limits and the bounds

2    of this case.

3         I do want to say up front that there are

4    disagreements between the parties, such as the defendants'

5    objections to the introductory instructions, and others

6    that I consider to be really non-substantive and,

7    therefore, I am not going to rule on them at this time,

8    and we are not going to need to discuss them.

9         I also don't think at this time we need to address

10   the money laundering instruction, because that is not

11   critical to how this case is going to move forward one way

12   or another.

13        We can proceed in two ways.  And I know you all

14   have probably prepared your oral arguments, and I can just

15   let you go ahead and give your arguments or, as I have

16   done in my sentencings and in a lot of other hearings, I

17   kind of give you an idea where it is I am going or what I

18   am thinking.

19        I have thoroughly reviewed the briefing that you

20   filed.  I have looked at the case law that you cited that

21   I thought was really pertinent.  And I have my thoughts as

22   to how I think this should play out.  And what I normally

23   do in sentencing is I tell you where I am inclined to go,

24   and then that way you know how you should target your

25   arguments or persuading me if I am going opposite the way

1    you are going, or you don't need to argue so hard if I am

2    leaning in the way that you wish to go.

3         So you tell me what you would prefer?

4         MR. PENA:  Your Honor, I think it would be helpful

5    if the Court gave us your preference, and that way we can

6    kind zero in on what is pertinent to the Court.

7         THE COURT:  So what my inclination is?

8         MR. MAIR:  Fine with us, Your Honor.

9         THE COURT:  All right.  Then I am going to actually

10   start with the one I think is the hardest, which is the

11   dispensing of the controlled substance instruction.  And I

12   have looked at both of yours, and I am just going to tell

13   you what my thoughts on that are.

14        It appears to me that the parties are essentially

15   in agreement with the first two elements of the pattern

16   instruction, which are that the defendant knowingly or

17   intentionally dispensed one or more controlled substances

18   as charged in the Superseding Indictment.  And, second,

19   the substance was, in fact, the substance charged in the

20   Superseding Indictment.

21        The major sticking point has to do with the third

22   element, which is what sets, in my mind, apart physician

23   prosecutions under the Controlled Substances Act from

24   prosecutions of other defendants who, because they are not

25   physicians, are never allowed to sell or dispense

1     controlled substances.

2          The parties essentially agree that to obtain a

3     conviction, the Government must prove the defendant

4     dispensed the pertinent controlled substances outside of

5     the usual course of professional medical practice or not

6     for a legitimate medical purpose, in accordance with

7     United States v. Nelson, 383 F.3d 1227, Tenth Circuit,

8     2004.

9          However, the parties disagree as to whether such

10    dispensing must have been knowingly or intentionally done.

11    And after reviewing everything in depth, I believe the

12    defendants have the better of this argument.   Under United

13    States v. MacKay, 715 F.3d 807, the Tenth Circuit just

14    recently said, "to convict defendant on the applicable

15    counts, the jury had to conclude beyond a reasonable doubt

16    that defendant knowingly and intentionally prescribed the

17    controlled substances to each of these patients outside

18    the usual course of medical practice or without a

19    legitimate medical purpose."   And that is on page 814 of

20    the opinion.

21         Now, in support of its position, however, the

22    Government cites to United States v. Celio, 230 Fed. Appx.

23    818, which is a Tenth Circuit, 2007 unpublished case.   I

24    am very familiar with Mr. Celio because I've handled a

25    number of his motions in that case, which I inherited.

1          I believe Celio was not availing to the Government

2     for several reasons.  First, I note that it is an order

3     and judgment and, thus, does not constitute binding

4     precedent.  Second, I believe Celio clearly erred when it

5     stated that "there is no opinion of any other appellate

6     court that indicates a physician must 'knowingly' act

7     outside the usual course of professional practice or

8     without a legitimate medical purpose when writing a

9     prescription in order to violate Section 841(a)(1)."

10          The year before Celio was authored, the Ninth

11     Circuit, in United States v. Feingold, 454 F.3d 1001, very

12     clearly held that in order to convict a practitioner under

13     841(a), one of the elements was that the practitioner

14     acted with intent to distribute the drugs and with intent

15     to distribute them outside the course of professional

16     practice.

17          And it went on, and essentially said, "In other

18     words, the jury must make a finding of intent, not merely

19     with respect to distribution, but also with respect to the

20     doctor's intent to act as a pusher rather than a medical

21     professional."  That is at page 1008 of that opinion.

22          Third, the panel order and judgment in Celio

23     reviewed the jury instructions in that case merely for

24     plain error.

25          Four, the actions taken by the defendant in Celio

1    were so egregious, that the mens rea issues being raised

2    in this case were not considered in the same way by the

3    trial court in the Celio case.  In Celio, the defendant

4    doctor wrote prescriptions for an undercover DEA agent in

5    a parking lot.  The agent told the defendant that he was

6    going to use the pills for partying and to share with his

7    girlfriend.  The defendant never inquired into the agent's

8    alleged knee pain, and did not examine the agent before

9    writing the prescription.

10        By contrast, the allegations here are that

11   defendants overprescribed to patients whom they saw

12   regularly for treatment.

13        The parties also disagree as to whether the third

14   element needs to read "outside the usual course of

15   professional medical practice or not for a legitimate

16   medical purpose."  And the defendants' version was

17   actually even more complicated.  The defendants' version

18   was that "the defendant knew and intended that the

19   dispensing was other than for a legitimate medical

20   purpose, other than in good faith, and not in the course

21   of professional practice."

22        I am leaning towards an even simpler formulation,

23   because I think all of that language just is going to be

24   very confusing to the jury.  What I have been considering

25   is whether we should take the "outside the usual course of

1    professional medical practice" out entirely, with the

2    thought that that language doesn't need to be given

3    because the Tenth Circuit, in the Nelson case, has said

4    that, essentially, "in the course of professional

5    practice" essentially means the same thing as "not for a

6    legitimate medical purpose."  That is at 383 F.3d at 1231.

7         And I think to leave it in just seems to be

8    confusing and might mislead the jury into thinking this is

9    a medical malpractice case.  And I think we need to be

10   very careful in this case about making sure they know this

11   is not a negligence case, this is a criminal case, and it

12   is a very different standard.

13        So it seems to me that if we took out the "outside

14   the usual course of professional medical practice" and

15   just used the "not for a legitimate medical purpose"

16   language, that we might be better off.  But I am totally

17   open on that.  It was just a thought I had as I was

18   working my way through these instructions.

19        Several cases have said that there is no difference

20   in the meanings of the two phrases; "in the course of

21   professional practice" and "not for a legitimate medical

22   purpose."  The Tenth Circuit in Nelson observed "it is

23   difficult to imagine circumstances in which a practitioner

24   could have prescribed controlled substances within the

25   usual course of medical practice but without a legitimate

1    medical purpose.  Similarly, it is difficult to imagine

2    circumstances in which a practitioner could have

3    prescribed controlled substances with a legitimate medical

4    purpose and yet be outside the usual course of medical

5    practice."  That is at page 1231.

6         And, as I said, really what I was considering here

7    is that if we remove the language "outside the usual

8    course of professional medical practice," that will result

9    in the less likelihood of confusing the jury that this

10   case is a medical malpractice action.

11        And I'll address that when we get to the next

12   instruction.

13        So, with that being said, the language that I would

14   propose for this element, the third element, would be

15   something to the effect of, "the defendant knew or

16   intended that the controlled substance was dispensed not

17   for a legitimate medical purpose."

18        MR. PETERS:  Your Honor, could you repeat that,

19   maybe even more slowly.

20        THE COURT:  Sure.  "The defendant knew or intended

21   that the controlled substance was dispensed not for a

22   legitimate medical purpose."

23        MR. PETERS:  "Controlled substance was dispensed"?

24        THE COURT:  Right.  "Not for a legitimate medical

25   purpose."  Or we could make it simpler, like lay language,

1    "was not dispensed for a legitimate medical purpose."  But

2    that is the gist of what I am saying.  And what I have

3    deleted from that is -- I believe, if you don't go with

4    that, then the language should be, "the defendant knew or

5    intended that the controlled substance was dispensed

6    outside the usual course of professional medical practice

7    or not for a legitimate medical purpose."

8         I think the Tenth Circuit case law makes it clear

9    that it is an "either or," it is not an "and."  It is not

10   a conjunction.  And that is why I rejected the defendants'

11   proposal, which makes it more of a conjunctive; that both

12   of those have to be met rather than either one or the

13   other.

14        MR. PETERS:  So, can I just read that back to you?

15        THE COURT:  You may.

16        MR. PETERS:  "The defendant knew or intended that

17   the controlled substance was not dispensed for a

18   legitimate medical purpose"?

19        THE COURT:  Well --

20        MR. PETERS:  Is that what --

21        THE COURT:  Well, actually I think it would be more

22   correct that "it was dispensed not for a legitimate

23   medical purpose."  I actually think that is what

24   grammatically would be more correct.

25        MR. PETERS:  "Defendant knew or intended that the

1    controlled substance was dispensed not for a legitimate

2    medical purpose"?

3              THE COURT:  Right.

4              MR. PETERS:  Thank you, Your Honor.

5              THE COURT:  And that's Instruction No. 1, and so

6    that is the first issue I would like to wrestle with.  So

7    I essentially agree, in sum, with the defendants, that

8    there has to be a knowing and intentional aspect to that.

9    And the other part I just threw out for thought to get

10   your feedback on.

11             And then I have actually included in this, I have

12   included a definition of "dispense" -- which I don't think

13   is different from what you all really had -- "controlled

14   substance," and the term "practitioner."  So it is very --

15   they are very short.  I don't like lengthy, busy

16   instructions.

17             So the definition of "dispense" is:  "The term

18   'dispense' means to deliver a controlled substance to an

19   ultimate user by or pursuant to the lawful order of a

20   practitioner, including the prescribing and administering

21   of a controlled substance."

22             "The term 'controlled substance' just includes --"

23   and I list all of the morphine, oxycodone, hydrocodone,

24   all of the ones that you all had in your instruction.

25             Then, "the term 'practitioner' means a physician or

 1    other person licensed, registered, or otherwise permitted

 2    by the United States or the jurisdiction in which he

 3    practices to dispense a controlled substance in the course

 4    of professional practice.  At all times charged in the

 5    Superseding Indictment, defendants were practitioners."

 6    And that is the extent of the instruction.

 7         So, with that being said, Mr. Pena, I will let you

 8    first address and make any arguments that you wish to

 9    persuade me otherwise.

10         MR. PENA:  Thank you, Your Honor.  May I start by

11    asking the Court to refer to the Government's proposed

12    instructions, on page -- page 4 of 18 of Document 235-1 an

13    attachment.  And those are the Schneider instructions.  It

14    may make it easier for me to address the Court by

15    referring to that, if you have it in front of Your Honor.

16         THE COURT:  235-1?

17         MR. PENA:  Yes, Your Honor.  And it is going to be

18    page 4 of 18.

