IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Criminal Case No. 11-cr-00302-CMA-01

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. SAM JAHANI, and
2. ERIC A. PEPER,

    Defendants.

## ORDER BIFURCATING TRIAL

On the three-year-and-three-month anniversary of the Government's original Indictment in this case, the Court examines Defendants' Motions to Sever (Doc. ## 180, 185, 280, 287), requesting that the Court sever the indictment's counts in one of two ways.[1] So-called "plan A" severance would involve severance of the counts alleging health care fraud resulting in death and unlawful dispensation or distribution of substances resulting in death from the remaining counts. "Plan B" involves severing the Controlled Substances Act ("CSA") counts from the remaining counts.

This Court has deferred to the lawyers for far too long: it has indulged in their predilection to litigate the knotty procedural and evidentiary issues raised by the Government's prosecution of this case. This litigation has only begat more and more litigation and the perennial promise that "just one more" filing or explanation or hearing

---

[1] As discussed below, this Order also resolves Defendants' Motions for Bill of Particulars (Doc. # 182) and Defendants' Motions for Disclosure of Grand Jury Colloquy and Instructions (Doc. ## 379 and 382).

will—finally—simplify matters. The parties have finally forced the Court's hand, and it must end this downward spiral of quasi-self-perpetuating litigation and get this case back on track. It is time to give the Defendants—and the alleged victims of their crimes—their day in court. Our Constitution commands that trials occur in a reasonably expeditious fashion, for very good reason:

> The public is concerned with the effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. Just as delay may impair the ability of the accused to defend himself, so it may reduce the capacity of the government to prove its case. Moreover, while awaiting trial, an accused who is at large may become a fugitive from justice or commit other criminal acts. And the greater the lapse of time between commission of an offense and the conviction of the offender, the less the deterrent value of his conviction.

*Dickey v. Florida*, 398 U.S. 30, 42 (1970) (Brennan, J., concurring).

Pursuant to Fed. R. Crim. P. 14(a), the Court finds that a separate trial of only the individual CSA counts, *i.e.*, Counts 28 through 65 of the Second Superseding Indictment, is both necessary and appropriate in order to avoid prejudice to the Defendants and to ensure justice in this case. The Government has assured the Court that "the gravamen of the entire indictment, every charge in the indictment is the illicit and illegal prescription of controlled substances." (Doc. # 183-1 at 12.) Trying the CSA Counts first—and separately—presents the most viable solution to cut through the indictment's needless complexity and move this case forward, because Defendants have been on notice since the original indictment about the nature of these relatively straightforward charges. Additionally, the universe of evidence that the Government seeks to rely upon in presenting these counts has remained (relatively) constant since this case was filed.

The Court does not exercise this discretion lightly, and employs bifurcation only as a "solution of last resort." Had the parties resolved the needless (and significant) problems with the various iterations of the indictment sooner, this case would have been tried precisely as the Government envisioned it, with the speed that justice requires—for both Defendants and for their alleged victims. However, what's past is prologue,[2] and, given this case's tortured past, the Court concludes that bifurcation now represents the only path forward.

## I. **BACKGROUND**

This criminal case was filed in 2011. Lamentably, three years, many status conferences and hundreds of pages of briefing later, it remains pending. After two and a half years of litigation regarding the infirmities of the original Indictment and Superseding Indictment, on August 26, 2014, the Government filed the Second Superseding Indictment ("SSI") which is now the operative pleading in this case. The SSI, which contains 65 counts, alleges that Defendants committed four broad categories of crimes: (1) Counts 2-17 allege specific instances of health care fraud perpetrated by the Defendants (including five additional counts from those alleged in the Superseding Indictment); (2) Counts 18-27 allege specific instances when the Defendants laundered money; and (3) Counts 28-65 allege specific instances of distribution of controlled substances in violation of the Controlled Substances Act (CSA), including for dispensing or distribution of controlled substances resulting in death

---

[2] William Shakespeare, The Tempest, 2.1 (1623).

of four patients.  (Doc. # 365.)  In addition, Count 1, a new count, alleges a wide-ranging conspiracy to commit health care fraud, launder money, and violate the CSA.  (*Id.*)

The core narrative of the Government's case is relatively simple to understand: Defendants, both doctors, allegedly used their medical licenses to contribute to the epidemic of prescription drug abuse that is a scourge of rural communities across the United States.  There are laws that punish doctors who engage in such behavior, and our Constitution provides that a jury will ultimately determine whether Defendants' alleged actions rise to the level of criminal culpability.