19         THE COURT:  All right.

20         MR. PENA:  Your Honor, in regards to the Court's

21    concerns, I would like to go ahead and first address the

22    Schneider case.  The Schneider case was a case that was

23    very similar to the case before the Court, in that it was,

24    aside from being a Tenth Circuit case, a case that

25    involved physicians that were prescribing to drug seekers

1     in a manner that, at least arguably, was not for

2     legitimate medical purposes and in the usual course of

3     professional medical practice or beyond the bounds of

4     enforcement -- beyond the bounds of medical practice.

5          Now, the third element that is before the Court in

6     the Schneider case had to do with the element that the

7     Court is addressing now.  And my concern really is that in

8     this particular case, you have both sorts of conduct and

9     how it impacted the facts in this case.

10          You have conduct by the defendants, at least

11    allegedly, that involved prescriptions that were not for

12    medical purposes in the usual course of professional

13    medical practice -- and, again, the cases say "or,"

14    because it is in the disjunctive.  It should be read "or"

15    in terms of the charging instrument "-- or beyond the

16    bounds of medical practice."

17          I think that that language is specifically taken

18    from the C.F.R. which we cite in the body of our

19    submission.  And it is out of a C.F.R. 1306.04, a case

20    that requires a physician to "knowingly" act without a

21    legitimate medical purpose or outside the usual course of

22    professional practice.

23          Your Honor, this instruction, the way that it was

24    prepared and submitted to the jury, is supported by the

25    C.F.R.  And the Government would ask that the Court track

1    the language of the C.F.R. as closely as possible, because

2    that is what makes it illegal for a physician, who is

3    otherwise registered, to dispense controlled substances to

4    do it -- to thus violate the Controlled Substances Act.

5          Having said that, Your Honor --

6          THE COURT:  All right.  But how do you square that

7    with MacKay?

8          MR. PENA:  Your Honor, in all fairness, the courts

9    do take a look at those two sort of standards, and they

10   say that they cannot separate the two.  In other words,

11   one is equal to the other, essentially.  They do say that,

12   Your Honor.  But I am asking the Court to track the

13   regulation that forms the basis.

14         THE COURT:  But I am not worried about the two

15   tracking, being the same.  What MacKay said is that -- and

16   this pretty much resolves it for me, I think, is that in

17   order to find him guilty -- find a physician guilty, it

18   has to be shown that he knowingly and intentionally

19   prescribed outside of the usual -- outside the usual

20   course of medical practice or without a legitimate medical

21   purpose.

22         So I can't track that language that is in there,

23   because I would be violating what the Tenth Circuit has

24   told me is an element of this offense.

25         In addition, as I recall, Schneider was reviewed

1    for plain error.  I am trying to be pro-active here.  I

2    don't want any error in this case.  If it is going to take

3    that long to try, we are trying to be pro-active and make

4    sure we get it right the first time.  So I don't consider,

5    even though it may have been upheld, it is a different

6    standard that we are looking at, now that I am looking

7    more pro-actively at it.

8            MR. PENA:  All right.  And I would just ask the

9    Court to keep an open mind on that, because the evidence

10   may come in that, you know, lends itself toward that other

11   half that the Court is thinking about doing away with.

12           THE COURT:  I am not -- it was just something to me

13   that I said -- I think, if I wanted to be totally 100

14   percent sure that I am complying, I would put both of them

15   in there.  I am just saying that I don't want the jury --

16   and I will be very careful about this, and I will address

17   that with one of the other instructions, that they know

18   this is not just a negligence case.  This is not a medical

19   malpractice case.  And it was that language that kind of

20   concerned me with it.

21           If the Government objects or if the defendant

22   objects, I will leave it the way it was, either one of

23   you.  So I would be inclined, if either side objected, to

24   just leave it with the "or" in there.

25           MR. PENA:  Okay.  And I anticipate that the

1    evidence is going to support having both in there.

2        The other thing, again, using this kind of as

3    template, looking at this thing, that page 4 of 18,

4    Document 235-1, and what the Court wants to accomplish, I

5    think that maybe the best way to do this, is to conflate,

6    basically, the three elements into one element.

7        The reason I say that is because the way that the

8    Court is proposing that we do it, with three separate

9    elements, you now have two different mens reas associated

10   with the same conduct.  And maybe the way to do it is

11   this.  The first paragraph, referring to first element,

12   where you have the defendant, if we just say, "the

13   defendant knowingly and intentionally dispensed --" and

14   then you have the controlled substances that were

15   dispensed, and then you have the language having to do

16   "-- that it was not for a legitimate medical purpose in

17   the usual course of professional conduct or beyond the

18   bounds of medical practice."

19       If you just kind of conflate that into a single

20   paragraph, I think that that takes care of all of the

21   problems, because then you will have a single mens rea

22   associated with the crime, and not multiple mens reas.

23       THE COURT:  Well, I don't think we would have

24   multiple mens reas.  And my concern would be that the jury

25   wouldn't understand that the "knowing" and "intentional"

1    apply to both aspects of that.  So I think it would be --

2    probably would be clearer to keep them separate.

3         It seems to me the second element, that could

4    probably be stipulated to, and we could do away with that

5    fairly quickly, just by telling them there is no dispute

6    that the substance that is charged was a controlled

7    substance.

8         But that is for the defendants to determine whether

9    they want to simplify it down to just the two mens rea

10   elements.

11        MR. PENA:  Your Honor, then the concern, then, is

12   are we thinking about making a two-element submission

13   where we have, for example -- and, again, using the

14   template in the Schneider case, "the defendants knowingly

15   and intentionally dispensed --" the list of whatever is

16   applicable to our case, and dropping the second element,

17   where it says, "the defendant acted knowingly and

18   intentionally," because that would really refer to that

19   first element, and then having a second element similar to

20   the one that the Court suggested, where we would have "the

21   defendant knowingly and intentionally prescribed the

22   controlled substances not for a legitimate medical

23   purpose," and that language?  Would we basically have two

24   elements, then?

25        THE COURT:  Well, actually, no.  I think we have

1    three.  First, "the defendant knowingly or intentionally

2    dispensed one or more controlled substances as charged in

3    the Superseding Indictment."

4         MR. PENA:  Okay.

5         THE COURT:  Two, "The substance was, in fact, the

6    substance charged in the Superseding Indictment."  That is

7    the one I think probably could be stipulated to.

8         Then, third, "the defendant knowingly or

9    intentionally dispensed," or "the defendant knew or

10   intended that the controlled substance was dispensed

11   outside the usual course of professional medical practice

12   or not for a legitimate medical purpose."

13        Those would be the three elements I would see are

14   critical to this elements instruction.

15        MR. PENA:  Your Honor, I think it is pretty close

16   to where we think we ought to be, and I just need to think

17   about the -- it is only because in my practice I haven't

18   seen situations where we have multiple mens reas alleged

19   in elements like that.  Your Honor, can I have a moment to

20   think about that?

21        THE COURT:  I mean, actually yeah.  I know I just

22   threw this on you.  I have been working on this, believe

23   me.  And I was tightening it up even last night.  So I am

24   not going to make any decisions at this time.  I just

25   threw it out there so that you would know what you needed

1    to target your argument toward.  And I will probably just

2    take it under advisement and allow you to submit something

3    further if you wish.

4        MR. PENA:  Thank you, Your Honor, I appreciate

5    that.  If I could just have the opportunity to think about

6    that and whether it really makes any difference in terms

7    of the Government's case or not.  I would, of course --

8        THE COURT:  And if you have better language to

9    submit, too.  As I said, this is the first time I have

10   dealt with one of these cases.  But I do believe that we

11   have to be very clear that the jury understands that it's

12   knowing and intentional with respect to the dispensing and

13   knowing and intentional with respect to the purpose.

14       MR. PENA:  Thank you, Your Honor.  I don't have

15   anything else on that issue.

16       THE COURT:  All right.  So let's go ahead, we'll

17   hear from Mr. Mair.

18       MR. MAIR:  Good afternoon, Your Honor.  First, as

19   to removing "the course of professional practice"

20   language, we would agree with that.  That language is

21   redundant, at least according to Nelson, who says that it

22   doesn't mean anything different than "legitimate medical

23   practice."

24       It is confusing because it sounds like negligence

25   language, and it doesn't really have much statutory basis.

1    Going on to the instruction, the key elemental

2    instruction, as you articulated it, "defendant knew or

3    intended that the controlled substance was dispensed not

4    for a legitimate medical purpose."  We would ask for our

5    additional language explaining what "legitimate medical

6    purpose" means.

7         The Supreme Court in <u>Gonzales</u> said that that phrase

8    is --

9         THE COURT:  I have a whole other instruction on

10   that.  I agree with you.  I do agree.  And, if you want, I

11   can tell you, it would be -- I put it separately, but we

12   could include it in there as a definition.  But what I had

13   come up with was, "The term 'not for a legitimate medical

14   purpose' means acting as a drug pusher instead of a

15   physician by engaging in illicit drug dealing and

16   trafficking as conventionally understood."

17        And I think I have to work on that language "as

18   conventionally understood," but that is what the case law

19   says.  "A finding of mere negligence, which would suffice

20   in a civil medical malpractice trial, is insufficient to

21   support a criminal conviction of either defendant for the

22   dispensing of a controlled substance."

23        So I essentially agree with the defendant that we

24   have to be very careful here to make sure the jury doesn't

25   get confused as to what it's finding here.

1          MR. MAIR:  That is where I was going, and that

2     language sounds basically like what we were asking for.

3     As with Mr. Pena, I would probably like to see it written

4     down somewhere before I completely sign off on it or have

5     an opportunity to say something more about it, perhaps,

6     but it sounds like what we were trying to get at.

7          THE COURT:  Well, it's rough, and it may need some

8     massaging, but I do believe that the United States Supreme

9     Court has stated that "legitimate medical purpose" is a

10    generally susceptible -- is generally susceptible to a

11    more precise definition.  And if you don't give a specific

12    definition, it's ambiguous and could be confusing.  That

13    is Gonzales v. Oregon, 546 U.S. 243, 2006.

14         The Tenth Circuit has indicated that "in the course

15    of professional practice," essentially means the same

16    thing as "not for a legitimate medical purpose" in the

17    Nelson case.  So that's why I found in the first one we

18    didn't need to have the latter, but that I do believe,

19    based on the United States Supreme Court's decision in

20    United States v. Moore, 423 U.S. 122, 1975, and the

21    Gonzales v. Oregon case that I just cited, defining it

22    turns out to be fairly straightforward.  I took the

23    language directly out of those cases.

24         In Moore, what the Court indicated was that a

25    prosecution of a physician under the Controlled Substances

1    Act only reaches that physician if he is acting "as a

2    large-scale pusher and not as a physician."  In Gonzales,

3    the Court noted, "We have not considered the extent to

4    which the CSA regulates medical practice beyond

5    prohibiting a doctor from acting as a drug pusher instead

6    of as a physician."

7        The Court went on to state, "Congress regulates

8    medical practice insofar as it bars doctors from using

9    their prescription-writing powers as a means to engage in

10   illicit drug dealing and trafficking as conventionally

11   understood.  Beyond this, however, the statute manifests

12   no intent to regulate the practice of medicine generally."

13       So, in United States v. MacKay, the Tenth Circuit

14   then took that language -- or I assume they took that

15   language, and stated that in a Controlled Substances Act

16   case against a physician that "the Government had to prove

17   defendant stepped outside his role as a doctor and became

18   a criminal drug pusher."