What has prevented these important questions from being presented to a jury, however, is the complicated and constantly changing manner in which the Government has linked the alleged actions of the Defendants to specific violations of federal criminal law.

This Second Superseding Indictment—and the process that led to its creation—presents a casebook-ready example of what Judge Richard Posner might call "legal hyperthropy."  As relevant here, hyperthropy denotes a structure or activity that has grown far beyond any apparent functional need.  *See* Richard A. Posner, *The Bluebook Blues*, 120 Yale L.J. 850, 851 (2011) (decrying hyperthropy in the development of the Bluebook legal citation system).

This case tracks a similar hyperthropic progression in the types of allegations advanced by the Government.  To be sure, parts of the SSI serve the specific and necessary purpose of articulating what the Government alleges the Defendants did wrong, *i.e.*, it provides instances of specific conduct and explains that this conduct was

illegal. For example, Count 28 of the SSI alleges that on or about April 12, 2007, Defendant Jahani dispensed a specific controlled substance to a specific alleged patient and that this was for no legitimate medical purpose. (Doc. # 365 at 30-31.) Those concrete acts present a firm target that can be litigated between the parties: either this particular instance of drug distribution was for a legitimate medical purpose or it was not. In total, there are 38 charges that are similar to this one and they have essentially remained the same since government first indicted Defendants in 2011.

Nevertheless, despite much pleading for clarity (both from Defendants and the Court), the indictment's continuing evolution has only further muddied the waters. The basic wrongful conduct allegedly perpetrated by the Defendants remains relatively constant, *i.e.*, that they provided prescriptions for no legitimate medical purpose. What complicates this case is the Government's position that if a doctor prescribes a controlled substance to someone he knows has no legitimate need of it, bills an insurance company (or government program) for the prescription, and then deposits the proceeds from that transaction in a bank, that doctor (1) violates the CSA for providing the prescription; (2) commits health care fraud by billing it; (3) engages in money laundering, and (4) engages in a conspiracy to do all of the above things.

In the Second Superseding Indictment, working from the base of the 38 CSA charges, the Government has added **some** corresponding health care fraud counts and has further linked these fraud counts to money laundering. In the First Superseding Indictment every health care fraud count referenced in the indictment had a

corresponding CSA count. In the Second Superseding Indictment, however, some—but not all—of the CSA counts are linked to a health care fraud count, and the Government alleges that some of the proceeds derived from these funds constitute money laundering.[3]

As a matter of logic, each of the inter-related counts should rise or fall together, based on the jury's determination of the legitimacy of the prescription relating thereto. In other words, if a patient had a real, medical need for the drug at issue, it would be logically inconsistent to acquit either Jahani or Peper on the CSA count for prescribing it to that patient, but then find him guilty of fraudulently billing the relevant insurance company or laundering the proceeds of the bill. In this respect, the CSA charges can be analogized to the very first domino in a longer row of dominoes, whereas the health care fraud counts and money laundering counts represent successive dominoes which cannot fall if the CSA counts are unsuccessful. Indeed, when this Court pressed the point as to why it was necessary to charge both a CSA count and a money laundering count—and how it would be permissible to obtain an acquittal on the former and a conviction on the latter—the Government was able to state only that such a conviction would survive because "inconsistent verdicts are considered legal verdicts. So the jury could find them—find inconsistent verdicts."[4]  (Doc. # 321 at 8.)

---

[3] As discussed below, the Court understands that some of the health care fraud counts do not implicate solely the illegal distribution of prescriptions: for example, defendants are also alleged to have engaged in "upcoding."