19       So the language may be -- may need some massaging,

20   but I do believe that that point has to be made very

21   clear.

22       MR. MAIR:  And we agree with that, Your Honor, and

23   I think we agree with where the Court is headed on that.

24   Just a couple other points.  We, again, would agree with

25   the Court's idea of getting rid of "the usual course of

1    professional practice" language.  That "course of

2    professional practice" language has not a lot of statutory

3    basis, as I mentioned, and the "usual course of

4    professional practice" has none.

5        The "usual course" language comes from 21 U.S.C.

6    830(b)(3)(ii), which defines a valid prescription, but

7    that definition is only applicable as used in this

8    paragraph.  And that paragraph deals with reporting

9    requirements for certain transactions in listed chemicals;

10   methamphetamine, precursors, I think.

11       It doesn't have anything to do with any other

12   aspect of enforcement, and certainly doesn't have anything

13   to do with Section 841 prosecution.  And that is the only

14   place where "usual" occurs or appears in the statutes.

15   And "usual" sounds a lot like negligence language.  I

16   think it is the concern you raised in our opening remarks.

17   When you say "usual," it's only a half step from

18   "reasonable," which is the negligence standard.

19       The Government, in asking you to keep that language

20   in there, relies on the C.F.R.  But, in Gonzales, the

21   Court has a fairly lengthy discussion about the C.F.R. and

22   it basically comes to the point that the C.F.R. is not

23   relevant to establishing a criminal violation.  The C.F.R.

24   is the justice department's interpretation.  And the

25   justice department only gets to make those sort of

1    regulations as it pertains to registration and controls.

2         And "control" is a term of art.  It has a very

3    specific meaning.  It basically just means what drug is on

4    what schedule.  So they essentially say that the justice

5    department doesn't get to define the crime.  And,

6    therefore, C.F.R. 1306.04 isn't relevant to defining the

7    crime.

8         If that's the case, then this "usual course"

9    language just provides an additional reason for removing

10   that language, as the Court suggested.  I think that's --

11   I have one other thing on the element, as you stated it.

12   You say, "the defendant knew or intended that the

13   controlled substance was dispensed not for a legitimate

14   medical purpose."

15        We would submit that that has to be "knew and

16   intended."  Specific intent goes to the legitimate medical

17   purpose prong.  I think that is supported by several

18   things.  First of all, the Feingold case that you

19   mentioned says that.  Also, the Guerrero case, which we

20   cite in the briefs, out of Fifth Circuit.  Even the

21   Schneider instructions, which are not good, say "knowingly

22   and intentionally," and so did the MacKay instructions.

23        And 841 is traditionally a specific intent crime,

24   so that specific intent should apply to that element.

25   And, finally, that specific intent is intrinsic to the

1   Moore/Gonzales requirements, that one was acting as a drug

2   pusher instead of a physician, that is something that one

3   does intentionally.

4         I think that is all of the remarks I have on the

5   instructions as you have set them out so far.  Thank you.

6         THE COURT:  Mr. Pena, you haven't had an

7   opportunity.

8         If you wouldn't mind, Mr. Lozow we will let

9   Mr. Pena address, because he didn't get the "not for

10   legitimate medical purpose" aspect of it.

11         MR. PENA:  Thank you, Your Honor.  I will just

12   respond briefly.  The "outside the usual course of

13   professional practice" prong is referenced in the C.F.R.

14   and is also referenced to by the Nelson case.  But, even

15   aside from that, the one thing that does give me some

16   pause -- well, two things.

17         Normally, in a Controlled Substances Act, contrary

18   to what Mr. Mair described, the mens rea is "knowingly or

19   intentionally" not "and intentionally."  What we don't

20   want to do is increase the Government's burden beyond what

21   the law calls for on those.

22         So, if the Court is wrestling with the mens rea

23   associated with that second prong having to do with

24   "legitimate medical practice," I think that the mens rea

25   that is talked about is "knowing" conduct.

1    "Intentionally" is not referenced.  It is "knowing"

2    conduct.  And maybe that is more appropriate, just to keep

3    it at "knowing" conduct.

4         Aside from that -- and of concern to the

5    Government, and it's something that we'll address with

6    further briefing, is the Court's proposed potential

7    instruction having to do with making a statement to the

8    jury that "the crime is beyond mere negligence" or "mere

9    negligence is insufficient."

10        If the Court is considering doing that pursuant to

11   the case law that is applicable to these sorts of very

12   specific crimes, the Government believes that we're going

13   to have to at least define what "negligence" is.  Because

14   we're using a term of art, and just assuming that a jury

15   is going to know what "negligence" means.

16        So, if the Court is really considering that -- and,

17   again, there is a great deal of discretion with the Court

18   as to what the Court believes is the law of the case --

19   the Government would just ask that the negligence be

20   defined so that the jury has a standard to compare to when

21   they are instructed in that way.

22        THE COURT:  All right.

23        MR. PENA:  Thank you, Your Honor.

24        THE COURT:  All right.  Actually, I am looking at

25   the pattern instruction, and they all use "knowingly or

1    intentionally."

2         MR. PENA:  That's correct.

3         THE COURT:  Not the conjunction.  That is something

4    you all can argue further.

5         Mr. Leffert?

6         MR. LEFFERT:  Judge, thank you for this hearing and

7    for being so careful with this issue, because I think that

8    it is very important in the prosecution of this case and

9    the defense of these defendants.  And, Judge, you have hit

10   on exactly the point that I tried to raise, although maybe

11   not very articulately, in our briefing, and that is this

12   phrase "usual course of medical practice."

13        I do think that it becomes synonymous with

14   "negligence," because it talks about standards of

15   practice.  It is a DOJ C.F.R., and I believe the Moore

16   court found that that is not really what is controlling.

17   And what I would propose to this Court is Moore's

18   interpretation of the statute is really what the federal

19   law is with respect to what the elements of this crime

20   should be.

21        I will not take up a lot of the Court's time, but

22   what I would like to focus on is while these jury

23   instructions are hugely important for both for preparing

24   for trial and for the decision the jury will make, but

25   even more important is that it gives us an idea and a

1    guide for what the evidence will be at trial.  And that is

2    the thing that is most concerning for me in this

3    discussion.

4         As we point out in our brief, the Government's

5    expert in this case, Dr. Ted Parran, has testified

6    numerous times for the Government, and only for the

7    Government.  He has testified some number of times for

8    Michelle Heldmyer.  He is a pain and addiction specialist.

9         In this case, the defendants were general

10   practitioners.  We have received his report, and I

11   reviewed his testimony from other cases.  And what is

12   really -- and I apologize, Judge, I am not sure if we gave

13   you the entire transcript of his testimony from the

14   Merrill case.

15        But I would propose to the Court that what he does

16   is he blurs the distinction between a standard of care;

17   "usual course of medical practice," and then concludes

18   that it's "not in the usual course and not for a

19   legitimate medical purpose."

20        He does in his testimony, or at least in this

21   Merrill case, exactly what the Court is concerned about

22   here.  First, he testifies -- they ask him about if he

23   knows what the standards of practice -- I am sorry, let me

24   restate that.

25        First he testifies as to the standards of practice

1    as to what doctors should do in prescribing controlled

2    substances.  And if the Court will indulge me just for a

3    moment, let me give you an excerpt of his testimony.  This

4    is the United States v. Merrill, a case that was in the

5    United States District Court for the Northern District of

6    Florida.  And I have got the case number if the Court

7    wishes to receive it, or I can get you a copy of the

8    entire transcript.

9        THE COURT:  Read very slowly so the court reporter

10   can take it down.

11       MR. LEFFERT:  I will, Thank you.  I do get going

12   fast some times.

13       The prosecutor asked:  "Dr. Parran, are you

14   familiar with the standards of practice with what

15   physicians should do with respect to prescribing

16   controlled substances in a clinical setting?

17       "Absolutely.

18       "Could you explain that a little bit?"

19       Dr. Parran's answer:  "Well, when prescribing

20   controlled drugs, physicians are expected to -- to first

21   do what physicians are expected to always do in the usual

22   course of medical practice, that is to do a history and a

23   physical; a thorough history and physical, to make a

24   reasonable attempt to get old medical records from a

25   patient who is a new patient.  Because, in order to make

1    reasonable clinical judgments on a patient, if a patient

2    has a medical history out there somewhere with other

3    doctors or other hospitals or other laboratories, I

4    think -- well, it's not that I think, it's considered only

5    appropriate for physicians to attempt to get old medical

6    records to help inform their decisions about the

7    management of this patient to do appropriate laboratory

8    studies, whether they are blood work studies or urine test

9    studies or x-ray studies.  To, if appropriate, consult or

10   refer the patient to consultants in order to get some

11   subspecialty input or to consult Allied Health

12   professional, physical therapy, occupational therapy,

13   psychologists, psychiatrists, psychiatric social workers

14   for counseling, et cetera.

15        Those are just the typical things that physicians

16   do in the usual course of medical practice.  And its

17   expected -- physicians are expected to do that in their

18   management of patients in general, and especially to do it

19   when prescribing controlled drugs."

20        I wish I could say he stops there, but he goes on

21   with more detail about his opinions about usual course of

22   medical practice.  Then, they asked him to repeat the

23   standards later, and he does.  So the Government's now put

24   that into evidence twice.  And then this is where it

25   becomes problematic, Judge, on page 94.

1          With respect to each of the Indictment patients,

2     the prosecutor says:  "Dr. Parran, based on your

3     observation of the medical file relating to --" blank, one

4     of the patients "-- and the prescription records

5     concerning that, do you have an opinion with respect to

6     the type of prescribing, if in your opinion it could have

7     resulted in the death of --" blank.

8          His answer:  "Yes.  My opinion is that prescribing

9     of controlled drugs to --" blank "-- does not conform with

10    standards consistent with the usual course of medical

11    practice.  The prescribing was for other than a legitimate

12    medical purpose, and that the prescribing appears to have

13    substantially committed or contributed to --" blank's "--

14    death on April 15, 2004."

15         So, in his testimony -- and I have only read an

16    excerpt of it to give the Court a feel for what may come,

17    and likely will come at trial.  This is an expert that has

18    testified for the Government many times.  He is very

19    conversant with what these terms are; "usual course of

20    medical practice."  I mean, he has got this down.

21         And my concern is that when he comes in and he

22    offers testimony about well, standards of care, I assume,

23    I can only think he is talking about negligence standards.

24    He equates those with usual medical practice, and then

25    puts it all into one pot with legitimate -- he confuses

1    all of those things together.

2         Now, Judge, I have wrestled with this issue the

3    same way you have about how do you define "usual medical

4    practice."  Is it a clinical setting where a patient

5    client -- I am sorry, a patient/doctor relationship in a

6    clinical setting?  To me, that would make some sense.  He

7    is not in the parking lot, as the case you've described,

8    selling prescription pads, not caring what it is for.

9         He is not taking internet requests and sending out

10   prescriptions, as has been the case in other doctor

11   prescription cases.  As far as I know -- and I believe

12   that I am accurate in this -- every one of the Indictment

13   patients were people where there was a doctor/patient

14   relationship seen in a clinical setting.