[4] The Court acknowledges that in *Dunn v. United States*, 284 U.S. 390 (1932), and *United States v. Powell*, 469 U.S. 57, 66 (1984), the Supreme Court held that inconsistent verdicts are permissible. It also acknowledges that the Government may well be able to bring a successful conspiracy charge (*e.g.*, conspiracy to dispense or distribute controlled substances) without

6

Adding to this confusion, the Government has frequently suggested that, in proving the health care fraud counts, it is able to introduce evidence of acts committed by the defendants that are (perhaps still) unreferenced in the Indictment.  The number of these so-called "uncharged" acts has changed dramatically over time, such that it has been necessary to refer to more and more papers extrinsic to the indictment to determine how the Government might prove its case.  In August of 2012, the Government filed a "Notice" regarding the scope of its evidence of health care fraud, stating that the acts it alleged in the Health Care Fraud portion of the indictment were "indicative, **but not an inclusive list**, of acts in execution of the overarching scheme to defraud charged in the Indictment." (Doc. # 173 at 3) (emphasis added).  Specifically, it informed the Court and the Defendants that it intended to present evidence regarding "**approximately 262 additional . . . patients**" who were not mentioned in the Indictment.  Additionally, it was unwilling to provide a firm number as to the scope of this evidence, and stated that it "may add or subtract names to this list as further investigation or defense discovery dictates." (*Id.* at 5) (emphasis added).

The Government has only continued to change these numbers and to equivocate about the size of this universe of uncharged patients.  For example, in August of 2013, the Government indicated it would discuss 38 uncharged patient names "substantively," (Doc. #267), while in November of 2013, it indicated it would discuss fifty charged **and** non-charged patients "substantively"  (Doc. # 284) – leaving Defendants to guess if additional patients would be discussed "non-substantively."  Finally, in June 2014, with

---

proving the substantive offense (*i.e.*, actually dispensing or distributing controlled substances). *See United States v. Cornelius*, 696 F.3d 1307, 1317 (10th Cir. 2012).

additional prompting by this Court to specifically and finally identify which unreferenced patients the Government intended to discuss at trial, the Government revealed that it would discuss testimony from **eleven unreferenced patients**, along with testimony from a number of pharmacists and other professionals who would provide anecdotal evidence related to other patients who were treated by Defendants. (Doc. # 347 at 6-12.) However, the SSI now contains references to **several (but not all)** of these uncharged eleven patients in its brand new conspiracy count.[5]

In addition to repeatedly equivocating regarding which patients the Government would present at trial, the Government has continued to vacillate regarding exactly **how** it plans to prove the health care fraud charges at trial. Specifically, Subpart C of the original and superseding indictment described 13 different (and generic) "manner and means" for committing health care fraud (including, for example, "upcoding" for a higher rate of insurance reimbursement, prescribing controlled substances in a manner inconsistent with the usual course of professional practice and for other than a legitimate medical purpose, or requiring patients to pay for unnecessary follow-up visits). However, the Government did not specify **which** of these 13 manner and means applied in a particular charge of health care fraud listed in Subpart D. For example, Count One referenced Defendant Jahani; Patient "K.G."; and the date June 20, 2008 –

---

[5] *Compare, e.g.*, (Doc. # 347 at 9 (describing "Patient I.C." as one of the "Patients Whose Treatment is Not Specifically Charged in the CSA Counts," and stating that "In 2009, at age 20, I.C. was a patient of Peper. Peper prescribed controlled substances. I.C. overdosed on prescription medication in 2009. I.C. and his girlfriend illegally sold Oxycontin prescribed by Peper to other abusers")) *with* (Doc. # 347 at 16 (listing I.C. in a table with "overt acts in furtherance of the conspiracy," and describing him as one of the patients to whom Jahani and Peper are alleged to have "engaged in the dispensing or prescribing of . . . controlled substances."))

8

but it was impossible to tell from the face of the indictment **precisely how** Jahani allegedly broke the law with regards to Patient K.G. in June of 2008—for instance, by engaging in "upcoding," by prescribing medication outside the usual course of medical practice, by requiring a patient to pay for a follow up business as a condition of receiving more medication, or something else entirely. Defendants argued that as a result of this ambiguity, they were forced to prepare defenses for 143 different possible charges (*i.e.*, 13 manner and means multiplied by 11 actual instances of executing the scheme). (Doc. # 182 at 11.) This preparation was on top of reviewing literally millions of pages worth of discovery. (Doc. # 185 at 5.)

      The Government sought to remedy these problems through the Second Superseding indictment. In describing what the SSI would do, the Government stated that "[t]hough **a charge** will change, the scope of this case and the Government's proof will remain the same as it was when the case was initially filed." (Doc. # 355 at 1-2, emphasis added). In reality, although the SSI does dismiss some counts, it adds **six** new charges – not just one. Additionally, far from maintaining the scope of this case and the evidence which might (or might not) be used to try it, one of these charges is a wide-ranging conspiracy with twenty pages of mostly new allegations.