15        And so I wrestle with, well, what does "usual

16   practice" mean.  I think the Court's suggestion of

17   following the case law and saying, well, they are

18   essentially synonymous, and taking it out, is the safest

19   and the best thing to ensure that justice is done in this

20   case and that these defendants get that fair trial.

21        Just to give you an example, of the things that he

22   says do not comply with standards of care and, therefore,

23   not in the usual course of a medical practice.  He talks

24   about getting the old medical records.  Well, that makes

25   sense.

1          In this case, many of these patients were walk-in

2     patients at an urgent care clinic that were indigent or on

3     Medicaid.  98 percent of them, at least the Indictment

4     patients, have been people -- and this, by far, is only a

5     small percentage of their practice.  They saw everything

6     from sprained ankles, to the flu, to acute injuries.

7          But the pain patients, 98 percent of them all had

8     long histories of chronic pain.  Many times had been seen

9     by as many as 10 or 15 doctors, who prescribed the very

10    same pain medications.

11         So, if Dr. Parran says, for example, as he does in

12    his report, that some of them there was a limited history

13    or that there was a limited physical exam taken,

14    undoubtedly it is in his report, he will say, well, that

15    falls below the standard; it is not in the usual course of

16    the medical practice.

17         And that is where we really get into trouble in

18    this case with the jury, who begins to think, well, here

19    is the expert from Case Western Reserve, and if he says

20    you don't do a complete and thorough physical, that you

21    are not in the usual course of a medical practice.

22         Well, another doctor in a civil case may say, well,

23    that is below the standard.  And if it results in an

24    injury, there might be civil liability.  Clearly that is

25    not what the criminal standard should be.

1          There is another Indictment patient, with respect

2     to Dr. Peper, where Dr. Parran is critical; virtually no

3     physical history.  Well, in fact, this lady had lower back

4     disease, degenerative disc disease and sciatica.  There

5     were three other treating physicians before Dr. Peper that

6     prescribed exactly the same drug for her.

7          And if he had done a limited examination based upon

8     her medical history but didn't receive all of her medical

9     history, which was more than 4 years old since her back

10    surgery, has he fallen below a standard of care?  Is it,

11    therefore, not in the usual course of medical practice?

12         And, I am sorry, I am belaboring the point, but

13    what is really important is that when it comes to this

14    trial and Dr. Parran gets on the stand and says, well,

15    this is what a doctor should do, this is what we all do,

16    even though he has never practiced it in the setting that

17    these two gentleman have, then we are left in the position

18    of trying to clarify for the jury the difference between

19    maybe they didn't do something that would comport with the

20    normal standard at the Case Western Reserve Pain Clinic in

21    Cleveland.

22         It doesn't mean that they crossed that line into

23    becoming a pill pusher or a drug dealer.  They still have

24    a patient/client relationship.  They are still seeing them

25    in a clinical setting.  And although they might have been

1   inept in some instances, and there might be evidence of

2   that, it doesn't mean that they've committed criminal acts

3   which would subject them to liability under the criminal

4   statute.

5          I appreciate the Court's suggestion, and I think --

6   and while the Court has talked about MacKay, the thing

7   that -- although there is some instructions that we would

8   like to see changed in MacKay, the fact is, that Court

9   tried to do and gave further instructions to try to

10  clarify these issues.

11         I think your suggestion of simply taking out "usual

12  medical practice" clarifies all of that for us.  And I

13  think it would help to focus the testimony at trial.  For

14  example, if Dr. Parran, or our experts, for example, are

15  focusing their opinions on was it for a legitimate medical

16  purpose, that creates a very different trial, may even

17  create less experts.

18         But if we have to also defend standards of care and

19  usual medical practice, could potentially make the trial

20  much longer in terms of witnesses and in terms of experts.

21  And so on be behalf of Dr. Peper, we would request that

22  you delete "usual medical practice" from the instructions.

23         I would be happy to answer any questions you might

24  have, Your Honor.

25         THE COURT:  All right.  I have none, thank you.

1          Anything more on those two instructions, the

2    dispensing of a controlled substance or not for a

3    legitimate medical purpose?

4          MR. MAIR:  I have, very briefly, Your Honor, one

5    more thing to say, just on the issue of the "knowingly or

6    intentionally" versus "knowingly and intentionally."  The

7    pattern for distribution says -- you are right, it says

8    "knowingly or intentionally."  But when you think about

9    the typical distribution case, you know you have a kilo of

10   heroin, it's always going to be illegal.  It is always

11   going to be an unlawful distribution to give it away.  You

12   are always going to be guilty.

13         I would analogize this more to a possession with

14   intent to distribute, which I think is the next pattern

15   instruction, but I neglected to bring it.  And there they

16   refer to possession with intent to distribute being a

17   specific intent crime, because it's knowingly as to

18   whether you have the illicit drug; typically the cocaine,

19   but specific intent to distribute.

20         And here I would say, what this is about -- this

21   isn't about distributing.  Obviously they wrote

22   prescriptions and the person took them to the pharmacy and

23   got the medications.  It is about distributing without a

24   legitimate medical purpose.  And that part has to be

25   deliberate per the Gonzales/Moore formulation.  And so I

1    think the instruction should require the intention.

2          THE COURT:  All right.  Thank you.

3          Mr. Pena, anything further on those two?

4          MR. PENA:  No, Your Honor.

5          THE COURT:  All right.  Then we get to the

6    instruction with respect to whether death resulted from

7    dispensing of a controlled substance.  The Controlled

8    Substances Act does provide for a heightened penalty if

9    death results from the use of a dispensed controlled

10   substance.

11         And the primary issue, that it appears to this

12   Court with respect to this is instruction, is that in the

13   event that the Government proves the defendant, one or

14   both of the defendants, guilty of certain controlled

15   substance counts, whether the Government then has to prove

16   that the defendants dispensing of such substances was the

17   but for or actual cause of death or also the proximate

18   cause of death.

19         Mr. Pena, you are already ready to go.

20         MR. PENA:  I am, Your Honor.

21         THE COURT:  Do you wish to hear what I have to say,

22   or do you want to make your argument first?

23         MR. PENA:  Your Honor, it will be quick.  I have a

24   quick argument.  Obviously, the Court has reviewed all of

25   the cases, so it will be quicker, I think.

1           THE COURT:  All right.  Very good.

2           MR. PENA:  Your Honor, I am very, very comfortable

3    that the Court has looked at the cases in these regards.

4    Generally speaking, when it comes to the application of

5    this "resulting in," this enhancement, the Government does

6    believe that the Schneider instructions adequately address

7    it.  And they talk about that being a matter that would

8    have to be specifically determined by the jury.

9           Pursuant to Apprendi v. New Jersey, it does

10   increase the statutory maximum and, therefore, becomes

11   elemental in nature.  The way that it was submitted,

12   either in the Government's proposals to the Court or under

13   the Schneider -- the manner in which Schneider addressed

14   it, is entirely appropriate.

15          The problem that we run into is what does

16   "resulting in" mean?  And all the way up until the recent

17   case in the Eighth Circuit, Burrage, the courts have been

18   very consistent, including in the Hatfield case, and I

19   believe in the McIntosh case, saying that we are going to

20   read the statute the way the statute reads, because that

21   is what Congress determined would be a violation of the

22   law.

23          And they have refused to go beyond that, in their

24   terms, and embellish on the statute.  So consistently the

25   courts, including the Eleventh Circuit said, when we are

1    talking about "resulting in," we are talking about a "but

2    for" determination.

3           The Burrage case, which is currently before the

4    Supreme Court, is an Eighth Circuit case, where the

5    defense tendered a proximate cause instruction, similar to

6    the one now being tendered by the defendants in this case.

7           The Government, during the course of the evidence,

8    it looked like from reading the decision, was not able to

9    prove up "but for the prescribing of the drugs in that

10   case, the individuals would have died."  I believe that

11   the testimony was that that was not the case or that the

12   experts in that case could not testify that way.

13          Therefore, the Government had a problem with a "but

14   for" standard.  The instructions that were submitted to

15   the jury in that case talked about -- let me see,

16   "contributing cause," which is a little bit different than

17   a "but for" standard.  The defendants complained on appeal

18   that they should have gotten the proximate cause

19   instruction, and that the Court erred in submitting the

20   contributing cause.

21          The Eighth Circuit disagreed and said that it was

22   appropriate under the circumstances.  That was then

23   appealed -- and this is where it gets a little bit weird.

24   It gets appealed to the Supreme Court.  At that point, the

25   only manner in which it can get before the Supreme Court

1    is for the defendant/appellant to then say, there is a

2    conflict in the authorities in the circuits.

3          All of the circuits on this side say the "but for"

4    is what is required.  And that now in the Eighth Circuit

5    you have this contributing cause and, therefore, you now

6    have a conflict in the circuits, because you have this

7    embellishment that all of the other circuits have just

8    refused to do.

9          They just say, "resulting in" is akin to a "but

10   for" sort of standard.  And when the Eighth Circuit took

11   that step and started talking about contributing cause,

12   they created, I think inadvertently, a conflict amongst

13   the circuits.

14         What is interesting about the way that it gets teed

15   up to the Supreme Court is, now the defendant/appellants

16   are saying, hey, "but for" would have been right, and the

17   fact that you embellished makes it wrong.  And that is

18   what created the conflict between the circuits.  It is not

19   what you would have expected that they were then saying,

20   hey, foreseeability is a standard, it is not the

21   contributing cause standard.

22         They came in and said, hey, you have got a problem

23   with a conflict in the circuit between the "but for" and

24   the "contributing cause" standard.  Not necessarily that

25   these -- that the causation, the true causation definition

1    should have been "foreseeability" and "proximate cause."

2    That was not before the Supreme Court on cert right now.

3         And so I think that the most conservative way to

4    proceed is, based on the status of the law, in all of the

5    circuits except for one, indicating -- and which is

6    consistent with the statutory language, that the "but for"

7    standard, the language that is part of the statute using

8    the "resulting in death" language, is appropriate, and

9    that "proximate cause" and "foreseeability" is actually an

10   embellishment of that standard and definition of

11   causation.

12        Thank you, Your Honor.

13        THE COURT:  All right.  Mr. Mair?

14        MR. MAIR:  Well, when Mr. Pena talks about all of

15   the circuits except for one, first of all, I don't think

16   it is quite that uniform.  But, more to the point --

17        THE COURT:  Let me ask you, who other than Burrage

18   holds otherwise?

19        MR. MAIR:  The Tenth Circuit.

20        THE COURT:  The Tenth Circuit doesn't hold.  The

21   Tenth Circuit has nothing on it.

22        MR. MAIR:  Well, it has nothing on it in a

23   distribution case; correct.  It has said in the context of

24   several other statutes using a "results in" formulation,

25   that it requires proximate cause.  And it refers to that

1    as a fundamental principle of criminal law, that the

2    defendant is responsible for the consequences proximately

3    caused by his conduct.

4         So I think to use this "but for" formulation that

5    the Government wants would be directly contrary to Tenth

6    Circuit law, and it is not uniform, as the Government

7    contends.  MacKay didn't use it.  MacKay required

8    causation.  And I don't even think Schneider uses this

9    "but for" language or the other language that the

10   Government puts in their instruction.

11        It just sort of says "results in," but doesn't

12   explain what it means.  So I would contend that the law of

13   this circuit doesn't allow for that, and I think MacKay

14   recognized that.  Thank you.