      Unfortunately, rather than clarify matters, the SSI exacerbates all of the problems outlined above. Now, each individual CSA charge from the First Superseding Indictment is implicated among a number of additional charges in the Conspiracy count of the SSI. However, the Government does not explain how the evidence in support of the conspiracy charge specifically relates to the other charges; it merely incorporates

9

the allegations contained in the conspiracy charge by reference, along with additional allegations, leaving the Defendants to guess how the health care fraud and money laundering charges will be proven with the conspiracy-related evidence.

Moreover, although the SSI appears to include some evidence unreferenced in the indictment, it also brings a surfeit of new charges, wholly unreferenced in any prior iteration of the Government's indictment. Thus, Defendants are faced with a new universe of evidence and facts that they will need to investigate in preparation for trial. Additionally, the SSI exponentially expands the different variations of actions that could yield criminal liability. Whereas in the prior indictment there was a 13 x 11 problem, the addition of the wide-ranging conspiracy count outlined in Count 1 of the SSI expands to encompass 18 "manners and means,"[6] 152 "overt acts," and an entirely new section with "financial expenses," including an extensive list of Defendants' loans and credit card payments. All of these issues would require litigation and resolution well in advance of trial. This litigation will only cause further delay – delay which could have been avoided had the Indictment (or the Superseding Indictment, filed six months later), been crafted in a more straightforward fashion.

Even beyond these extensive problems, the SSI's appearance at this late stage in the process has opened up an entirely new font of litigation—whether to have disclosure of grand jury information related to the issuance of the SSI. *See* (Doc.

---

[6] Although there are nine "manners and means" listed in the SSI, one of these nine "manners and means" is broken into six subparts, and another is broken into five subparts; accordingly, the Court has counted these subparts separately so as to do an "apples to apples" comparison with the Superseding Indictment. *Compare*, (Doc. # 84 at 14-16 (providing 13 manners and means)) *with* (Doc. # 365 at 11-13 (providing nine manners and means, including two with five and six subparts)).

## 379 and 382.) The Defendants' Motions argue the Government's must disclose additional grand jury materials because, in its view, (1) the grand jury was improperly used for the primary purpose of preparing for trial; and (2) the Government misled the grand jury on critical elements of the offenses. (Doc. # 379 at 4-5.)

## II. **LEGAL STANDARD**

As both parties acknowledge, the Government has broad discretion to initiate and conduct criminal prosecutions. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Schneider*, 594 F.3d 1219, 1226 (10th Cir. 2010) (acknowledging the "authority of the executive branch to design a criminal prosecution in the way it deems most prudent"). Additionally, the United States Attorney is solely responsible for deciding what federal charges to present and how to present them. *See United States v. LaBonte*, 520 U.S. 751, 762 (1997) (describing the "discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect").

Under Fed. R. Crim. P. 8(a), "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." As stated by the Tenth Circuit, in a case in which the defendant was charged with 180 counts of mail fraud, "it is fundamental that charges may be joined in one indictment where they arise from the same or continuing act or transaction and are of the same or similar character,

thus coming together to constitute parts of a common scheme." *United States v. Shelton*, 736 F.2d 1397, 1409 (10th Cir. 1984).

However, "even in the absence of a misjoinder under Rule 8(a), the court may order the separate trials of counts '[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses.'" *United States v. Hollis*, 971 F.2d 1441, 1456 (10th Cir. 1992) (quoting Fed. R. Crim. P. 14). In addition to the prejudice to the defendant resulting from joinder, severance may be ordered based at least in part on "logistical concerns" in the management of complex cases. *United States v. Kennedy*, 819 F. Supp. 1510, 1515 (D. Colo. 1993) (collecting cases). Ultimately, severance is a matter left to the trial court's "very broad" discretion. *United States v. Wiseman*, 172 F.3d 1196, 1211 (10th Cir. 1999) (citation omitted); *see also Zafiro v. United States*, 506 U.S. 534, 541 (1993) ("Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts."). The power of district courts to manage their dockets is "deeply ingrained" in Tenth Circuit jurisprudence. *United States v. Schneider*, 594 F.3d 1219, 1226 (10th Cir. 2010).