15        THE COURT:  Okay.  Before you sit down, let me ask

16   you this, because this is what I wrestled with on this

17   one.  Because of the first instruction, where I said there

18   has to be "knowing and intentional, not for a legitimate

19   medical purpose," it seemed to me that because I was that

20   strict in that instruction, we don't even get to this one

21   if they don't find him guilty of that.

22        But, Congress has made it pretty clear, and the

23   courts actually have interpreted as being pretty clear,

24   that once you are no longer a doctor, when you are a drug

25   pusher -- and that is what they would have to find before

1    they even get to this instruction, it is pretty much, you

2    know, as long as there is a demonstration of the "but for"

3    causation, that that was the actual cause of death, it is

4    pretty much strict liability.

5         But that is because we are not talking about the

6    protective -- you know, we imposed that standard.  It is

7    "knowing and intentional, not for a legitimate medical

8    purpose."  If they are found guilty of that, they have

9    essentially been found of being drug pushers.  And,

10   therefore, they are no different than any other person

11   being charged under this statute.

12        And so for that reason, I think in this -- with

13   respect to this particular instruction, I was leaning more

14   towards where the Government had come out, because I think

15   the protection is provided in the first instruction.

16        MR. MAIR:  Well, we would disagree that that is

17   adequate.  Now, yes, you are right, it would require the

18   jury initially to find him guilty of the offense, thereby

19   finding that they were a drug pusher.  But, Burrage, which

20   is up on cert, was a drug pusher.  That is a heroin case.

21        And Woodlee, which is the Tenth Circuit case that

22   controls, that person had been found guilty of the

23   offense.  It was essentially an assault in violation of

24   somebody's civil rights.  And they still found that

25   foreseeability proximate cause was required as to the

1      "result in."

2            THE COURT:  But we are talking very different --

3      assault versus illegal drugs.  The statute in this case

4      makes it pretty clear that if you are going to be a drug

5      dealer, you are on notice that your sentence is going to

6      be enhanced if people die from using these controlled

7      substances because they are dangerous.  That is different

8      from an assault.

9            So I am kind of putting those cases aside, because

10     I agree, that is what those cases say.  But when we are

11     talking about a controlled substance, the reason it is

12     controlled is because it is inherently dangerous.  And the

13     statute pretty much makes it real clear, it doesn't matter

14     if that was the only cause.  All that has to be shown is

15     that as a result of using the drugs that were distributed,

16     you can be found liable for an enhanced sentence

17     essentially.

18           MR. MAIR:  Well, again, I think the statute says

19     "results in," just like every other statute that contains

20     one of these provisions.  And drug pushing, being illegal,

21     inherently illegal, results in death.  Assaulting somebody

22     results in death.  I guess I don't see the distinction.

23           THE COURT:  I believe that the drug laws -- the

24     reason we have controlled substances, as I said, is

25     because they are inherently dangerous.

1           MR. MAIR:  I guess that speaks to some of the

2     complications and basic strangeness that arises when we

3     talk about using 841 to prosecute doctors.

4           THE COURT:  But, you can prosecute, but we don't

5     get to this point until it is shown that they are not

6     acting as doctors, they are acting as drug pushers.

7     Therefore, they are no different than anybody else on the

8     street.  We give them the special protection in the first

9     instruction because they do have the training, and it is

10    not a negligence standard.

11          But, if they are found guilty under that

12    instruction, they no longer have those sort of protections

13    that we give, because they are no better than a drug

14    pusher.

15          MR. MAIR:  Well, I guess I would submit that it

16    remains different, only because when you prescribe

17    somebody a pain medication, if it is not reasonably

18    foreseeable that they are going out and mix that pain

19    medication with a gallon of alcohol and then die, that

20    results in -- shouldn't -- the "results in death"

21    provision shouldn't apply in that instance.

22          Whereas, if you are giving someone heroin, you know

23    that is inherently dangerous, in a way that prescribing

24    pain medications that are FDA approved and marketed for

25    the first several years that they were in existence as not

1    even being addictive, is a very different thing than

2    giving somebody heroin, where, yes, you can expect they

3    are going to die.

4        THE COURT:  Not if it was not done for a legitimate

5    medical purpose.  That is where we disagree.  If the jury

6    has found that those substances were prescribed not for a

7    legitimate medical purpose, they are no different than

8    somebody who sold heroin.  They are drug pushers.

9        And that is why I said, I am being very strict on

10   the first one, but it seems to me that if you look at the

11   rationale for our drug laws, if you look at all of the

12   interpretations of this causation, essentially, if they

13   get to this point, if they have been found guilty, the

14   jury has essentially said, you are not acting as a

15   physician, you are acting an a drug pusher.  Then they are

16   on the same footing with everybody else.

17       And the law essentially says, if somebody dies from

18   the use of that drug, you get this enhanced sentence, and

19   it is a "but for" causation.

20       MR. MAIR:  Well, I understand the distinction, I

21   suppose, that the Court is making.  I guess we would

22   disagree, and we would object to that language based on

23   the, as I say, the fundamental principle of criminal law

24   that Woodlee sets forth.

25       THE COURT:  All right.  Mr. Leffert?

1          MR. LEFFERT:  Judge, here is why in this case "but

2     for" is not enough.  And I appreciate everything that you

3     have said.  The difference is -- there is four death

4     counts in this case; two against each defendant, they

5     share one death count.

6          If you had a situation where the jury got beyond

7     the "legitimate medical purpose," let's say that he met

8     him in a parking lot and gave him a prescription of

9     oxycodone, the person went home, took it all and died.

10    Okay.

11         In this case, all four of these death cases are

12    people with long histories of multiple medical problems.

13    And, more importantly, the toxicology reports show that

14    they had a multitude of drugs and alcohol in their system

15    at the time they died.

16         Some, in a couple of instances, what these doctors

17    prescribed, they had drugs off the street.  They had

18    non-prescription drugs that they were taking at the same

19    time.

20         So, when you look at it from a standpoint of

21    toxicology and really what caused this person to die, when

22    you use only a "but for," think about the quandary that is

23    left to the jury.  In one case that I can think of, there

24    were eight different drugs in this person's body,

25    including alcohol, and one of which they got from

1    Dr. Peper, and the rest of which they got from different

2    sources.

3            There was Valium.  I believe there was meth.  There

4    was Xanax.  There was alcohol involved.  And in those

5    situations, it looks like a smorgasbord of drugs.  And I

6    believe that the -- I don't believe there will be any

7    evidence at trial that the doctors knew they were taking

8    these other drugs that they had not prescribed for them.

9            So, in that situation, what is the jury left with?

10   It says, but for that drug.  Well, I guess technically you

11   would say, but for any one of those drugs that death might

12   not have resulted.  Were it not for Xanax with oxycodone,

13   it might not have resulted.

14           I just think that because we are talking -- Judge,

15   you know this better than I do, each of these death counts

16   carries a mandatory minimum 20 years sentence.  There are

17   four counts; two against each defendant here.  And I think

18   it calls for a heightened standard of causation, so that

19   it is clear to the jury that "but for that drug," is not

20   sufficient.  It must have resulted in.  That there had to

21   be some foreseeable causation, based on what I think the

22   evidence will be at trial.

23           THE COURT:  All right.  And where we are losing

24   track of the forest, because we are focusing on this tree,

25   is that they don't get to that instruction unless they

1    found that it was not for a legitimate medical purpose.

2    So if it was for a legitimate medical purpose, we don't

3    even get there.

4        MR. LEFFERT:  Well, judge, if that is the case,

5    then you have a multiplicity issue with these two charges,

6    because one criminal count is "not for a legitimate

7    medical purpose."  Another criminal count is it "results

8    in death."  Those are separate charges.  And if you are

9    going to take the position in instructions that once you

10   get to one, you don't need causation for a second, then I

11   think you have a multiplicity issue with respect to the

12   charging Indictment, and those two charges should be

13   merged.

14       THE COURT:  Well, no.  What I am saying is that

15   this is an enhancement to it, essentially.  But they can't

16   get to this instruction unless they find them guilty of

17   Count 26, Count 50, Counts 66 and 69.  If they say, we

18   don't find them guilty on those, they can't even get to

19   this instruction.

20       And that is where I am saying, it has to have been

21   shown first that these prescriptions were not for a

22   legitimate medical purpose.  And if they are shown to have

23   been for a legitimate medical purpose, then the jury can't

24   even get to it.

25       MR. LEFFERT:  I understand, Your Honor.

1          THE COURT:  All right.  Well, let me give you the

2     benefit of the rationale, just for the record, to make it

3     clear on the record.

4          The language that I would come up with here is --

5     and I will send this to you, so you don't have to write it

6     down.  And I will send it out, so that if you want to do

7     some further briefing on this based on what I have to say

8     here.

9          "If you find either defendant guilty of Counts 26,

10     50, 66 or 69, you must determine whether the Government

11     has also proved beyond a reasonable doubt that death

12     resulted from the use of the controlled substance, as

13     specified in that count.

14          However, if you find defendants not guilty of

15     Counts 26, 50, 66 or 69, then you need not consider

16     whether death resulted from the use of a controlled

17     substance for that count.

18          A determination that death resulted from the use of

19     the controlled substance specified in the relevant count

20     is satisfied upon a finding by you that but for the

21     patient having ingested the controlled substance, he would

22     not have died."

23          And, as I said, originally when I looked at this,

24     when I first started looking into it, it seemed to make

25     sense, defendants; argument made sense.  But the more I

1    looked into how I was putting these instructions together,

2    I ended up doing a complete switch on it.

3         The primary issue, as I stated, is whether it is a

4    "but for" or "actual cause of death" or a "proximate cause

5    of death."  "Proximate cause" contains a reasonable

6    foreseeability argument, and that is more onerous than

7    just proving "but for" causation.

8         As far as this Court is aware, every circuit to

9    have considered this question in this context has

10   determined that 21 United States Code Section 841(b)

11   "resulting in death" language does not require a finding

12   of proximate cause.

13        The First Circuit, in United States v. De La Cruz,

14   514 F.3d 121, First Circuit, 2008.  Third Circuit, United

15   States v. Robinson, 167 F.3d 824, Third Circuit, 1999.

16   Fourth Circuit, United States v. Patterson, 38 F.3d 139,

17   Fourth Circuit, 1994.  Sixth Circuit, United States v.

18   Rebmann, R-E-B-M-A-N-N, 226 F3d. 521, Sixth Circuit, 2000.

19   Eighth Circuit -- actually, before the Burrage, United

20   States v. McIntosh 236 F.3d 968, Eighth Circuit, 2001.

21   Ninth Circuit, United States v. Houston, 406 F.3d 1121,

22   Ninth Circuit, 2005.  Eleventh Circuit, United States v.

23   Webb, 655 F.3d 1238, Eleventh Circuit, 2011.

24        After reading all of those cases, the Court finds

25   that the reasoning employed by those courts is sound.  To

1    begin with, the language of 21 United States Code Section

2    841(b)(1) "if death results from" does not, on its face,

3    evince a foreseeability or proximate cause requirement.