"'Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' [of evidence pertaining to certain other charges] is sufficient to warrant severance.'" *United States v. Bailey*, 952 F.2d 363, 365 (10th Cir. 1991) (quoting *United States v. Cardall*, 885 F.2d 656, 667-68 (10th Cir. 1989)). A defendant must make a showing of real prejudice, and must demonstrate that any prejudice he would suffer would outweigh the expense and

inconvenience of separate trials. *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994).

Nevertheless, a district court has a duty under Rule 14 to "vigilantly monitor for developing unfairness and [the court] should not hesitate to order severance at any point after indictment if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide. . . . [and] the district court is peculiarly qualified to discharge this function." *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994); *see also United States v. Turner*, 93 F.3d 276, 284 (7th Cir. 1996) (noting that the risk of unfairness is elevated where the joinder of two or more offenses is predicated on their "same or similar character," and that "district courts should be especially watchful for possible jury confusion, illegitimate cumulation of evidence or other sources of prejudice not worth the reduced efficiency gains of a joint trial."); *Schaffer v. United States*, 362 U.S. 511, 516 (1960) (noting that "the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.")

### III.  **ANALYSIS**

The Court recognizes that it is the sacrosanct province of the prosecutor to determine what charges to bring and how to craft its indictment. If the new charges now alleged in the Second Superseding Indictment had been in the original indictment or, even in the Superseding Indictment, the Court would not be so concerned. But such is not the case: more than three years have passed since the original indictment was issued and this Court it is deeply concerned that if it does not bifurcate the trial of the

counts, the trial in this case will be unduly delayed and Defendants' constitutional right to a speedy and just trial will be denied.

The Second Superseding Indictment is confusing to this Court. If it is confusing to the Court, it will certainly be confusing to jurors. As the number of counts in an indictment increases, "it is obvious" that the resulting complex trial record makes it more difficult for a jury to keep straight the specific evidence and charges against each defendant. *United States v. Branker*, 395 F.2d 881, 887–88 (2d Cir. 1968). Even before the new conspiracy count was added to the SSI, the Government estimated that, given the sheer magnitude of evidence it would proffer, this case would take five months to try from start to finish.[7] The 38 CSA counts alone will require the Government to present hundreds of exhibits and many hours of testimony. These counts will also require the jury to examine a vast quantity of complex medical evidence and, in so doing, determine (1) the causation of four deaths, and (2) whether drugs were prescribed to almost fifty different patients for a legitimate medical purpose. Juries are certainly capable of listening carefully, sorting through evidence and following instructions; however, asking the jury to simultaneously consider the somewhat-related (but discrete) factual issues implicated by the 27 remaining counts of money laundering, health care fraud, and a large overarching conspiracy would be a Herculean task for

---

[7] In *United States v. Gallo*, 668 F. Supp. 736, 754 (E.D.N.Y. 1987), Judge Weinstein described the significant hardships that jurors face in months-long trials: "[Jurors] are removed from their normal lives for inordinate stretches of time, and are subjected to an alien and often confusing system. They must sit stoically and silently for hours every day, day after day. They must absorb vast quantities of information, try to keep it in order, and evaluate its credibility and probative value. They must also perform the 'mental gymnastics' . . . of properly considering the various permutations of the many limiting instructions they are given."

even the most dedicated of our citizens.  It would also unnecessarily complicate and potentially confuse the "threshold" CSA determination, which this Court believes to be critical to resolution of the remaining counts.[8]  The evidence used to prove money laundering is the same as, or similar to, the evidence relevant to prove the fraud charges – *e.g.*, Dr. Jahani's billing, financial recordkeeping, bank statements, and other financial matters.  However, this evidence would have little to no probative value as to the CSA counts.  Trying the "gravamen" of the government's case first, *i.e.*, the CSA counts, will greatly reduce the overall volume of evidence, which will in turn result in less confusion of the jurors with respect to the CSA counts.  It will also reduce the very real possibility of two important kinds of prejudice: the possibility that the jury cumulates evidence of the separate crimes, and the possibility that the jury improperly infers a criminal disposition and treats the inference as evidence of guilt.  *See Blunt v. United States*, 404 F.2d 1283, 1288 (D.C. Cir. 1968).