4         The admission of any reference to "foreseeability"

5    or "proximate cause" cuts against the defendants' position

6    because the purpose -- because of the purposes of the

7    Controlled Substances Act.

8         The Controlled Substances Act deals with "a

9    discrete problem; the distribution of controlled

10   substances, products which Congress recognized will, in

11   some cases, cause death or serious bodily injury."  That's

12   from Robinson, 167 F.3d, at 826.  The Third Circuit has

13   stated, "Congress recognized that the risk is inherent in

14   the product and, thus, it provided that persons who

15   distribute it do so at their peril."  Also from Robinson,

16   at 826.

17        And the Court agrees with the Fourth Circuit's

18   conclusion that, "the statute puts drug dealers and users

19   on clear notice that their sentences will be enhanced if

20   people die from using the drugs they distribute."  That is

21   Patterson, 38 F.3d, at 145.

22        In general, drug crimes do not require the

23   Government to prove proximate cause when the charging

24   statute calls for a certain result.  United States v.

25   Pineda-Doval, D-O-V-A-L, 614 F.3d 1019, Ninth Circuit,

1    2010 case, which gives numerous examples of that.

2         Because the purpose of the Controlled Substances

3    Act is to curtail the nations' drug abuse problem, and

4    because Congress recognized that there is an inherent risk

5    that death would result from drug use, the Court agrees

6    with the precedent that has previously been cited; that a

7    finding of proximate cause is not required to trigger this

8    heightened penalty of a 841(b).

9         In making this conclusion, as I stated, I was

10   noting the interrelationship between the -- this

11   instruction and that of the elemental instruction.  The

12   Government's argument as to causation succeeds really

13   because the Government must prove that the defendants were

14   acting as drug dealers or pushers or traffickers, as that

15   is conventionally understood.

16        If the defendants' conduct was other than drug

17   dealing, it would -- imposing what would amount to a

18   strict liability for the death of those who had died would

19   make little sense.  But that is not the case.  We have a

20   very high standard that has to be met in the first place

21   before we even get to this instruction.

22        Now, I reach this conclusion notwithstanding the

23   fact that the Tenth Circuit, as the defendant has argued,

24   has interpreted similar language from other statutes to

25   require a finding of proximate cause or foreseeability.

1    In particular, United States v. Woodlee, 136 F.3d 1399,

2    Tenth Circuit, 1998, which found that the "bodily injury

3    element" of the conviction under 18 United States Code

4    Section 245 is satisfied "if injury was a foreseeable

5    result" of the defendant's conduct.  United States v.

6    Brown, 50 Fed. Appx. 970, Tenth Circuit, 2002, also

7    dealing with assault resulting in serious bodily injury,

8    essentially found that they had to show that the assault

9    was the cause in fact and the proximate cause of injury.

10          However, those statutes do not deal with the

11   discrete problem arising from products involving an

12   inherent risk of serious injury or death, such as those

13   under the Controlled Substances Act.  Thus, the Court

14   finds that interpretations of similar language found in

15   those statutes are not persuasive in this setting,

16   especially when compared to the weight of authority from

17   the other circuit courts whose rationale was persuasive.

18          And the Court does note that this case is currently

19   before the Supreme Court in Burrage v. United States.  Who

20   knows, if that comes down before we go to trial, it may be

21   a different result.  But this Court at this point has

22   proceeded in accordance with what it considers to be the

23   well-reasoned authority from the other circuits that

24   directly applies in this case.

25          Because in this case the Government will have to

1    prove that the defendants were acting as drug pushers,

2    maintaining the lower standard of causation supported in

3    these numerous drug dealing cases makes perfectly good

4    sense.

5           Anything further on that?

6           MR. PENA:  No, Your Honor.

7           MR. MAIR:  No, Your Honor.

8           MR. LEFFERT:  No, Your Honor.

9           THE COURT:  All right.

10          MR. PETERS:  Your Honor, if I may be heard briefly,

11   you have got the hearing scheduled for all afternoon.  We

12   seem to be making quite a bit of progress.  I would like

13   to take a bathroom break.

14          THE COURT:  I need to give the court reporter a

15   break also.  We will take about a 15-minute break.  We

16   will reconvene at 2:25.

17          (A break is taken from 2:08 p.m. to 2:23 p.m.)

18          THE COURT:  You may be seated.

19          All right.  Moving on to the elements instruction

20   for health care fraud.  There is no pattern instruction

21   for health care fraud in this circuit.  But the bank fraud

22   statute is highly similar to the health care fraud

23   statute.  As I understand it, there are two main points of

24   contention between the Government and the defendant with

25   respect to this instruction.

1         First, the defendants want to add at the end of the

2    first element the following language, "that is, the

3    defendant knowingly and willfully caused money to be

4    obtained from the health care benefit program named in the

5    particular count based on a false or fraudulent claim that

6    the defendant caused to be submitted on or about the date

7    charged for the count for medical services and procedures

8    that were not medically necessary."

9         The defendants assert that "an instruction that

10   does not properly limit the jury's consideration of the

11   execution of the scheme to that charged language would

12   constitute a constructive amendment of the Indictment,

13   resulting in a violation of the defendants' Fifth

14   Amendment right to a grand jury."

15        The Government argues that such language,

16   particularly the "based on a false or fraudulent claim for

17   medical services and procedures that were not medically

18   necessary," is merely an improper attempt to limit the

19   jury's consideration of the totality of the 17 pages of

20   information and allegations for the health care fraud

21   counts in the Superseding Indictment.

22        The Fifth Amendment to the United States

23   Constitution does require that a felony defendant be tried

24   only on an offense alleged in a grand jury Indictment.

25   Once an Indictment has been returned, its charges may not

1    be broadened through amendment caused by a court's jury

2    instructions.  And "A jury instruction constructively

3    amends an Indictment if, together with the evidence

4    presented at trial, the possibility is raised that the

5    defendant was convicted of an offense other than that

6    charged in the Indictment." United States v. Johnson, 996

7    F.2d 312, Tenth Circuit, 1993, unpublished opinion.

8         To rise to that level, "the change in the

9    Indictment must be more than the addition or deletion of

10   nonessential factual averments.  It must effectively alter

11   the substance of the Indictment." Hunter v. New Mexico,

12   916 F.2d 595, Tenth Circuit, 1990.

13        In this case, the Superseding Indictment is

14   structured as follows:  Counts 1 through 11, health care

15   fraud.  Counts 12 -- or Count 12, rather, conspiracy to

16   commit money laundering.  Counts 13 through 22, money

17   laundering.  And Counts 23 through 70, dispensing or

18   distribution of controlled substances.

19        The health care fraud section of the Superseding

20   Indictment charges a scheme to defraud various health care

21   benefit programs through several manners and means,

22   including a paragraph describing the execution of the

23   scheme, and in table format, sets forth 11 counts, which

24   constitute acts allegedly taken in execution of that

25   scheme.

1        The structure of the health care fraud section of

2   the Superseding Indictment evinces quite clearly the

3   substance of the health care fraud allegations.  A

4   straightforward reading of the Superseding Indictment

5   indicates that the Government intends to put on evidence

6   to show:  One, instances in which defendants prescribed

7   controlled substances not for a legitimate medical purpose

8   which resulted in concomitant fraudulent acts.

9        Second, the instances in which defendants falsified

10  medical records.

11       Third, instances in which defendants engaged in

12  "upcoding."

13       And, four, instances in which defendants billed for

14  services not rendered.

15       The execution of the scheme section specifically

16  mentions instances in which defendants allegedly "caused

17  money to be obtained based upon false and fraudulent

18  claims that the defendants caused to be submitted for

19  medical services and procedures that were not medically

20  necessary."

21       However, the substance of the Indictment as to the

22  health care fraud is clear.  At this point, the Court

23  discerns no possibility that defendants could be convicted

24  of an offense other than that charged in the Superseding

25  Indictment, because the instruction that I am going to

1   propose does not contain language broader than the

2   Superseding Indictment.

3        Now, defendants point out that the pattern mail

4   fraud instruction states that for the first element of

5   that crime, the Court should "describe the scheme as

6   stated in the Indictment."  But the defendants then draw

7   only from the "execution of the scheme" paragraph of the

8   Superseding Indictment.

9        That selective quoting does not fairly describe the

10  scheme as stated in the indictment.  To the extent that

11  the defendants argue that the Court must describe the

12  scheme as stated in "the execution of the scheme"

13  paragraph, they provide no authority that so holds, nor is

14  the Court aware of any.

15       The two cases they do cite are so inapposite as to

16  actually detract from the position the defendants submit

17  them for.  For example, in Hunter v. State of New Mexico,

18  916 F.2d 595, Tenth Circuit, 1990, the Tenth Circuit

19  identified a constructive amendment where a jury

20  instruction allowed the defendant to be convicted of a

21  crime that, at the time he was convicted, did not exist.

22       In this case, the proposed elemental jury

23  instruction and the Superseding Indictment upon which it

24  is based, both accurately describe a violation of the

25  health care fraud statute, a law that currently exists.

1  United States v. Mills, 29 F.3d 545, Tenth Circuit, 1994,

2  is also unavailing.  The Tenth Circuit in that case

3  determined that no constructive amendment occurred in that

4  case.

5       Now, under Section 1347, the Government is not

6  required to charge a defendant with every execution of a

7  health care fraud scheme.  United States v. Boesen,

8  B-O-E-S-E-N, 473 F.Supp. 2d 932, Southern District of

9  Iowa, 2007.  In fact, the Government could indict a

10  defendant for health care fraud -- for a health care fraud

11  scheme by charging only one execution of that scheme.

12       Although the crime of health care fraud "is

13  complete upon the execution of a scheme, any scheme can be

14  executed a number of times, and each execution may be

15  charged as a separate count."  United States v. Hickman,

16  331 F.3d 439, Fifth Circuit, 2003.

17       Essentially, for each count of conviction there

18  must be an execution.  But the opposite is not true.  Each

19  execution need not give rise to a charge in the

20  Indictment.  United States v. Hammen, H-A-M-M-E-N, 977

21  F.2d 379, Seventh Circuit, 1992.

22       Therefore, the Court is inclined to reject the

23  defendants' attempts to artificially limit the

24  Government's ability to prove the health care fraud scheme

25  alleged in the Superseding Indictment.

1          The second issue is that the parties disagree as to

2     whether "willfully" should be defined in the instruction.

3     The Government urges that the Court not define the term,

4     and references the Tenth Circuit's pattern instruction

5     1.38, "Willfully -- to act."  The comment to that

6     instruction states that, "the Committee does not recommend

7     any general instruction defining the term 'willfully,'

8     because no single instruction can accurately encompass the

9     different meanings this term has in federal criminal law."

10         However, that comment goes on to note that "the

11    Committee suggests that when a statute uses this word,

12    care should be taken to distinguish between its meanings."

13         The Court is not planning on giving a general

14    instruction defining "willfully."  Rather, the Court

15    believes that it should define the term "willfully" in the

16    context of the health care fraud elemental instruction,

17    and it will do so with care.