      Notably, the CSA counts are the most serious charges being alleged against Jahani and Peper.  If the government is successful in convicting the Defendants on one of the death counts, the Defendants would be facing a sentence of twenty years to life imprisonment.  A conviction on any "non-death" controlled substance count carries a potential 20-year prison sentence.  21 U.S.C. § 841(b)(1)(C).  Thus, depending on the jury's verdict, the remaining claims may evanesce, depending on what the Government chooses to do after the first trial.

---

[8] As stated above, the Court recognizes that the CSA determination may not be completely dispositive for determination of the remaining counts.  Nevertheless, a finding on the CSA counts has the potential to significantly streamline another, later trial.

Additionally, the brand new conspiracy count in the indictment and many of the other current issues being litigated, including the grand jury issue and the confusing nature of the Second Superseding Indictment's conspiracy charge – all which must be resolved before trial – will only further delay the date that trial can finally commence. *See Barker v. Wingo*, 407 U.S. 514, 532 (1972) ("the inability of a defendant adequately to prepare his case skews the fairness of the entire system"); *United States v. Cone*, 310 F. App'x 212, 216 (10th Cir. 2008) (noting that delays in trial "approaching one year generally satisfy the requirement of presumptive prejudice," one of the components of a speedy trial violation).  Such concerns are further compounded by the fact that defense counsel will now require significant time to prepare for a brand new, far-reaching conspiracy count, which could involve interviewing hundreds of brand new people and reviewing significant quantities of evidence.

The Court remains mindful that there are certain efficiencies that a trial on all of the issues could provide.  Nevertheless, such efficiencies are not adequate to justify such a trial here, particularly due to the very different types of evidence needed to prove the counts (*i.e.*, medical versus financial evidence), the fact that the resolution of the CSA counts might well narrow the issues and lead to efficiency gains (regardless of whether the Defendants are found guilty), and the prejudice Defendants will undoubtedly face if they are tried in a single proceeding—particularly given the continuing problems with notice of the charges and the brand new wide-ranging conspiracy count in the SSI.

Notwithstanding the significant, additional delay (already on top of these three-plus years) that would be required to litigate the new (and remaining) issues with the SSI, there is also the matter of the Court's management of an unwieldy docket. This Court has hundreds of cases pending before it, each with parties that deserve to have their matters resolved expeditiously and efficiently. *See United States v. Gallo*, 668 F. Supp. 736, 755 (E.D.N.Y. 1987) (noting that multi-month cases require a judge to "adjourn the remainder of his or her civil and criminal calendars for an indefinite and protracted period of time. The effect under the individual calendar system is ruinous. The already overburdened docket of the court reaches a breaking point, and the administration of justice in all of the court's cases is unconscionably delayed. The judge effectively presides over a one-case court. Where the judge decides to sever the trial, the court is left with much greater flexibility to administer both that and other cases. The calendar is more easily adjusted and controlled, conflicts are more readily reconciled, and some normalcy remains as to the rest of the court's docket.")

The Court has done all it can to get this case on track without bifurcation, and has thoroughly considered any other options. Exercising its discretion, it has decided that, at this point, justice requires that Counts 28-65 of the Second Superseding Indictment (the CSA Counts) be tried separately from the other counts in the Second Superseding Indictment and that they be tried first. The Court takes this step to avoid unfair prejudice to the Defendants and to bring under control what has become an unmanageable and excessively delayed criminal proceeding.

## IV. **CONCLUSION**

Based on the foregoing, it is ORDERED that

1. Defendants' Motion to Sever all 21 U.S.C. § 841 Counts (Doc. ## 287 and 280) are GRANTED to the extent set forth in this Order.

2. Defendants' other Motions for Severance (Doc. ## 180, 185) are DENIED.

3. Defendants' Motions for Bill of Particulars (Doc. # 182) is DENIED without prejudice.

4. Defendants' Motions for Disclosure of Grand Jury Colloquy and Instructions (Doc. ## 379 and 382) are DENIED without prejudice.

Additionally, the parties shall call Chambers and set this matter for a status conference.

DATED: November 25, 2014

BY THE COURT:

*[signature]*

CHRISTINE M. ARGUELLO
United States District Judge