18         The comment goes on to note that "although the term

19    'willful' can denote a specific intent requirement, this

20    is not always the case."  The law in the Tenth Circuit is,

21    however, that "the health care fraud statute requires a

22    specific intent to defraud or misrepresent."  United

23    States v. Franklin-El, 554 F.3d 903, Tenth Circuit, 2009.

24         Defendants assert that, in this case, "willfully"

25    requires "proof of a voluntary, intentional violation of a

1    known legal duty."

2         However, "willfulness" understood as intentional

3    conduct that the defendant knows to be a violation of law,

4    is explicitly not required by the health care fraud

5    statute.  18 United States Code Section 1347(b) provides,

6    "With respect to violations of this section, a person need

7    not have actual knowledge of this section or specific

8    intent to commit a violation of this section."

9         Rather, "willfulness" in this case is understood

10   merely as intentional conduct.  As such, the Court's

11   definition; that defendant "performed an act deliberately

12   and intentionally 'on purpose,' as contrasted with

13   accidentally, carelessly or unintentionally," is all that

14   is required.  United States v. Hilliard, H-I-L-L-I-A-R-D,

15   31 F.3d 1509, Tenth Circuit, 1994.  That is also in accord

16   with the Tenth Circuit pattern instruction 1.38, quoting

17   Hilliard.

18        And so the instructions -- I don't want to read the

19   whole thing to you, but I will read the elements, at

20   least.  First, "the defendant knowingly and willfully

21   executed or attempted to execute a scheme or artifice to

22   defraud the health care benefit program named in that

23   count by means of false or fraudulent pretenses,

24   representations or promises.

25        Second, the health care benefit program named in

1    the particular count of the Indictment was a health care

2    benefit program within the meaning of the law.

3          Third, the defendant knowingly and willfully

4    intended to defraud.

5          And, fourth, the false or fraudulent pretenses,

6    representations or promises that the defendant made were

7    material."

8          And then I go on to, "when the word 'knowingly' is

9    used in these instructions, it means that the act was done

10    voluntarily and intentionally, and not because of mistake

11    or accident.  Similarly, to find that the defendant acted

12    willfully, you must find that he knowingly performed an

13    act deliberately and intentionally, 'on purpose,' as

14    contrasted with accidentally, carelessly or

15    unintentionally."

16          And then I have definitions for "scheme or artifice

17    to defraud the health care benefit program."  And then I

18    have, "the pretense, representation or promise is false or

19    fraudulent if it is known to be untrue or is made with

20    reckless indifference as to its truth or falsity.  A

21    pretense, representation or promise would also be false or

22    fraudulent when it constitutes a half truth or effectively

23    omits or conceals a material fact, provided it is made

24    with intent to defraud."

25          And "'to act with intent to defraud' means to do

1    something with the specific intent to deceive or cheat

2    someone, usually for personal financial gain or to cause

3    financial loss to someone.  A statement is material if it

4    has a natural tendency to influence or is capable of

5    influencing the decision of the person or entity to which

6    it is addressed."

7         So we are going to focus first on just the

8    elemental instruction, and then we'll get to the death

9    enhancement instruction that will relate to that.

10        Mr. Pena?

11        MR. PENA:  Your Honor, I fear that I am going to

12   inadvertently snatch victory from the jaws of defeat, and

13   I don't want to do that.  However, I would like to ask the

14   Court to consider this.  I have handled a number of health

15   care fraud, specifically 1347 cases over the years.  And

16   even though the Tenth Circuit does not have an accepted

17   pattern jury instruction specifically on that, in the past

18   I have also looked towards the bank fraud statute and its

19   applicability in the Tenth Circuit.

20        But, what I found in the past also, is what is

21   instructive is the case law has been very well developed

22   in the Eleventh Circuit, and they do have a pattern

23   associated with it, all these concepts that you talked

24   about, that were kind of an adoption of the bank fraud

25   statute for use in a 1347 case, has already been done in

1    the Eleventh Circuit pattern jury instructions.

2          So all I ask the Court is to please consider the

3    Eleventh Circuit pattern jury instructions and the

4    definitions associated with those.  They are very similar

5    to what the Court has already indicated.  The element are

6    very similar.  But I would just ask that the Court

7    consider those.

8          THE COURT:  Well, I did.  Actually, the language

9    that I drew from this, a lot of it was taken from the

10   Eleventh Circuit instructions.

11         MR. PENA:  With regards, of course, to the rest of

12   the proposed instruction, the Government is comfortable

13   with the Court's determination as to what the appropriate

14   law is and the mens rea is with regard to "willfully."

15         Under the circumstances, of course, there is the

16   definitions associated with "non-tax" cases.  That is part

17   of *O'Malley*s.  But the Government is comfortable with the

18   definition that is implied in the Court's definitions on

19   "willfully."

20         Thank you.

21         THE COURT:  All right.  Mr. Mair?

22         MR. MAIR:  Briefly, Your Honor.  Defendants would

23   ask that the Court limit the jury's consideration of the

24   execution of the scheme to defraud to the execution that

25   is set fort in the Indictment.  If you look at what I call

1    a typical fraud case; a wire fraud or a mail fraud, you

2    would have your scheme to defraud, and it would be 15

3    different mortgages that you submitted false documents on.

4         And then you would have your executions, which

5    would be the mailings or the wires.  Either you put the

6    application in the mail or you got the money wired to you

7    from the bank.  And if the Government's proof fails on

8    either one of those, then the defendant is not guilty.  If

9    the mailing fails, the defendant is not guilty.  Here,

10   similarly, there are 15 pages of schemes, essentially, 4

11   years of medical practice.  And then there is the

12   execution.

13        And the execution, by its terms, is limited to

14   submitting claims for medical services and procedures that

15   were not medically necessary.

16        We would simply ask that the Court formulate an

17   instruction in some manner that holds the proof -- makes

18   the Government prove those executions.

19        THE COURT:  All right.  And I am not disagreeing

20   with you.  I think the instruction does do that; that the

21   counts of conviction would be limited to that execution.

22   But that's not to say the Government is going to be

23   limited to just evidence on that that is cited in the

24   Indictment.  I will give them a bit of leeway to prove the

25   scheme via executions that are not charged.

1       MR. MAIR:  As an evidentiary matter, we don't

2    disagree.  As an instructional matter, we would just hope

3    that when -- that somehow it is communicated to the jury

4    that the execution is the execution stated in the

5    Indictment.

6       THE COURT:  And I think we can have an instruction

7    that would address that specifically.  That they're not

8    charged with any crime other than what is set forth in the

9    Indictment for that particular count.

10       MR. MAIR:  As to "willfully," I would just direct

11    the Court's attention to United States v. Ferrell, the

12    Northern District of Illinois case from June 12th of this

13    year, so just a few weeks ago.  It is 2013 West Law

14    2636108.  And it discusses willfully as it applies to

15    1347.

16       And, in particular, it notes the Congressional

17    Amendment of 2010, and how they clarify that the defendant

18    does not need to know that he is violating 1347

19    specifically, but holds that he must know that his acts

20    were "unlawful."

21       We would submit that the defendants' definition

22    accurately incorporates that requirement, and it is a

23    requirement of willfulness under 1347.  And the

24    Government's instruction -- and I believe the instruction

25    as the Court has set it forth so far, does not.  Thank

1   you.

2          THE COURT:  All right.  Mr. Leffert, anything

3   further?

4          MR. LEFFERT:  Judge, we have nothing to add, but

5   join with Mr. Mair's comments.

6          THE COURT:  All right.  That takes us, then, down

7   to the death enhancement.  Now, this one I come out

8   opposite of how I came out before.  Because, as opposed to

9   the Controlled Substances Act, 1347 does not deal with

10  discrete problems arising from products that have an

11  inherent risk of serious injury or death.

12         1347 essentially provides an enhanced penalty if

13  the fraudulent health care scheme resulted in death.  As

14  such, 1347 "applies to a wide variety of economically

15  motivated health care activities, and focuses on the

16  relationship between the defendants' conduct and the

17  consequences thereof," as opposed to the relationship

18  between the use of a controlled substance and death, which

19  is the focus in 841.

20         And that is all language taken from Webb, 655 F.3d,

21  at 1259, concurring and dissenting.  Therefore, in this

22  Court's mind, the proximate cause in this -- the proximate

23  cause in this count is an appropriate standard to apply

24  when determining whether the health care fraud violation

25  results in death.

1          In United States v. Martinez, 588 F.3d 301, the

2    Sixth Circuit in 2009 held that 1347 requires a finding of

3    proximate cause.  And its analysis was quite persuasive to

4    this Court.  Woodlee, in this particular case, was more

5    applicable, and the Court believes that Woodlee, with

6    respect to this count, would require that there be such an

7    additional element of the instruction.

8          In Pineda-Doval, 614 F.3d, at 1047 -- let me see if

9    I can find the full cite.  Well, in that particular case,

10   the Ninth Circuit explained, I thought quite well, the

11   phenomenon of why the "if death results" language from the

12   Controlled Substances Act, does not require a finding of

13   proximate cause, while the same language in other statutes

14   does.  And that is at page 1027-28.

15         The Court in that case started from the premise, as

16   I previously mentioned, that a basic tenant of criminal

17   law is that when a criminal statute requires that the

18   defendant's conduct has resulted in an injury, the

19   Government must prove that the defendant's conduct was the

20   legal or proximate cause of the resulting injury.

21         It then went on to state that "the presumption is

22   that the Government must prove proximate cause whenever

23   the charged offense requires a certain result," and that

24   this presumption can be rebutted.  And the Court

25   specifically mentioned the example of the Controlled

1    Substances Act.

2         MR. LOZOW:  Can you give me the cite again?

3         THE COUR:  Sure.  It is 614 F.3d -- I am sorry, I

4    don't have the full case, but it is 614 F.3d, at pages

5    1027-28, is where I was quoting from.  And they were

6    essentially explaining how it didn't apply in the

7    Controlled Substances Act cases, but it would apply in

8    other cases.

9         And the analysis that they used in that case was

10   persuasive to this Court as to why in the health care

11   fraud counts there should be a proximate cause

12   requirement.

13        Therefore, this instruction would be, "If you find

14   defendant Jahani guilty of Count 1, 10 or 11, you must

15   determine whether the Government has also proved beyond a

16   reasonable doubt that death resulted from health care

17   fraud, as specified in that count."

18        Then, if you don't find him guilty, then you don't

19   need to consider this.  Then I go on to say, "To find that

20   dealt resulted from health care fraud, you must be

21   convinced that the Government has proved beyond a

22   reasonable doubt that defendant Jahani's commission of

23   health care fraud was both the actual and proximate cause

24   of death.

25        A determination that death resulted from the

1    commission of the health care fraud specified in that

2    count or the relevant count is not satisfied upon a

3    finding by you that but for the health care fraud the

4    patient would not have died.

5         The term 'actual cause,' means that death would not

6    have occurred but for the health care fraud.

7         The term 'proximate cause', means that the health

8    care fraud in a natural and continuous sequence, unbroken

9    by any intervening cause, produced the death, which could

10   have been reasonably anticipated or foreseen as a natural

11   consequence of the fraud.

12        The term 'intervening cause' means an event that

13   occurred between the health care fraud and the death,

14   thereby altering the natural course of events that might

15   have connected the fraud to the death."

16        And I know that is a lot.  I will send that

17   language out to you because, as I said, these are my

18   proposals.  I would like to hear if you have any further

19   argument to make with respect to that.

20        And the full cite to that, if you want it, is 614

21   F.3d 1019, a Ninth Circuit, 2010 case.

22        So, in this case, because this was not dealing with

23   an inherently dangerous substance, such as drugs, I do

24   believe that you have to have both the "but for" and the

25   "proximate causation."  "Actual cause" and "proximate

1    cause."

2         Mr. Pena?

3         MR. PENA:  Your Honor, with regards to the "but

4    for" causation, I think that the Government's position,

5    and has been in the past, that the "but for" causation,

6    because the statutory language is the same, the "resulted

7    in" causation should apply to both the Controlled

8    Substances Act and the health care fraud count.

9         And the reason that I say that, Your Honor, is one

10   of the cases that we talked about earlier with regards to

11   the "but for" causation was the Eleventh Circuit case

12   cited as United States v. Webb.  And in that case, the

13   Eleventh Circuit squarely addressed the issue of the

14   "resulted in" language and the health care fraud statute,

15   and how it relates to the same language in the Controlled

16   Substances Act.

17        And there was no -- and this is a quote.  "No

18   principled way to distinguish between the 'results in'

19   language in 18 U.S. Code 1347 and the 'results from'

20   language in 21 U.S. Code 841" and that, therefore, the

21   jury instructions that did not require foreseeability or

22   proximate cause on an enhanced sentence for death

23   resulting from the health care fraud was also proper.

24        I think that the Eleventh Circuit has addressed

25   this squarely.  I am not sure -- and, to be honest with

1    you, I am not sure whether the cases the Court has cited

2    dealt specifically with the "results in" language out of

3    the health care fraud statute.  That is 18 U.S. Code 1327.

4    But this case squarely address it.  And it made no

5    distinction between the two statutes.

6         And, for that reason, the Government would ask that

7    the Court consider this case in formulating its

8    instruction regarding that.  And I do think also that the

9    issue of foreseeability and proximate cause is almost like

10   a red herring to the causation issue in this case, and I

11   think that it is -- the language is very similar.  It is

12   almost indistinguishable from the Controlled Substances

13   Act.

14        I understand what the Court has said and the

15   distinctions that the Court sees.  However, I would ask

16   and urge the Court to consider the Eleventh Circuit case

17   of United States v. Webb.

18        THE COURT:  I did.  I considered it very carefully.

19   And Webb did determine that proximate cause was not

20   required to find that dealt resulted under 1347.  And, as

21   the Webb court noted, Congress clearly could have chosen

22   to, but did not, to include a proximate cause requirement

23   in the statute.

24        However, Congress also could have specified that

25   proximate cause was not required, and that only but for

1    causation would be necessary.  Congress did neither.

2         And this Court disagrees with the Webb court's

3    analysis, to the extent that it relies on the "plain

4    language" of the statute for those reasons.  And then the

5    language that I cited from Judge Stapleton, which it was

6    his concurrence/dissent in Webb, I thought he had the

7    better argument of it.

8         So I did very carefully consider Webb, and I think

9    there is a big distinction between the Controlled

10   Substances Act and other types of cases.

11        MR. PENA:  Thank you, Your Honor.

12        THE COURT:  All right.  Mr. Mair?

13        MR. MAIR:  I have very little to add to what the

14   Court said.  I think the Court reached the correct

15   instruction in this instance.  To the extent the

16   Government thinks tat the same language should result in

17   the same standard, I might be inclined to agree, but I

18   would flip it.  And think that the proximate cause should

19   go to the 841 counts, pointing only to U.S. v. Martinez.

20        As you pointed out, that is a Sixth Circuit case

21   discussing the 1347 and requiring proximate cause, and

22   citing the Tenth Circuit's opinion in Woodlee.  Thank you,

23   Your Honor.

24        THE COURT:  All right.

25        MR. LEFFERT:  Nothing further, Your Honor.

1          THE COURT:  Nothing further.  All right.

2          That pretty much does it as far as I'm concerned

3     with respect to the instructions that I thought were

4     really critical to this case.  Do you all believe there is

5     something else I ought to be considering?

6          Mr. Peters?

7          MR. PETERS:  A couple.  Your Honor, you asked us to

8     come to court on the elements, and I agree that we

9     attacked the elements; that laundry can wait for another

10    day.  The Government was fairly conspicuous about

11    tendering a good faith instruction.  And it's my view that

12    there will be good faith instructions applicable to both

13    the fraud case and the Title 21 case, which would be well

14    supported by case law.

15         I just want to make a record that we see it that

16    way, so that there aren't any surprises at a later date.

17         THE COURT:  All right.

18         MR. PETERS:  I don't know if that is something that

19    you want -- I just want to make sure that you are not

20    looking to take that up this afternoon.

21         THE COURT:  No, I wasn't.  All I was planning on

22    taking up this afternoon -- what I really -- as you know,

23    we set this hearing to try to get our arms around what the

24    scope of this trial is going to be; whether I should

25    bifurcate or not in this case.  And I think this would

1    give us a better sense of where we were headed if this is

2    what I am going to limit it to.

3            MR. PETERS:  It does indeed.  And then I have kind

4    of a process question, because I am extremely thankful

5    that you have done this out of order in the case.  But it

6    raises a process question about, if there were a jury

7    waiting on us right now, and we were doing it in the

8    customary fashion, you would be handing something out, and

9    we would be just noting objections for the record.  How do

10   you see that going here?

11           THE COURT:  What I will do is I will prepare for

12   you the instruction with the language.  I will send it

13   out.  Then, if you -- there were a couple of issues that I

14   think I would probably want a little more briefing on,

15   because you really didn't address the conjunction "and/or,

16   knowingly" and "and/or intentionally."

17           So I think you all might want to do a little more

18   briefing on that for me with respect to these.  Perhaps a

19   little more briefing on the "usual medical practice,"

20   whether I exclude it or not.

21           And I will tell you, at this point, I am more

22   inclined, because this case is getting too complicated, I

23   am inclined to exclude it, especially because the Tenth

24   Circuit says they are synonymous.  We don't need to then

25   have negligence instructions and everything else.

1          It will limit -- I understand, the Government's

2     expert witness, because he is not going to come in and

3     testify as to general practice, it is going to be

4     essentially with respect to legitimate medical purpose.

5          But, before I make that decision, if the Government

6     or the defendants wish to submit additional briefing on

7     that issue, because that was not something -- it was

8     something I kind of brainstormed in the last few days, I

9     will accept that briefing, as well.

10          So what I would propose is that I will send out to

11     you the language that I would propose based on this

12     hearing, after taking into account what you all have said.

13     You can then submit anything in writing suggesting other

14     changes that you want to have made, and also the briefing

15     on those particular issues.  I think those are the two

16     that I specifically wrote down that I didn't want to have

17     fall by the wayside.

18          So I would propose, I will get you something

19     probably by -- I can probably get you something out by

20     tomorrow.  Then if you had two weeks to submit

21     simultaneous briefing, and any other suggestions for

22     language on this, that would be fine.  And then I will let

23     you know where we are going.

24          And then we also need to set a hearing on a couple

25     of the outstanding motions, as to whether there needs to

1    be a bill of particular.  There were a number of things

2    that we need to hold a hearing on, as well.

3              MR. LOZOW:  Severance.

4              THE COURT:  Severance.  That is what it is.

5              MR. PETERS:  And there is some contention -- there

6    is a motion for reconsideration directed to a bill of

7    particulars, too, that is very focused on the fraud count.

8              THE COURT:  Okay.

9              MR. PETERS:  Your Honor, you suggested two weeks,

10   and vacation schedules are never a good reason.  But, on

11   bended knee, because of our schedule, could we have three?

12             THE COURT:  That would be fine.  So let's go ahead

13   and say, I will get out for you by tomorrow, I will e-mail

14   out to you tomorrow the proposed instructions, or I may

15   docket them, just so we have a clear record.  I will

16   docket them, the proposed instructions on this.

17             Then you will have until July 24th to submit

18   simultaneous briefing on any issues mentioned here or on

19   your objections.  And you don't need to reiterate

20   everything that you've already argued, but just to make it

21   easier for appellate purposes and all that, and to try to

22   persuade me otherwise, you can submit that.

23             Then how long do you think the severance and the

24   bill of particulars motions will take?  Do we need an

25   hour, more?

1          MR. PETERS:  Well, Your Honor, I felt like the

2    setting this afternoon was very comfortable.  And I know

3    we are ending early, but I would rather not be constrained

4    to an hour, because I very much believe that this next

5    round of motion practice will sort of drive the case.

6          THE COURT:  All right.  So how long do you want for

7    that?

8          MR. PETERS:  Could we have another afternoon?  Do

9    you have an afternoon available?

10          THE COURT:  And how far in advance do you want

11    that?

12          MR. PETERS:  I am sorry, I don't understand the

13    question?

14          THE COURT:  So if we have your briefing by the

15    24th, we are looking sometime in August?

16          MR. PETERS:  Oh, yes, that would be fine.

17          THE COURT:  Ms. Hartmann, is your computer up and

18    running now?

19          COURTROOM DEPUTY:  Yes, it is.

20          THE COURT:  Thank goodness.

21          COURTROOM DEPUTY:  We have August 8th available.

22    We can set it for 1 o'clock.

23          MR. PETERS:  That is fine for defendant Jahani,

24    Your Honor.

25          MR. PENA:  That is fine for the Government, Your

1    Honor.

2         THE COURT:  Does that work?

3         MR. LEFFERT:  Yes, Your Honor.

4         THE COURT:  All right.  So, 1 o'clock on August

5    8th, we will put the whole afternoon aside.  And the main

6    items to address there are the motions for severance and

7    for the bill of particulars.  It has been awhile since

8    I've looked at those.  I don't think there needs to be

9    more briefing, but if you want to submit additional

10   briefing, you may do so, by if you could get that to me by

11   the 24th, as well, so I can have it all together in a

12   packet, I would appreciate it.

13        MR. PENA:  Your Honor, I think, I think this is in

14   keeping with what Mr. Peters is representing to the Court,

15   I think that that will be the next major issues for the

16   Court to consider.  Can we also at least preliminarily

17   bring our calendars at that time to kind of have an idea

18   of where we are going to go from that point on?

19        THE COURT:  I think that would be a good idea.  We

20   do need to get this on track once everybody knows what it

21   is we are trying.

22        All right.  Anything further?

23        MR. PENA:  No, Your Honor.

24        MR. PETERS:  Nothing over here, Judge.

25        MR. LEFFERT:  No, Your Honor.

1          MR. LOZOW:  Nothing, Judge.  Thank you.

2          THE COURT:  Thank you very much.  Court will be in

3     recess.

4          (Court is in recess at 2:59 p.m.)

5

6          **R E P O R T E R ' S   C E R T I F I C A T E**

7          I, Darlene M. Martinez, Official Certified

8     Shorthand Reporter for the United States District Court,

9     District of Colorado, do hereby certify that the foregoing

10    is a true and accurate transcript of the proceedings had

11    as taken stenographically by me at the time and place

12    aforementioned.

13

14         Dated this 10th day of July, 2013.

15

16

17         _____

18         s/Darlene M. Martinez

19         RMR, CRR

20

21

22

23

24

25